**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AON PLC, AON CORPORATION, and AON FAC, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ALLIANT INSURANCE SERVICES, INC., LOUIS AMBRIANO, NICHOLAS AMBRIANO, JUAN APONTE, OWEN BUSCAGLIA, ANDREW MASSE, RACHEL MCALLISTER, CHRISTOPHER MEDLICOTT, MICHAEL O'BRIEN, and ROBERT OSBORNE, <br><br> Defendants. | Case No.  23-cv-03044 |

## PLAINTIFFS' VERIFIED COMPLAINT

Plaintiffs Aon plc, Aon Corporation, and Aon Fac, Inc. (collectively, "Aon"), by and through their undersigned counsel, Littler Mendelson, P.C., complain of the wrongful actions of Aon's former leader of its U.S. Facultative Reinsurance group within its global Reinsurance Solutions business ("Facultative Reinsurance group"), Nicholas Ambriano ("N. Ambriano"), and other former senior leaders and key employees in that same business, Louis Ambriano ("L. Ambriano"), Juan Aponte ("Aponte"), Owen Buscaglia ("Buscaglia"), Andrew Masse ("Masse"), Rachel McAllister ("McAllister"), Christopher Medlicott ("Medlicott"), Michael O'Brien ("O'Brien"), and Robert Osborne ("Osborne") (collectively, the "Former Employees"), along with their new employer, Alliant Insurance Services, Inc. ("Alliant") (the Former Employees and Alliant are collectively referred to herein as "Defendants").

Beginning on April 19, 2023, Defendants executed a premeditated unlawful raid on Aon's Facultative Reinsurance group, taking 26 Aon employees, business from Aon's top U.S. facultative reinsurance clients, and Aon confidential and trade secret information. Using Alliant's illicit playbook,

Defendants' conduct was (and is) aimed at attempting to steal Aon's U.S. facultative reinsurance broking business to gain entry into the reinsurance market and jumpstart the launch of Alliant Re, Alliant's own reinsurance division and a new Aon competitor in the facultative reinsurance broking industry.

To be clear: prior to the raid, Alliant did **not** have a reinsurance division and did **not** compete in the reinsurance broking industry. Then, on April 25, 2023, Alliant announced its abrupt entry into the reinsurance brokerage market with "Alliant Re" and "Reinsurance Solutions," boasting that "Alliant Re is committed to providing our reinsurance clients with a consistent competitive advantage, with **unparalleled industry knowledge** and **technical underwriting expertise** to vet your risks exposure, analyze loss data and negotiate **favorable retention levels, pricing, coverage terms and conditions**."[1] Alliant Re's "industry knowledge" of "favorable retention levels, pricing, coverage terms and conditions" as well as the "reinsurance clients" advertised in Alliant's announcement were exclusively obtained by the Former Employees on behalf of Aon, by virtue of their employment at Aon, and at Aon's expense. Defendants even stole Aon's branding, now referring to themselves as "Reinsurance Solutions" at Alliant Re – the same way Aon describes its own reinsurance business as "Reinsurance Solutions," of which the Former Employees only days prior were a critical part.

Further, in blatant disregard for the Former Employees' confidentiality, non-solicitation, and non-servicing obligations to Aon, Alliant openly touts the Former Employees' industry relationships, which were developed at Aon, using Aon information, and at Aon's expense, stating that Alliant takes "pride in our commitment to building and maintaining strong insurer and reinsurer relationships. **For decades, our team of leading reinsurance brokers has cultivated industry relationships and built a foundation of trust which is at the root of every reinsurance deal**." (Emphasis added.)

---

[1] https://www.alliant.com/reinsurance/ (last visited May 8, 2023) (emphasis added).

Indeed, the Former Employees are actively and openly breaching their covenants, on Alliant's behalf and with Alliant's clear encouragement, by soliciting and servicing their former Aon clients. Defendants are also continuing to wrongfully attempt to poach key Aon reinsurance employees as of the time of the filing of this Verified Complaint.

For these reasons, and others, Aon files this Verified Complaint, and alleges as follows:

## **INTRODUCTION**

1.      Until recently, the Former Employees were trusted senior leaders and key employees in Aon's Facultative Reinsurance group. The events forming the basis of this lawsuit demonstrate that Aon's trust was woefully misplaced. The Former Employees misused their positions at Aon to, with Alliant's encouragement and direction, covertly orchestrate the raiding of 26 Aon employees, Aon's top U.S. facultative reinsurance clients, and Aon's confidential and trade secret information to form a new competing business – Alliant Re. Defendants did so in deliberate disregard of the Former Employees' contractual duties and fiduciary obligations to Aon and with an intent to interfere with Aon's business.

2.      As of approximately three weeks ago, on April 25, Alliant publicly announced the launch of Alliant Re – it's new facultative reinsurance broking business staffed, almost exclusively, with Aon's former employees – to actively compete against Aon in the business of facultative reinsurance broking. Alliant's intention was never to compete fairly. Instead, it conspired with the Former Employees to unlawfully appropriate from the inside-out what Aon assembled at great effort and expense over many years. Indeed, Aon's Facultative Reinsurance group is comprised of three different sub-groups: (a) casualty; (b) property; and (c) facilities. To date, Alliant has poached approximately 32% of Aon's Facultative Reinsurance group, including attacking Aon's facultative casualty group at all levels (Alliant took 18 of the 25 Aon employees in this group). Alliant also took

Aon's entire property team in Chicago, Illinois (5 employees; plus 1 additional employee in New York). Alliant also took two (2) reinsurance Client Service Advocates who serviced these groups.

3.      Defendants took elaborate steps to cover their tracks throughout, seeking to hide their coordination and disloyal acts from discovery. They were at least partially unsuccessful based on the facts Aon uncovered to date, and Aon's investigation is still underway. And the circumstances leave little doubt as to the nature of much of the wrongdoing. Indeed, Defendants were not subtle in coordinating the near simultaneous resignations of the 26 Aon employees (who all resigned in a matter of a week, "effective immediately"). In fact, **Medlicott**, **O'Brien**, and **N. Ambriano** resigned, "effectively immediately," within a matter of **hours** of each other on April 19, 2023, and by the next business day, industry publications were already reporting their hirings at Alliant.

4.      Alliant Re would not exist but for Defendants' theft of Aon's employees, clients, and information that Aon developed over decades. What's more, the timing of the resignations between April 19-25 – just days prior to May 1 renewals – is not coincidental.[2] To the contrary, it was intentionally calculated to inflict maximum harm on Aon – who it knew would be focusing on picking up the pieces after the sudden mass group resignation – so that Aon would be forced to expend considerable cost and effort to re-establish its operations to meet impending renewal dates, including May 1 renewal deadlines in the fast-paced reinsurance broking business, where placements often need to be made within days of the first of the month renewals.

5.      Part and parcel of Defendants' calculated scheme, numerous of the Former Employees pilfered highly confidential Aon information on the eve of their resignations (and in some

---

[2] Defendants show no signs of ceasing their raid on the Facultative Reinsurance group as another Client Service Advocate resigned on May 4, 2023. Alliant also aggressively recruited another Aon leader in the Facultative Reinsurance group. In addition, Aon continues to receive nearly daily notices of attempts by the Former Employees (on behalf of Alliant) to move business from Aon to Alliant.

instances, on the same exact day). For example, **Masse** sent client renewal information to his personal email mere days before he resigned. Numerous of the Former Employees also suspiciously accessed highly confidential and trade secret information immediately before resigning, when they plainly had no justifiable business reason to do so. Aon expects discovery will reveal that the Former Employees instructed and facilitated other defecting employees to do the same.

6.     In addition, immediately upon joining Alliant, including in some cases the day after they resigned from Aon, the Former Employees started directly targeting and soliciting Aon's top facultative reinsurance clients, including those (again, not coincidentally) with impending renewal dates (including May 1 renewals).

7.     This is far from fair competition. To the contrary, this case represents a new chapter in Alliant's unlawful playbook (the "Playbook") – namely, the acquisition of an entirely new line of business for which Alliant did not previously have the capabilities, staffing, or clients through an illicit corporate lift-out.

8.     Per Alliant's illegal Playbook, Alliant engages in corporate raids on its competitor's officers, employees, and clients in order to grow its business by corporate piracy based on the calculated risk that stealing business for itself and paying a litigation settlement or judgment is significantly less expensive to Alliant and its investors than a fair corporate acquisition. Alliant provides the employee-targets of its raids with indemnification for lawsuits from prior employers, along with significant salary guarantees for a period of two to three years (knowing that it and the former employees will be sued). Alliant and its private equity investor call this illegal Playbook their "leveraged hiring strategy," but in reality it is just a calculated assessment that the profitable ends justify any means, even if it involves causing employees to breach their agreements and obligations and stealing their competitor's confidential information, good will, hard work and investment.

9.     While secretly scheming with competitor employees to execute the raid, Alliant and its counsel also create a façade of compliance measures designed to lure its competitors into a false sense of security, including having the new hires make false representations that they will purportedly abide by their covenants in order to protect the competitor's (here, Aon's) information. Alliant also purports to retain a "forensic expert" to remove competitor (here, Aon) information from the Former Employees' email accounts – which in reality is just an excuse for Alliant's counsel to rummage through competitor confidential and trade secret information. As set forth below, these purported "compliance" measures are a complete and utter sham, as the Delaware Chancery Court observed in *Mountain West Series of Lockton Companies, LLC v. Alliant Insurance Services, Inc.*, No. 2019-0226-JTL, 2019 WL 2536104, at *1 (Del. Ch. June 20, 2019).

10.     Alliant has executed its Playbook time and again, despite being sued multiple times in multiple locations across the country for unlawfully targeting competitor employees. *See, e.g., Aon PLC v. Heffernan*, No. 1:16-cv-1924 (N.D. Ill. Feb. 3, 2016); *Willis of Mass., Inc. v. Feinberg*, No. 1684-cv-1497 (Mass. Super. Ct., Suffolk Cnty. May 10, 2016); *The Hays Group, Inc. v. Peters*, No. 0:16-cv-023520PJS-FLN (D. Minn. July 7, 2016); *The Hays Corp. v. Peters*, No. 423615v (Cir. Ct. of Md., Montgomery Cnty. Aug. 1, 2016); *Wells Fargo Ins. Servs. USA, Inc. v. Laman*, No. 502016CA009049 (Fla. Cir. Ct., Palm Beach Cnty. Aug. 11, 2016); *Willis of Fla., Inc. v. Powell*, No. 16-CA-007824 (Fla. Cir. Ct., Hillsborough Cnty. Aug. 18, 2016); *Marsh USA Inc. v. Moody*, No. 651325/2017 (N.Y. Sup. Ct., N.Y. Cnty. Mar. 13, 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Alliant Ins. Servs. Inc.*, No. 2017-0540 (Del. Ch. July 26, 2017); *USI, Inc. v. Call*, No. BC 678226 (Cal. Super. Ct., L.A. Cnty. Oct. 2, 2017); *Arthur J. Gallagher & Co. v. Long*, No. 1:17-cv-12313 (D. Mass. Nov. 22, 2017); *Arthur J. Gallagher & Co. v. Kuntz*, No. GD-19-002108 (Ct. Com. Pl. of Pa., Allegheny Cnty. Feb. 8, 2018); *Corporate Synergies Group, LLC v. Andrews et al.*, No. 18-cv-13381 (D.N.J. Aug. 30, 2018); *Mountain West Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. 2019-0226 (Del. Ch. Mar. 22, 2019); *JLT Specialty Ins. Servs. Inc. v. Riccio*, No.

652659/2019 (N.Y. Sup. Ct., N.Y. Cnty. May 6, 2019); *Aon PLC et al. v. Alliant Ins. Servs., Inc.*, et al., No. 1:19-cv-07312 (N.D. Ill. Nov. 5, 2019); *Arthur J. Gallagher & Co. v. Alliant Insurance Services, et al.*, C.A. No. 21-2828 (Ma. Sup. Ct. Dec. 10, 2021); *Aon PLC et al. v. Alliant Ins. Services, Inc., et al.*, C.A. No. 1:21-cv-6871 (N.D. Ill. Dec. 27, 2021).

11.     Most recently, on May 8, 2023, Alliant was sued by a competitor in *Armfield Harrison & Thomas, LLC, et al. v. Brian King, et al.*, No. 2:23-cv-00666 (W.D. Wash. May 8, 2023). The lawsuit describes "Alliant's Growth Strategy" as being "Based on Unfair Competition." The lawsuit alleges that in a meeting between plaintiff and Alliant executives, during which Alliant expressed an interest in purchasing the plaintiff (an idea the plaintiff rejected), Alliant's President, Greg Zimmer, stated that Alliant's growth strategy is supported by what Alliant refers to as "Leveraged Hires." (*Id.*, ¶¶ 31, 32). "These 'Leveraged Hires' are producers Alliant hires from competitors, with the intent that these producers bring clients to Alliant from their former employers." *Id.* The lawsuit alleges that "Zimmer mentioned that Alliant anticipates getting sued for hiring these Leveraged Hires, after which Alliant attempts to strike a deal with the competitor that involves buying the producer's book of business for less than full market value." *Id.*, ¶ 33. "Zimmer mentioned that Alliant also disregards restrictive covenants on the same theory – that it can buy those out to resolve the litigation." *Id.* "Zimmer's comments accurately reflect Alliant's 'growth' strategy. It is a matter of public record that Alliant is regularly a defendant in these cases, having been sued approximately 31 times in the last four or so years." *Id.*, ¶ 34.

12.     What's more, Alliant has a history, pattern, and practice of targeting Aon, specifically. For over a decade, Alliant engaged in multiple raids on Aon's officers, employees, and clients.[3] These repeated raids were designed to: (1) take Aon's trade secrets and confidential information; (2) induce

---

[3] In fact, as discussed *infra*, the two main Alliant employees that orchestrated the raid here, Michael Cusack and Peter Arkley, were former Aon employees themselves.

Aon officers and employees to violate their contracts with Aon by breaching restrictive covenants prohibiting the former Aon employees from soliciting Aon's employees to leave Aon and from taking Aon's clients; and (3) induce those Aon officers and employees to breach their fiduciary duties and duties of loyalty to Aon. *See, e.g., Aon Risk Servs. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct., N.Y. Cnty. Dec. 20, 2011) (detailing "systematic and coordinated raid" by Alliant on Aon's clients and employees, describing Alliant's scheme to "enter into some form of mutually acceptable agreement" with Aon, and noting that Alliant "knew it would be sued for its conduct"), *aff'd* 102 A.D.3d 461 (1st Dept. 2013); *Aon PLC, et al. v. Heffernan, et al.*, No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016) (temporarily restraining Alliant and former employee from soliciting, accepting, or entering into any business relationship with certain Aon clients, as well as from soliciting certain Aon employees); *Aon PLC, et al. v. Alliant Ins. Servs.*, Inc., et al., No. 1:19-cv-07312, Dkt. Nos. 31 & 32 (N.D. Ill. Nov. 25, 2019) (temporarily restraining former employees from directly or indirectly soliciting certain Aon clients, and from utilizing or disclosing Aon's confidential information and trade secrets); *Aon PLC et al. v. Alliant Ins. Services, Inc., et al.*, C.A. No. 1:21-cv-6871 (N.D. Ill. Dec. 27, 2021) (detailing Alliant raid on Aon's Portland office).

13.    The new chapter in Alliant's Playbook executed here – namely, stealing a competitor's employees to gain entry into a ***new*** market – worked exactly as they planned to jumpstart the launch of a new reinsurance business, Alliant Re, without the requisite investment required to develop a reinsurance division through fair and legal means. Indeed:

- The raid was planned well in advance, and was hatched at least as of February 2023 (although other evidence suggests that Alliant's planning may have started earlier, in January 2023, or even much earlier than that).

- Over a **seven (7) day period**, from April 19, 2023 through April 25, 2023, Alliant attempted to gut Aon's Facultative Reinsurance group, taking 25 Aon employees who resigned near simultaneously and "effective immediately." Consistent with Alliant's Playbook (as described further below), it did so by aggressively contacting the Aon employees on their cell phones (information Alliant obtained, upon information and belief, from at least **N. Ambriano**,

**Medlicott**, and **O'Brien**), and giving them until the end of the day to accept Alliant's employment offer (without any prior application for employment, interview, or any other vetting process, indicating Alliant had already received detailed insider information concerning the employees it was targeting, eliminating the need for any further inquiry). Indeed, in his voice message to Buscaglia, Michael Cusack of Alliant stated that Buscaglia came "highly recommended." The assault continues, and another Aon employee recently resigned on May 4 for Alliant.

- In the days leading up to their resignations, the Former Employees accessed some of Aon's most proprietary trade secret data, including client lists with impending renewal information. For example, **Aponte** emailed client lists, renewal information, and confidential financial information to his personal email account. **Masse** likewise emailed renewal information to his personal email account, invaluable information for Alliant to use in soliciting customers on behalf of Alliant.

- Like clockwork, Alliant's long-time counsel then contacted Aon's counsel; claimed it retained a forensic vendor; and stated that Alliant's counsel was reviewing Aon's confidential information taken by the Former Employees using their own review and search parameters. Alliant's counsel also sent Aon's counsel a letter whereby it claimed that the Former Employees are not soliciting Aon clients.

- Yet, despite counsel's representations, within days of their departure, the Former Employees embarked on a mass solicitation campaign, encouraged by Alliant. In fact, days after he resigned from Aon, **Medlicott** traveled to Bermuda to meet with Aon clients on behalf of Alliant – meetings that he set up while employed by Aon, with Aon clients, for Aon's benefit. **Buscaglia** likewise scheduled travel to New York to call on and meet with Aon clients. **Masse** similarly called upon and met with two of Aon's largest facultative reinsurance clients, days after he resigned from Aon, and on behalf of Alliant. Alliant also solicited at least one Aon client on behalf of the Former Employees, sending the client information about Alliant, including a "roster" containing the Former Employees' Alliant email addresses and phone numbers, and telling the client that "time is of the essence" for it to transfer its business. Similarly, through misdirected emails, Aon learned that at least **L. Ambriano**, **Osborne**, **Buscaglia**, and **McAllister** are actively soliciting reinsurance coverage on behalf of some of Aon's largest clients.

- Not surprisingly, in light of Defendants' aggressive solicitation campaign, since the raid, Aon has already started losing business to Alliant (as described further below).

14.     The Former Employees continue to repeatedly breach, and Alliant continues to interfere with, the Former Employees' contractual obligations owed to Aon as of the date of this filing, while also violating the trade secret laws and other common law obligations to Aon. Through their unlawful acts, the Former Employees enabled Alliant's entry into the facultative reinsurance broking industry by quite literally comprising virtually all of Alliant Re's "Reinsurance Solutions" group, while

at the same time directly, intentionally, and maliciously severely damaging Aon's facultative reinsurance broking operations. There is no justification for Defendants' wrongdoing. Defendants must be held accountable for their actions, and enjoined to stop further harm to Aon.

15.     Left unchecked, Alliant will continue to build Alliant Re by unlawfully raiding Aon's remaining employees and clients, and stealing for itself the business that Aon spent many years and untold dollars developing. Defendants' ongoing assault on Aon's facultative reinsurance business has caused, is continuing to cause, and threatens to cause, immediate, irreparable harm to Aon by, among other things:

- Impairing Aon's goodwill and reputation with its clients, employees, and the reinsurance market at large (including its client's reinsurers). Indeed, upon information and belief, part of Alliant's solicitation tactics include falsely asserting, or giving Aon clients the impression, that: "There is going to be no one left"; "Everyone's gone"; and "Aon's going to close down CasFac."

- Destroying Aon's established customer relationships that it has invested years and millions of dollars to build. Indeed, Defendants are actively soliciting and calling upon the same top revenue-generating Aon clients that Aon worked with for many years, wined & dined (at Aon's expense), and dedicated substantial resources to the Former Employees developing these client relationships on behalf of Aon. For example, Aon financed trips, golf outings, sporting event outings, numerous meals, and other relationship-building expenses with the Former Employees and these clients.

- Destroying Aon's employee relationships and disrupting the continuity of Aon's workforce. Indeed, one of the former Aon employees that resigned even expressed the employee's regret in doing so, and stated they had to do so "due to circumstances outside my control." What's more, Alliant is still aggressively soliciting Aon employees to this day using information that, upon information and belief, only the Former Employees could have provided to Alliant. In fact, Alliant's strategy was to first target Aon brokers. And now who are they aggressively targeting? None other than the service employees that worked directly with the Former Employees while they were employed by Aon, who are the key employees who service the clients on a daily basis and directly support the brokers. One such employee just resigned on May 4. This is, again, no coincidence. It is calculated and malicious.

- Threatening the continued disclosure, misuse, and misappropriation of Aon's trade secret, confidential, and proprietary business information, including the identity of the Aon employees with key client relationships, Aon employee compensation information, the identity of the individuals employed by Aon's top clients who make broking decisions, valuable revenue and financial information, client needs/preferences/terms/conditions, renewal dates when clients will need facultative reinsurance, and other proprietary, confidential, and trade

secret information that Alliant has used or will now use to launch its business and compete directly against Aon.

16.     Defendants must be stopped. Otherwise, they present a serious threat to Aon's client relationships, employee relationships, and valuable confidential information and trade secrets. As set forth above and herein, these efforts are underway, ongoing, and continuous. Injunctive relief is critical and necessary based on the long-term client relationships and employee relationships at issue here. Based on Defendants' recent and ongoing solicitations, coupled with Alliant's Playbook, Alliant will continue to unlawfully try to take Aon clients and employees unless and until Defendants are enjoined. Aon's client and business losses are a direct and proximate result of Defendants' unlawful conduct. In other words, any business generated by Alliant Re is solely attributable to Aon's: Former Employees, client relationships, and confidential and trade secret information.

17.     This is not an unreasonable or unprecedented request. Courts, including this Court, have enjoined Alliant for less egregious conduct. *See Cook Maran & Assocs., Inc., v. Scrocca and Alliant Ins. Servs.*, Inc*.,* No. C-209-17 (Super. Ct. of N.J., Bergen Cnty., Sept. 13, 2017) (Order granting preliminary injunctive relief against Alliant); *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 Del. Ch. LEXIS 231, at *70-71, 2019 WL 2536104 (Del. Ch. June 20, 2019) (granting a broad preliminary injunction where Alliant "raided" twenty of a direct competitor's employees holding that "Alliant set out in bad faith on a strategy to induce [plaintiff]'s employees to breach their agreements."); *Aon PLC, et al. v. Heffernan*, et al., No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016) (restraining Alliant and former employee from soliciting, accepting, or entering into any business relationship with certain Aon clients, as well as from soliciting certain Aon employees); *Aon PLC, et al. v. Alliant Ins. Servs., Inc., et al.*, No. 1:19-cv-07312, Dkt. Nos. 31 & 32 (N.D. Ill. Nov. 25, 2019) (restraining former employees from soliciting certain Aon clients, and utilizing or disclosing Aon's confidential information and trade secrets). This Court should likewise recognize Alliant's evolving Playbook for what it is, and bring it to an immediate halt.

**THE PARTIES**

18.     Plaintiff **Aon plc** is an Ireland public limited company. It is the parent company of, among others, Plaintiff Aon Fac, Inc. and Aon Corporation. Aon plc's principal office location in the United States is located in this District, in Chicago, Illinois.

19.     Plaintiff **Aon Corporation** is a Delaware corporation with its principal place of business in Chicago, Illinois.

20.     Plaintiff **Aon Fac, Inc.** is an Illinois corporation with its principal place of business in Chicago, Illinois.

21.     Aon is a leading global professional services firm providing a broad range of conventional and alternative risk management products and services, including (among other things) insurance and reinsurance brokerage services.

22.     Defendant **Alliant Insurance Services, Inc.** is a California Corporation with its principal place of business in California. According to its website, Alliant has three offices in Illinois, including in Chicago. Until approximately three weeks ago, Alliant did not have a reinsurance brokerage division of its business. Now, Aon and Alliant are direct competitors in the reinsurance brokerage industry.

23.     Defendant **Louis Ambriano** ("L. Ambriano") is an adult individual whose permanent home and residence is, upon information and belief, located in New York. L. Ambriano was employed by Aon for **over 19 years**, since 2004. At the time of his resignation, he held the position of Managing Director in Aon's Facultative Reinsurance group, based in New York, New York. As a Managing Director at Aon, L. Ambriano was responsible for building relationships with clients, markets, other Aon employees, and driving innovation and effective solutions in Aon's facultative reinsurance services. L. Ambriano was required to work closely and in collaboration with other team members and clients to develop reinsurance solutions. L. Ambriano was a senior professional responsible for

facultative broking production; developing new business; and developing sales and marketing strategies to cultivate revenue generation opportunities, as well as grow existing client accounts. L. Ambriano also acted as a mentor to broking professionals within the Facultative Reinsurance group. L. Ambriano resigned from Aon on April 20, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to his role at Aon.

24. Defendant **Nicholas Ambriano** ("N. Ambriano") is an adult individual whose permanent home and residence is, upon information and belief, located in New York. N. Ambriano was employed by Aon for **nearly 24 years,** since 1999. At the time of his resignation, he led Aon's Facultative Reinsurance group, and held the position of **Executive Managing Director**, based in New York, New York. N. Ambriano resigned from Aon on April 19, 2023 to work for Alliant, Aon's new direct competitor in the reinsurance space, in a substantially similar position to his role at Aon. Indeed, according to Alliant's own announcement, N. Ambriano joined Alliant as "**Executive** Vice President, **Managing Director**, Alliant Re" the "newly launched reinsurance brokerage division of Alliant." (Emphasis added.) According to Alliant, in this role, N. Ambriano "will build a client-focused reinsurance operation and grow a team of top reinsurance professionals to deliver best-in-class resources and client services in the marketplace." These were his same duties at Aon. According to Alliant: "Nick brings exceptional value and expertise to benefit our clients as we establish Alliant Re as a leading reinsurance brokerage. He has worked in reinsurance for the past 20+ years [i.e., at Aon], most recently overseeing national facultative reinsurance operations for a leading global broker [i.e., Aon], where he showed proven success in managing major facultative reinsurance operations, executive recruiting and handling a book of complex casualty accounts" [i.e., the exact same work Alliant concedes he is now performing for Alliant].

25. Defendant **Juan Aponte** ("Aponte") is an adult individual whose permanent home and residence is, upon information and belief, located in Florida. Aponte was employed by Aon for

**nearly 14 years**, since 2009. At the time of his resignation, Aponte held the position of Managing Director in Aon's Facultative Reinsurance group, based in Miami, Florida. In this role, Aponte had the same duties as L. Ambriano, described above. Aponte resigned from Aon on April 23, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to his role at Aon. According to his LinkedIn profile, his "specialties" include: "[C]ontract negotiation of commercial casualty and program reinsurance business. **Extensive both primary and reinsurance customer profile.**" (Emphasis added.)

26. Defendant **Owen Buscaglia** ("Buscaglia") is an adult individual whose permanent home and residence is, upon information and belief, located in Illinois. At the time of his resignation, he held the position of Associate Director in Aon's Facultative Reinsurance group, based in Chicago, Illinois. In this role, he operated as a casualty facultative broker, working with clients and reinsurers to meet Aon's clients' needs. Buscaglia was responsible for enabling innovation, diagnosing client problems, and providing strategic solutions. Buscaglia resigned from Aon on April 21, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to his role at Aon. According to his LinkedIn profile, Buscaglia is now a casualty facultative broker at Alliant Re.

27. Defendant **Andrew Masse** ("Masse") is an adult individual whose permanent home and residence is, upon information and belief, located in Illinois. Masse was employed by Aon since 2017. At the time of his resignation, he held the position of Senior Managing Director in Aon's Facultative Reinsurance group, based in Chicago, Illinois. In this role, Masse had the same or similar duties to L. Ambriano and Aponte, described above. Masse resigned from Aon on April 19, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to his role at Aon.

28. Defendant **Christopher Medlicott** ("Medlicott") is an adult individual whose permanent home and residence is, upon information and belief, located in New Jersey. Medlicott was employed by Aon for **nearly 10 years**, since 2013. At the time of his resignation, he held the position

14

of Senior Managing Director in Aon's Facultative Reinsurance group, based in New York, New York. In this role, Medlicott had the same or similar duties as Masse, described above. Medlicott resigned from Aon on April 19, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to his role at Aon. According to his LinkedIn profile, he is now a "Senior Vice President" at "Alliant Re"; his "clients" include "multi-national insurance companies"; and he has "[s]trong relationships with insurers, reinsurances, brokers and wholesalers across all disciplines" which provide him with a "unique advantage to provide a vast arsenal of solutions for our clients."

29.     Defendant **Rachel McAllister**[4] ("McAllister") is an adult individual whose permanent home and residence is, upon information and belief, located in New York. McAllister was employed by Aon since 2017. At the time of her resignation, she held the position of Director in Aon's Facultative Reinsurance group, based in New York, New York. In this role, McAllister worked on broking production and placement for Aon clients; producing new business; assisting in the development of sales and marketing strategy; working collaboratively with team members to establish and reinforce relationships with clients and prospects; and developing innovating and efficient client solutions. McAllister resigned from Aon on April 20, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to her role at Aon. According to her LinkedIn profile, she is now an Assistant Vice President at Alliant.

30.     Defendant **Michael O'Brien** ("O'Brien") is an adult individual whose permanent home and residence is, upon information and belief, located in Pennsylvania. O'Brien was employed by Aon **for approximately 26 years**, since 1997. At the time of his resignation, he held the position of Senior Managing Director in Aon's Facultative Reinsurance group, based in Philadelphia, Pennsylvania. In this role, O'Brien had similar job duties and responsibilities as Masse and Medlicott,

---

[4] Rachel McAllister's maiden name is Rachel Sbarbaro.

described above. O'Brien resigned from Aon on April 19, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to his role at Aon. According to his LinkedIn profile, he is now a "Senior Vice President at Alliant Re."

31.     Defendant **Robert Osborne** ("Osborne") is an adult individual whose permanent home and residence is, upon information and belief, located in New Jersey. Osborne was employed by Aon for approximately 9 years, since at least 2014. At the time of his resignation, he held the position of Managing Director in Aon's Facultative Reinsurance group, based in New York, New York. In this role, he had the same or similar duties and responsibilities as L. Ambriano and Aponte, described above. Osborne resigned from Aon on April 20, 2023 to work for Aon's direct competitor, Alliant, in a substantially similar position to his role at Aon.

## JURISDICTION AND VENUE

32.     This Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA"). *See* 28 U.S.C. § 1331. This Court further has supplemental jurisdiction over the others counts in this Complaint because they form part of the same case or controversy as Count I. *See* 28 U.S.C. § 1367(a).

33.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Northern District of Illinois because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district. Indeed, the coordinated raid occurred in Illinois (in part), including the targeting of numerous of Aon's Illinois-based former employees. Venue is also proper in the Northern District of Illinois because, as set forth below, each of the Former Employees consented to venue in the federal court located in Cook County, Illinois in agreements they signed with Aon.

34.     Alliant is subject to personal jurisdiction in Illinois given its continuous contacts with Illinois and purposeful availment of its laws, including, but not limited to, its maintenance of multiple office locations in Illinois.

35. Alliant is also subject to personal jurisdiction in Illinois given its tortious interference with the Former Employees' Illinois agreements in Illinois, and conspiratorial actions the object of which occurred in Illinois. As noted above, and herein, numerous of the former Aon employees who are the subject of Alliant's unlawful raid are located in Illinois.

36. Further, all Defendants are subject to personal jurisdiction in Illinois given that they engaged in wrongful conduct that was directed at Aon, knowing it is located in Illinois, and calculated to harm Aon in Illinois. Aon, whose principal place of business is located within this District (or whose US headquarters is in Illinois, in the case of Aon plc), is damaged and continues to be damaged by Defendants' conduct in Illinois.

37. Personal jurisdiction also exists over the Former Employees because the Former Employees expressly consented to venue and personal jurisdiction in Illinois in agreements they signed with Aon. *See, e.g.,* Restricted Stock Unit Agreements ("RSU Agreements"), attached as **Exhibits 1-9**, ¶ 10(k). Specifically, the Former Employees agreed that "[v]enue for any legal proceedings instituted related to this Agreement will be exclusively in the state and/or federal courts located in Cook County, Illinois." The Former Employees further "knowingly, voluntarily and irrevocably agree[d], consent[ed] and submit[ted]" to the "exclusive jurisdiction and venue" of courts located in Cook County, Illinois.

## BACKGROUND

38. Before April 19, 2023, Alliant did not have a reinsurance brokerage practice. Now it does – Alliant Re – based almost exclusively on Aon employees, confidential and trade secret information, and clients that Aon invested in for decades.

39. As set forth above, the Former Employees worked as brokers in Aon's Facultative Reinsurance group. Reinsurance is the practice through which insurers transfer certain risks to other insurers by agreement, in turn reducing the possibility of paying out a large obligation to the underlying insured and/or otherwise managing their volatility or capital at risk. Put simply, reinsurance is

insurance for insurance companies. The party seeking reinsurance (i.e., the insurance company) is known as the "cedent," and pays premiums to the reinsurer through Aon, as the reinsurance intermediary-broker for the cedent. The reinsurance business is heavily dependent on the use of reinsurance brokers (like Aon), who help their clients – i.e., the cedents and the underlying insureds – secure reinsurance coverage. As such, relationships that are established between reinsurance brokers (such as Aon), cedents, and underlying insureds are integral to Aon's business; and building such relationships takes substantial time, resources, and expertise.

40.     Facultative reinsurance is a specific type of reinsurance purchased by a cedent (with the assistance of a broker, like Aon) for a particular, defined risk or set of risks under a single insurance policy (e.g., the risk of a fire or natural disaster at a specific building the cedent has insured for the underlying insured).

41.     As set forth below, Aon invested heavily in the Former Employees' efforts to foster and nurture these cedent-client relationships, as well as Aon's client relationships with their underlying insureds. Through this investment, the Former Employees established significant business relationships on behalf of Aon. They also obtained confidential information about Aon's reinsurance broking business, Aon's valuable clients, and its employees.

42.     For example, between 2013 and 2022, through Aon's significant investment in its employees in the Facultative Reinsurance group, Aon tripled its U.S. facultative reinsurance business. In 2022 alone, Aon invested: (a) over $15 million in its talent; and (b) over $1 million in travel and entertainment expenses so that the Former Employees and their colleagues could develop client relationships on Aon's behalf. This is proof and point that it is Aon's investment in its employees and clients that makes its business so successful. Alliant stole this business for itself instead of investing the time and funds necessary to develop a reinsurance broking business on its own.

43.     Aon's investment in its client relationships is evident from expense reimbursements

provided to the Former Employees. For example, from January 2022 through their resignation dates, the Former Employees expensed the following to Aon:

**Figure 1**

| Former Employee | Expense Reimbursements |
|---|---|
| Louis Ambriano | **Over $26,000**, including, but not limited to, for "gift for top client," "lunch with [Client A]⁵," "lunch with [Client B]," "lunch with [Client C]," "entertaining clients," "tickets for mets game," "lunch with [Client D]," "lunch with [Client A]," "lunch with [Client E]," and "lunch with [Client F]." |
| Nicholas Ambriano | **Over $35,000**, including, but not limited to, for client meals, gifts, and events for the following clients: Client B, Client C, Client D, Client E, Client G, Client H, and Client I. |
| Juan Aponte | **Over $16,000**, including, but not limited to, for "breakfast," "lunch" and "dinner" with Client B; "lunch," "dinner," and "cocktails" with Client A; "dinner with [Client C]"; "lunch with [Client E]"; and "cocktails," "dinner," and "lunch" with Client G. |
| Owen Buscaglia | **Over $58,000**, including, but not limited to, for "Uber to Lunch – [Client B] Construction"; "[Client D] / Aon Re Team Building Event"; trips to visit [Client D]; "Networking Event with [Client D] – Braves Game"; "Lunch with [Client C]"; "Aon Re/[Client E] Happy Hour"; "[Client E] Construction – end of year client meeting/dinner"; "lunch W [Client J]"; "Networking lunch with [Client J]"; "Uber to Lunch w [Client G]"; "Transportation to Wrigley for [Client K] client event"; and "Networking with [Client I]." |
| Andrew Masse | **Over $58,000,** including, but not limited to, for client events, entertainment, and meals. |
| Rachel McAllister | **Over $13,000**, including, but not limited to, for "client events, entertainment, [and] meals." |
| Christopher Medlicott | **Over $100,000**, including, but not limited to, for "lunch with… [Client D]"; "drinks during ski trip with [Client H], [Client A], [Client L], [Client M]"; "lunch with [Client A]"; "trip to Bermuda to see Professional clients and some casualty…[Client N], [Client M], [Client A], [Client O]"; "ski trip with Bermuda clients, [Client A], [Client L], [Client M], [Client H]"; "dinner with [Client C] …"; "lunch with [Client E] …"; "breakfast with [Client K] …"; drinks and dinner with [Client N]; "lunch with [Client H] to secure new business"; "ski trip with [Client H] …"; and drinks and lunch with [Client I]. |
| Michael O'Brien | **Over $70,000**, including, but not limited to, for "attending [Client B] Rodeo |

---

⁵ Client names are anonymized in this Verified Complaint to protect this client information.

| | |
|---|---|
| | Event"; "[Client B] Houston Trip"; "trip to Pittsburgh to visit [Client E] and [Client D]"; "Golf with [Client D]"; "meeting with [Client C]"; "meeting with [Client G]"; "meeting with [Client H]"; and "meeting with [Client I]." |
| Robert Osborne | **Over $14,000**, including, but not limited to, for "[Client E] lunch"; "[Client J] Lunch"; "[Client P] Lunch"; "[Client M] Dinner"; "[Client C] Lunch"; "Golf Outing"; "[Client P] Outing"; "client/reinsurance ski trip"; and "[Client B] lunch." |

44. As set forth in further detail below, Aon also provided the Former Employees with access to copious amounts of confidential, trade secret, and proprietary information to enable them to service Aon customers and develop Aon's facultative reinsurance client relationships and goodwill.

45. Accordingly, given Aon's substantial time, effort, money, and other resources invested in the Former Employees' relationships with its clients, and that such relationships are crucial to Aon's continued financial success in the reinsurance brokerage industry, Aon has a legitimate interest and need to keep these relationships within Aon if a broker departs for a competitor.

<u>**Former Employees Agree to Clear and Reasonable**</u>
<u>**Post-Employment Restrictions**</u>

46. One of the many ways that Aon invests in its client relationships (cedents and underlying insureds) is by its substantial investment in its reinsurance brokers, including by making substantial payments, benefits, and stock grants to those brokers whose client relationships are crucial to maintaining and building Aon's reinsurance broking practice. For example, the Former Employees were compensated handsomely throughout their employment with Aon. At the time of their resignations, the Former Employees earned generous, six-figure base annual salaries.

47. In addition, separate and apart from their substantial compensation, in an effort to incentivize the Former Employees to stay with Aon, they each were offered and accepted Restricted Stock Units ("RSUs") in Aon in varying amounts. *See* **Exhibits 1-9, ¶ 1**.

48. In return for the RSUs, the Former Employees each agreed to the terms set forth in Aon's RSU Agreements, including the restrictive covenants. The RSU Agreements signed by the

Former Employees are substantially similar in material terms, and are governed by Illinois law with respect to the post-employment restrictions. *See* **Exhibits 1-9.**[6]

49.     At issue here are the post-employment restrictions the Former Employees agreed to abide by following the termination of their employment with Aon. The Former Employees each acknowledged that their "material employment duties and responsibilities" at Aon included the "development and maintenance of personal contacts and relationships with clients and prospective clients." They further acknowledged that Aon "invests considerable time and money to develop and maintain client relationships and referral sources, including payment of employees' salaries, benefits, travel, entertainment and other business expenses" as well as by providing the Former Employees with access to "valuable confidential business and professional information." *See* **Exhibits 1-9, § 9(a)**. As set forth above, Aon's investments here, including the Former Employees' six-figure salaries, stock grants, and generous expense reimbursements, were substantial.

50.     The Former Employees further acknowledged that, while Aon "clients, prospective clients, and referral sources may be secured or serviced by Aon employees, including [the Former Employees], the [Former Employees] acknowledge[] that such clients, prospective clients and referral sources remain at all times the clients… of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon will be the sole beneficiary of such goodwill during and after the termination of the [Former Employee's] employment with Aon." *Id.*

51.     The Former Employees likewise acknowledged that the "personal identification of clients or referral sources of Aon with an Aon employee, including the [Former Employees], creates

---

[6] This Complaint cites the language in the most recent versions of the RSU Agreements signed by the Former Employees. Earlier RSU Agreements, also attached, have slightly different wording than that quoted in this Complaint, but nevertheless have similar terms.

the potential for the [Former Employee's] appropriation of the benefits of the relationships developed with clients and referral sources on behalf of and at the expense of Aon." *Id.* Accordingly, since "Aon would suffer irreparable harm if the [Former Employee] left its employ and solicited the Business of the clients… of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the [Former Employees] for a limited period of time after [the Former Employee] leaves employment **so that Aon may renew or restore its business relationship with its clients, prospective clients, referral sources and employees**." *Id.* (emphasis added). Consequently, the Former Employees acknowledged that they were "willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client, referral sources and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information." *Id.*

52.     Specifically, the Former Employees agreed to the following client non-solicitation provision:

> The [Former Employee] hereby covenants and agrees that, except with the prior written consent of Aon, the [Former Employee] (on the [Former Employee's] own behalf or on behalf of any other person or entity) **will not, during the course of employment, and for a period of two (2) years after the [Former Employee's] Termination Date (the "Restricted Period")… directly or through the direction or control of others: (i) call upon or solicit, any business of the same type or kind as the business performed by Aon from or with respect to a Covered Client; or (ii) accept, engage in, service or perform any business of the same type or kind as the business performed by Aon from or with respect to a Covered Client; or (iii) knowingly engage in any conduct that is intended to cause, or could reasonably be expected to cause a Covered Client to stop or reduce doing business with Aon, or that would involve diverting business opportunities away from Aon.**

> **"Covered Client"** means (i) any client of Aon with respect to whom the [Former Employee] provided services, either alone or with others, or had a business relationship, or on whose account the [Former Employee] worked or became familiar, or supervised directly or through the direction or control of others the servicing activities related to such clients, during the 24 months prior to the [Former Employee's] Termination Date (or such shorter time as [Former Employee] was employed) ("Look Back Period") and, further provided, such clients were clients of

Aon either on the Participant's Termination Date or within 12 months prior to such Termination Date…

**[Former Employee] acknowledges that with respect to Aon's reinsurance business, the foregoing reference to clients shall include all risk protection buyers, cedents and retrocedents (a/k/a reinsureds), and, in respect of facultative reinsurance Business, the original policyholders (a/k/a underlying insureds) and wholesale and retail brokers.** "Solicit" is understood to include any direct or indirect interaction between the [Former Employee] and another person or entity that takes place in an effort to develop or further a business relationship, irrespective of which party first initiates contact, and **expressly includes notifying a client that the [Former Employee] has left Aon's employ to go to a competitor**…

*See* **Exhibits 1-9,** § 9(b) ("Client Non-Solicit") (emphasis added).

53. The Former Employees likewise agreed to the following employee non-solicitation provision:

The [Former Employee] hereby also agrees, for the duration of the Restricted Period, not to, directly or through the direction or control of others: (i) solicit or cause any person or other entity to solicit or induce, any Covered Employee to work for the [Former Employee] or for any third party or entity, or to leave the employ of Aon; (ii) induce, attempt to induce, or cause any person or other entity to induce any Covered Employee to leave the employ of Aon, or on behalf of a competing business, (iii) assist with hiring or attempting to hire any Covered Employee.

"Covered Employee" means any employee of Aon with whom the [Former Employee] had material contact, whom [Former Employee] supervised, or about whom [Former Employee] had access to Confidential Information during the twenty-four (24) months prior to the [Former Employee's] termination of employment….

*See* **Exhibits 1-9, § 9(c)** ("Employee Non-Solicit").

54. Through the RSU Agreements, the Former Employees acknowledged that:

the [above-referenced] covenants . . . are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on [Former Employees] and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition . . . .

*See id*, § 9(f). The Former Employees also acknowledged:

The [Former Employee] acknowledges that the [Former Employee's] services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and

that a breach of [the post-employment covenants] will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon will be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the [Former Employee] (without the need to post any bond or other security)….

*See* **Exhibits 1-9, § 9(g).**

55.     These restrictions are supremely reasonable. Aon has a reputation for expertise in the reinsurance brokerage industry and has developed through great expense significant goodwill embodied in its relationships with its clients. As discussed above, Aon employees invest considerable time – often years – developing and nurturing relationships with Aon's clients and prospects, and Aon invests substantial resources in this endeavor. Therefore, Aon has a legitimate business interest in protecting its client relationships.

56.     The RSU Agreements further recognize that "Aon's Business depends to a significant degree upon the possession of confidential, proprietary, and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon." ***See* Exhibits 1-9, §9(h)(i).** The RSU Agreements specify that Aon's confidential information includes:

> lists of clients and prospective clients; customer lists and records of customers and customer contact information, as well as customer communications, private customer contract terms, unique customer preferences and historical transaction data; contract terms and conditions; private bids, proposals, quotes, requests for proposal, and related analyses; financial records and analysis...; business plans and strategies, forecasts, and analyses; client information relating to services, insurance, benefits programs, employees, finances, and compensation;… corporate, management and business plans and strategies; compensation (unless [Former Employee's] own) and revenues; internal business methods, procedures, techniques, processes, know how, systems and innovations used to improve [Aon's] performance and operations;… unpublished pricing information, and underlying pricing-related variables such as costs, volume discounting options, and profit margins….

*Id.*

57.     Each of the Former Employees had access to (and utilized) all of the above-referenced categories of confidential and trade secret information. By way of non-exhaustive example only, the

Former Employees had access to Aon's proprietary GRiDS ("Global Risk Distribution System") reinsurance placement and processing platform. The system's primary purpose is to facilitate and document the reinsurance placement process (e.g., marketing/quoting/binding, contract requests, document filing) and the directly-related client services (e.g., contract tracking and transmittal, premium, and claims processing). It also has functions relating to finance/budgeting, sales/pipeline management, contact management, entity maintenance, client/reinsurer communications, and management reporting. In the weeks leading up to their departures, numerous of the Former Employees received reports from the GRiDS system with detailed client information, including renewal information. The Former Employees also had access to the above-referenced information outside of the GRiDS system. N. Ambriano, in his role as Executive Managing Director of Aon's Facultative Reinsurance group, and Medlicott and O'Brien (in their senior roles), also had detailed information related to Aon's financials for the group, including revenues, profit margins, financial budgets, spending, strategies, and detailed confidential information concerning each employee in the Facultative Reinsurance group, including their skill sets, compensation, and client relationships.

58.     Accordingly, the RSU Agreements legitimately and justifiably required the Former Employees to acknowledge that they "(x) will not… copy, upload, transfer, delete, transmit, download, disclose or use any Confidential Information; or (y) reverse engineer, disassemble or decompile, misappropriate or otherwise attempt to gain unauthorized access to any Confidential Information." Further, each of the Former Employees acknowledged that they understood that "**they should not have any records (containing Confidential Information) of any kind in their possession or control with which to refresh their memory after the Termination Date**." *See* **Exhibits 1-9, § 9(h)** ("Confidential Information Provision") (emphasis added).

59.     The Confidential Information Provision also requires that, "[u]pon termination of employment or upon Aon's request (whichever is earlier), the [Former Employees] will promptly

return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the [Former Employee's] possession or control…." *Id.*

60.    The Former Employees each accepted the terms of the RSU Agreement(s) containing the above-referenced and/or similar provisions, with their most recent acceptance dates set forth in **Figure 2** below.

### Figure 2

| Former Employee | Date Accepted RSU Agreement |
|---|---|
| Louis Ambriano | June 6, 2022 (Exhibit 1) |
| Nicholas Ambriano | June 6, 2022 (Exhibit 2) |
| Juan Aponte | August 10, 2022 (Exhibit 3) |
| Owen Buscaglia | December 12, 2022 (Exhibit 4) |
| Andrew Masse | June 6, 2022 (Exhibit 5) |
| Rachel McAllister | August 2, 2022 (Exhibit 6) |
| Christopher Medlicott | June 6, 2022 (Exhibit 7) |
| Michael O'Brien | July 3, 2022 (Exhibit 8) |
| Robert Osborne | July 5, 2022 (Exhibit 9) |

61.    In addition, in return for good and valuable consideration, the following Former Employees each signed Employment Agreements and/or Confidentiality and Non-Solicitation Agreements containing similar post-employment requirements, which are governed by New York or New Jersey law, as set forth in Figure 3.

### Figure 3

| Former Employee | Title of Agreement | Governing Law |
|---|---|---|
| Nicholas Ambriano | Employment Agreement (**Exhibit 10**) | New York |
| Rachel McAllister | Confidentiality and Non-Solicitation Agreement (**Exhibit 11**) | New York |

| Christopher Medlicott | Non-Solicitation Agreement (**Exhibit 12**) | New Jersey |
|---|---|---|

62.     In addition, O'Brien signed an Employment Agreement (**Exhibit 13**), which likewise contains similar terms to those summarized above, wherein he also agreed that: (a) "prior to the commencement of any new employment in the insurance business… [he will] furnish the prospective new employer with a copy of this Agreement"; and (b) the Employment Agreement may only be terminated "by the Employee [O'Brien] without cause on no less than forty-five (45) days advance notice." **Exhibit 13**, § 3. O'Brien did not, however, provide 45 days advance notice, and instead resigned from Aon "effective immediately."

63.     Despite the generous consideration the Former Employees received in exchange for their agreements to abide by their post-employment covenants, as set forth below, the Former Employees blatantly breached them.

### Alliant "Playbook"

64.     This is a new chapter in Alliant's well-established Playbook to, in its own words, "launch" a brand new "brokerage division of Alliant" not through lawful, legitimate means, but instead by poaching groups of employees from its competitors and stealing the entire infrastructure to do so from its rivals (including through the use of the competitor's confidential compensation information and pressure tactics, including offers that expire within 24 hours). After poaching these employee groups, Alliant then deploys its new employees to leverage their client relationships to steal key clients of its competitors by utilizing its competitors' confidential and trade secret information, usurping the goodwill the competitors developed with the clients. Alliant knows that this unlawful business practice causes the subject employees to breach their restrictive covenants.

65.     Alliant's Playbook is, unfortunately, all too well known to Aon. Alliant starts by targeting an Aon business leader or leaders, and then works with the business leader(s) to identify

other Aon employees to solicit to join Alliant. Alliant works with the Aon leader(s) to coordinate the mass resignation of numerous other Aon employees, which are designed to be near simultaneous and "effective immediately," in order to inflict maximum harm upon Aon. To induce the Aon business leader(s) to participate in the scheme, Alliant offers them excessive financial compensation not in line with industry standards, including, but not limited to, generous salary guarantees **and** indemnification for when they are inevitably sued by Aon. Then, using the insider information provided by the disloyal Aon business leader(s), Alliant targets other Aon employees by sending them an email or text message with a link to an employment application and job offer at the same time – and tells the other Aon employees that they must accept the offer by the end of the day and resign effective immediately – such that the Aon employees have no opportunity to consider their contractual commitments to Aon, consult with their own counsel, or give Aon an opportunity to retain them. Alliant offers the target Aon employees compensation above what they are receiving from Aon, again based on inside information it receives from the Aon business leader(s) with whom Alliant colluded.

66.     Alliant uses its counsel to effectuate this scheme, seeking to hide its unlawful acts under the shield of privilege. While secretly converting its competitors' clients and employees utilizing their rivals' confidential and trade secret information, Alliant and its counsel create a façade of compliance measures in order to lure its competitors into a false sense of security and provide false assurances. Alliant purports, for example, to require its new hires to sign a Prospective Employee Departure Protocol ("PEDP") containing a series of representations that new hires will purportedly abide by in order to protect the competitor's information. While drafted to seemingly provide some veneer of credibility to Alliant's actions, it is nothing more than a front. Indeed, despite the fact that the new hire signs the PEDP, they **still** access and take Aon confidential and trade secret information in the days leading up to their departure. This information relates to clients that (not coincidentally) shortly thereafter the former employees solicit on behalf of Alliant. What's more, Alliant's counsel

and "forensic experts" claim that they locate and remove Aon confidential information from the former employees' devices and accounts – information which they should not have taken in the first place and which they were contractually required to leave at Aon. In reality, this is really just the former employees disclosing Aon confidential information to Alliant and/or its agents (despite their contractual prohibition from doing so), and a disguise to allow Alliant's long-time counsel to openly review Aon information. What's more, even the unilateral "search" that Alliant's counsel purports to conduct is deficient, only searching for the term "@aon.com." The PEDP and Alliant's purported "compliance" measures are a complete and utter sham.

67. Indeed, Alliant's Playbook was discussed, in detail, in the case captioned *Mountain West Series of Lockton Companies, LLC v. Alliant Insurance Services, Inc.*, No. 2019-0226-JTL, 2019 WL 2536104, (Del. Ch. June 20, 2019), where the Court found that Alliant "coordinated the mass resignation of twenty Former Employees" from its competitor, Lockton. *Id.* at *7. As here, Alliant worked closely with the former employees "to plan and coordinate their departures" and "identify additional Lockton employees for Alliant to target." *Id., *1, 7. Peter Arkley, a senior Alliant executive involved in the raid here and a former Aon employee himself, was found to have "significant experience recruiting groups of personnel from other insurers and has conducted a series of mass recruitments on Alliant's behalf." *Id.* *3. Arkley instructed the former employees to resign without notice. *Id.* The former employees "were also told that [Alliant's] outside counsel represented them." *Id.* at *7. Once they joined Alliant, the former employees began soliciting as many Lockton customers as they could. *Id.* at *8. Far from comforted by Alliant's purported "procedures" of "imaging the Former Employees' computers and devices" and having them sign the PEDP "in which they agreed not to take, disclose, use, or otherwise misappropriate Lockton's trade secrets and confidential information," the Court found instead that Alliant and the Former Employees engaged in "secretive and underhanded behavior in violation of contractual obligations and legal requirements" and "demonstrated their willingness and ability to

29

mask their activities under a façade of compliance measures and through misleading representations and averments." *Id.* at *22. The Court enjoined Alliant from directly or indirectly soliciting, inducing, persuading, encouraging, accepting, servicing, or working on any competitive business from any of the at-issue customer accounts, or in any way doing business with any of the at-issue customer accounts to the extent such business was the same or similar to the business Lockton did with the restricted customers (including those customers that had already transferred to Alliant); as well as from soliciting, recruiting, hiring, inducing, persuading or encouraging any employee of Lockton to terminate their employment with Lockton. The Court reasoned: "I lack confidence that Alliant would abide by an injunction directed at anything less than Alliant as a whole. I similarly lack confidence that Lockton would be able to detect Alliant's breaches and prove them to the court." *Id.* at *22.

68.     Alliant receives substantial support from its private equity backer, Stone Point Capital ("Stone Point"). According to its website, Stone Point "assists management with all material add-on acquisitions." Stone Point also touts that it "helped [Alliant] evaluate business line expansion opportunities and alternative distribution strategies." Stone Point states on its website: "We **have led the process for all of Alliant's financings** since the initial investment in 2015." (Emphasis added.) According to Tom Corbett, Chairman and CEO of Alliant: "The resources and support Stone Point has provided have been essential to Alliant's success as we have actively grown our organization and **expanded our offerings**." (Emphasis added.) On Stone Point's website, it further reflects that Alliant is in the "Buyout" stage, meaning Stone Point works with Alliant "in carve-outs from larger organizations, as well as in standalone structured buyouts."

69.     Upon information and belief, Stone Point and Alliant have worked together for nearly a decade to develop Alliant's now well-honed Playbook and global strategy of raiding competitors to grow Alliant's business, and line both of their pocketbooks. Upon information and belief, through its investments, Stone Point funds the raids allowing Alliant to offer over-inflated compensation,

indemnification, and salary guarantees to induce the competitor (here, Aon) employees to breach their contracts and fiduciary duties to their present employers. Both Stone Point and Alliant know that Alliant will be sued for its conduct. They just don't care. Alliant (backed by Stone Point) steals business in violation of law based on the calculated assumption that a litigation settlement or judgment would be cheaper than purchasing the book of business through lawful means in the open and competitive market.

<u>Former Employees' Coordinated Departures and</u>
<u>Theft of Aon Confidential and Trade Secret Information</u>

70.     As set forth below, Alliant executed its illicit Playbook seamlessly here. Evidence suggests that by at least January 2023, Alliant was preparing documents for its brand-new Alliant Re division. By at least March 15, 2023, Michael Cusack ("M. Cusack") (a former Aon employee previously enjoined for improperly soliciting other Aon employees, and father to one of the improperly solicited employees here, Alison Cusack ("A. Cusack"))[7], called **O'Brien** and left a voice message requesting a meeting with O'Brien. M. Cusack stated that Peter Arkley (another former Aon employee who similarly was the subject of prior lawsuits), would be a part of that meeting.[8] The

---

[7] *Aon Risk Servs. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct., N.Y. Cnty. Dec. 20, 2011) ("This action involves a systematic and coordinated raid by **defendant Michael Cusack** and his new employer, defendant **Alliant Insurance Services, Inc.**, on the clients and employees of the Construction Services Group of plaintiffs Aon Corporation and Aon Risk Services, Northeast…"; discussing Alliant's coordinated raid on Aon with none other than Cusack and Arkley, resulting in 60-employee group departure to Alliant) (emphasis added).  The *Cusack* Court entered an injunction, and found **M. Cusack's testimony** that he "never discussed clients, revenue that they generated at Aon, or other Aon employees who might be interested in joining Alliant" as "not credible," concluding "it is simply not believable that Alliant would pay such astronomical salaries and bonuses to Arkley and Cusack without some understanding of the magnitude of the revenue to be brought over." *Id.*

[8] *Id.; see also Mountain West Series of Lockton Companies, LLC v. Alliant Insurance Services, Inc.*, No. 2019-0226-JTL, 2019 WL 2536104, *3 (Del. Ch. June 20, 2019) ("Before the events giving rise to this case, Alliant did not have an office in Denver. **Arkley** set out to change that"; "Arkley instructed the Former Employees to resign without notice"; discussing how Arkley deleted relevant text messages; and discussing how Arkley submitted untrue averments in a declaration submitted to the Court.) (emphasis added.)

message requested that the meeting occur "next week." M. Cusack stated: "we are going to be starting a reinsurance initiative and we would like you to be a part of that, a major player in that strategy of ours." Further, suspiciously, on that same date, March 15, **N. Ambriano** sent from his personal email to his Aon email an unusual message to "set up meeting with [Defendant] Walt [Ford]," to presumably discuss moving to Alliant.

71. On about March 16, **Medlicott** also started Google searching "alliant." He searched for "alliant nyc office" on March 21, and had a Zoom call with M. Cusack on or about March 29.

72. Around this same time, **Medlicott** and A. Cusack (M. Cusack's daughter) were also suspiciously (and unusually) communicating on LinkedIn (a business and employment-focused social media platform). For example, on March 29, after Medlicott's Zoom call with M. Cusack, Medlicott received an email from A. Cusack via LinkedIn. That email stated that 1 new message awaited Medlicott's response and provided a link to retrieve that message. Medlicott accessed the website referenced in the email minutes later. Medlicott then appears to have had a second Zoom meeting with Alliant the very next day, on March 30. Of course, there would be no need for Medlicott and A. Cusack to communicate in the ordinary course of business **on behalf of Aon** over LinkedIn, as they both had access to and routinely utilized Company email and internal messaging systems to do so (and not an unauthorized offline social media platform).

73. Then, less than a month after the Alliant meeting with O'Brien, and weeks after the Zoom call with Medlicott, the dam broke and Aon employees not coincidentally began resigning ("effective immediately") in droves within a matter of days (and sometimes hours) of each other. The resignations followed Alliant's Playbook. M. Cusack contacted Aon employees that worked closely with the Former Employees. Alliant recruiters also contacted Aon employees that worked closely with the Former Employees on their cell phones (information that Alliant would not otherwise have but for information provided to it by the Former Employees). In some instances, Alliant would send Aon

employees a text message – on their personal cell phone – with a link to a job description, offer letter, and employment package information. The Aon employee was given until the end of the day to accept; without having ever interviewed for the position, met with anyone from Alliant, submitted an employment application, reviewed the Aon agreements to which he or she is subject, or consulting with their own independent counsel. Plainly, Alliant knew: (a) exactly who to target, (b) what to offer the Aon employees in compensation in order to exceed their Aon compensation, and (c) contact information regarding how to reach the targeted Aon employees. Alliant successfully executed on its raid, resulting in the mass resignations of 25 Aon employees within a matter of days (and with an additional Aon employee resigning on May 4). In addition, and consistent with Alliant's Playbook, the Former Employees demonstrated a predictable pattern of accessing confidential client and business data immediately prior to their departures that would permit the Former Employees to seamlessly establish Alliant Re and continue servicing the same clients they serviced at Aon in their new (identical) roles at Alliant.

74.    Specifically, on Wednesday, April 19 at 1:10 pm, **Medlicott** resigned from his position as Senior Managing Director at Aon "with immediate effect."

      a)      On March 21, the same date he searched for "alliant nyc office" on his Aon computer, Medlicott attempted to access Google Drive twice on his Aon computer. Google Drive is a commercial file storage service offered by Google (not Aon), that allows users to save files to an Internet based storage website ("the cloud").

      b)      Then, in the three days prior to his resignation, Medlicott accessed approximately 63 folders and files from Aon's computer network or his Aon assigned computer system. Some of these files included: "May 2023 Renewal Report – Chris original.xlsx" (accessed on April 19, about an hour and a half

33

before he resigned); "2023 Weekly Forecast New York Casualty Facultative Budget (Draft).xlsx" (accessed on April 17; and "2023 New York Budget Final.xlsx" (accessed on April 17). The folders and files accessed contain detailed compilations of Aon trade secret information, including (without limitation): Aon financials for "Aon FAC New York Casualty" including broken down by employee (including numerous employees who would imminently resign from Aon for Alliant, including L. Ambriano, N. Ambriano, Ameruoso, Aponte, Masse, A. Cusack, Osborne, and Sbarbaro) and month; 2023 budgeted financials; historical revenue information; travel & entertainment expense information; and client information (including client lists with cedent name, renewal information, underlying insured name, client producer name, client producer email, and premium information).

c) In addition, after resigning, Medlicott put an "Automatic reply" on his Aon email account which included his personal cell phone number. This was an indirect invitation to every Aon client, prospective client, reinsurers, and/or current Aon employee emailing him to contact him on his personal cell phone.

75. Three hours later, on Wednesday, April 19 (at 4:07 pm), **O'Brien, whom Medlicott reported to,** resigned "effective immediately" from his position at Aon.

a) During the last two days of his employment, O'Brien accessed 35 documents and folders from Aon's computer network or his Aon assigned computer system. One of the files accessed was named: "forecast 2023b.xlsx." This file was opened on April 18, 2023 at 4:36 pm from a folder titled "Budget 2023." The "forecast 2023b.xlsx" file was created on March 15, at 7:27 pm, which was within one hour of when O'Brien received a voicemail from M. Cusack.

O'Brien did not access this document again until the day before his resignation. In addition, O'Brien created or accessed nine other files on March 15, 2023 after he received M. Cusack's voicemail. One of these files was named "forecast 2023a.xlsx." This file was accessed on March 15, was located within a folder named "Budget 2023," and was also accessed within one hour after he received a voicemail from M. Cusack.

b) On the last day of his Aon employment, April 19, O'Brien accessed approximately 28 files, 25 of which were stored within a folder containing the name "renewal." O'Brien had no legitimate Aon business purpose for accessing these files and folders on the same day he resigned from Aon to join Alliant.

76. On Wednesday, April 19, Justin Conway resigned from his position at Aon "effective immediately."

77. On Wednesday, April 19, A. Cusack (an employee who Aon promoted just weeks prior to the position of Associate Director) resigned "effective immediately."

78. On Wednesday, April 19 at 5:29 pm, **N. Ambriano** resigned from Aon "with immediate effect" stating "I truly appreciate the past 24 years at Aon." As noted, N. Ambriano was the head of Aon's Facultative Reinsurance group. All the U.S. brokers, including all of the brokers who resigned from Aon and who now work for Alliant, reported directly or indirectly to him.

a) Approximately one month before resigning, on/about March 15, 2023, and upon information and belief at approximately the same time N. Ambriano was speaking with Alliant, N. Ambriano asked for, and his Senior Client Advocate provided to him, a list of "in force" construction projects. This list identifies many clients and transactions with placement level detail. This was an odd and

35

unusual request. Upon information and belief, N. Ambriano was collecting information and data to share with Alliant about business that he could bring to Alliant, which clients to target for construction-related deals, and confidential premium/pricing information. Further, not only could this document be used to target specific clients on specific renewal dates, but it would enable N. Ambriano to pitch the clients knowing the underlying project (insured risk), line of business (type of insurance), and agreed-upon premium. The spreadsheet would allow N. Ambriano to have a significant advantage in pitching business (to Alliant and/or the client once he was with Alliant) based on the advance knowledge of the client's needs. Further, it could be used to build a placement strategy or calendar at Alliant while Alliant was building out its own Alliant Re in anticipation of the Former Employees resigning to join Alliant.

b)      In addition, less than two weeks before resigning, N. Ambriano asked an Aon Client Advocate to pull the [Client D] terms and conditions for facultative reinsurance contracts (i.e., the client's prescribed terms and conditions for each and every one of their many facultative reinsurance transactions), and make a copy of them. N. Ambriano then proceeded to place the document in his briefcase. This information is client-specific and information that N. Ambriano would need to know in order to place business on the client's behalf. N. Ambriano has not returned this document to Aon, and upon information and belief is using this document now for the benefit of Alliant.

c)      Then, between April 17 and April 19, N. Ambriano accessed approximately 39 folders and files from Aon's computer network or his Aon assigned computer

36

system. On April 19, which was N. Ambriano's resignation date, beginning at 1:36 pm and ending at 4:00 pm, N. Ambriano accessed approximately 12 folders and files, including files named "Ambriano Submission Account Log.xlsx," "[REDACTED] – 2023 AL Quote Summary (REVISED).doc," "[REDACTED] 2023 Excess Liability Quote Summary.doc," and "[REDACTED] – 2023 AL Quote Summary (REVISED).doc."

79.    On Wednesday, April 19, **Masse** similarly suddenly resigned from his position with Aon.

    a)    Between April 18 and April 19, Masse accessed approximately 33 folders and files from Aon's computer network or his Aon assigned computer system, including 26 folders and files on the last day of his Aon employment (April 19).

    b)    In addition, five days before Masse resigned, on April 14, 2023, Masse sent from his Aon email to his personal three email messages that contained the image of an excel spreadsheet. The emails had the subject lines: "May renewals," "June 23 renewals," and "July 23 renewals." The information in the emails included client names (including cedents and underlying insureds), renewal dates, and financial information – all information that Masse could use at Alliant to target clients with impending renewals.

80.    On Thursday, April 20, **Osborne** resigned from Aon "effective immediately."

81.    On Thursday, April 20, **McAllister** resigned from Aon "effective immediately."

    a)    Between April 17 and April 20, McAllister accessed approximately 54 folders or files on her Aon issued computer. Of these, 39 items were accessed from a folder or sub-folder that contained the storage location:

"\\aonnet.aon.net\nafs\NY2ARE\Casualty\Rachel Sbarbaro\Cede\. Almost all the folders within this location were named after clients, and included Client H, Client C, Client E, Client B, and Client I.

82. On Thursday, April 20, Walter Ford resigned from Aon "effective immediately."

83. On Thursday, April 20, **L. Ambriano** (N. Ambriano's brother), resigned from Aon "effective immediately" thanking Aon "for the last 19 years."

   a) The day before he resigned, L. Ambriano had lunch with Aon's client, Client A. Client A is one of Aon's largest Facultative Reinsurance group clients. L. Ambriano plainly was aware that he was joining Alliant the next day, and nevertheless lunched with the client in order to ultimately bring that client over to Alliant. Indeed, as set forth below, after joining Alliant, L. Ambriano began to immediately seek to place reinsurance for this same client.

84. According to a voice message of an Aon reinsurance employee recovered in Aon's investigation, dated April 20, "a couple people that came in this morning were just taking stuff – Rob, Lou, and um Rachel…". Upon information and belief, "came in this morning" refers to coming into the office to take Aon information, "Rob" is Osborne, "Lou" is L. Ambriano, and "Rachel" is McAllister.

85. On Friday, April 21, **Buscaglia** (an employee who Aon promoted just weeks prior to the position of Associate Director) resigned from his employment with Aon "as of 4.21.23."

   a) Buscaglia was contacted by Cusack, of Alliant, on April 18 (the day before N. Ambriano, Medlicott, Masse, and O'Brien resigned from Aon). Cusack left Buscaglia a voice message which stated: "You've come highly recommended" and that Cusack would like to have a conversation about the "reinsurance operation we would like to build at Alliant."

86. On Friday, April 21, Joseph Ameruoso ("Ameruoso") resigned from his employment with Aon "effective today, 4/21/23."

87. On Friday, April 21, Demetrios Strange (an employee who Aon recently promoted to the position of Senior Associate Director) resigned from his employment with Aon "effective immediately."

88. On Friday, April 21, at 5:13 pm, Tyler Nielsen, resigned from his employment with Aon "effective immediately."

89. On Friday, April 21, Marisa Varco (who Aon had just promoted weeks prior to the position of Director) resigned from her employment with Aon. When Varco resigned, Varco stated: "I sincerely apologize for not being able to provide notice, but under the circumstances I must resign immediately."

90. On Friday, April 21, Kayla DesLaurier (an employee who Aon recently promoted to the position of Associate Director) resigned "effective immediately" from her employment with Aon.

91. On Friday, April 21, Tim Janeway (who Aon recently promoted to the position of Senior Director) resigned "effective 4/21/23" from his employment with Aon.

92. On/about Saturday, April 22, Deborah Pevion (an employee of Aon recently promoted to the position of Senior Account Representative) resigned from Aon "effective immediately."

93. On Saturday, April 22, William (Bill) Beckemeier resigned from his Managing Director position with Aon "effective immediately."

94. On Sunday, April 23, **Aponte**, resigned from his Managing Director position "effective today" thanking Aon "for the opportunity afforded over my almost 14 year tenure."

    a) On April 19/20, mere days before he resigned, and after he was surely talking to Alliant, Aponte asked for, and received from, an Aon Senior Client Advocate a

renewal report for July 2023 renewals. He thereafter requested the listings for the "rest of the months too" (i.e., from July 2023 through December 2023) because he was working on "budgeting for the rest of the year." This is untrue: budgeting occurs in October; not April. These spreadsheets contain a compilation of detailed client information, including cedent name, insured name, expiration date, line of business, client producer name and email, as well as premium and pricing information.

b) In addition, also on April 20, three days before he resigned and again after he was already almost certainly in discussions with Alliant, Aponte sent from his Aon email address to his personal email address numerous placement renewal and brokerage spreadsheets:

   i. The placement renewal spreadsheets include cedent name, expiration date, insured name, client producer name, client producer email, order premium, brokerage-producing team, and transaction type. These spreadsheets contain client names/emails that Aponte could use at Alliant to solicit business, as well as key expiration information that Aponte could use to target opportunities for renewal business on behalf of Alliant (including renewals coming up in April, May, and June 2023).

   ii. The brokerage spreadsheets likewise contain detailed client information from 2023, including various client accounts, the type of coverage, the effective date, net premium, and Aon's total brokerage fees.

   iii. Aponte has not returned any of this information to Aon.

c) What's more, on April 21, two days before he resigned, Aponte used his corporate card to purchase three Broadway tickets (the date of the show was May 6, 2023),

which he justified in the expense report as client (Client A) entertainment, for a total charge of $707.99. Upon information and belief, Aponte used Aon funds for client entertainment, knowing he was leaving for Alliant, which he then subsequently used to entertain the client on behalf of Alliant.

95.     On Sunday, April 23, Wilson Brickner (an employee who was recently promoted to the position of Associate Director), resigned "effective immediately" from his employment with Aon.

96.     On Monday, April 24, Stephen McCarthy (an employee who Aon recently promoted to Senior Director), resigned from his position with Aon "effective immediately."

97.     On Tuesday, April 25, Anacony Chea Dobles resigned from her employment with Aon "effective immediately." When Dobles resigned, Dobles stated: "I must leave the company immediately due to circumstances outside my control."

98.     On Tuesday, April 25, Thomas Uzzo (who Aon promoted just weeks prior to the position of Senior Director) resigned from Aon.

99.     On Tuesday, April 25, Jessica Sherry resigned from Aon "effective immediately."

100.    Most recently, on Tuesday, May 4, Maria Lara (who worked closely with Ameruoso) resigned from Aon, stating "I accepted an offer with another company and will not be giving a 2 week notice (my apologies)."

101.    The following chart in Figure 4 summarizes the *en masse* group departure.

**Figure 4**

| No. | Name | Aon Office / Tenure as Aon Employee | Date of Resignation | No Notice Provided |
|-----|------|-------------------------------------|---------------------|--------------------|
| 1 | Justin Conway, Senior Managing Director | Chicago (Aon employee since 2014) | April 19 | "effective immediately" |
| 2 | Chris Medlicott, Senior Managing Director | New York (Aon employee since 2013) | April 19 | "with immediate effect" |

| 3 | Michael O'Brien, Senior Managing Director | Philadelphia (Aon employee since 1997) | April 19 | "effective immediately" |
| 4 | Alison Cusack, Associate Director | New York (Aon employee since 2019) | April 19 | "effective immediately" |
| 5 | Nicholas Ambriano, Executive Managing Director | New York (Aon employee since 1999) | April 19 | "with immediate effect" |
| 6 | Andrew Masse, Senior Managing Director | Chicago (Aon employee since 2017) | April 19 | "effective immediately" |
| 7 | Louis Ambriano, Managing Director | New York (Aon employee since 2004) | April 20 | "effective immediately" |
| 8 | Rachel McAllister, Director | New York (Aon employee since 2017) | April 20 | "effective immediately" |
| 9 | Robert Osborne, Director | New York (Aon employee since 2012) | April 20 | "effective immediately" |
| 10 | Walter Ford, Managing Director | Wethersfield (Aon employee since 2007) | April 20 | "effective immediately" |
| 11 | Owen Buscaglia, Associate Director | Chicago (Aon employee since 2019) | April 21 | "as of 4.21.23" |
| 12 | Joseph Ameruoso, Managing Director | New York (Aon employee since 2019) | April 21 | "effective today, 4/21/23" |
| 13 | Demetrios Strange, Senior Associate Director | Boston (Aon employee since 2019) | April 21 | "effective immediately" |
| 14 | Deborah Pevion, Senior Account Representative | Chicago (Aon employee since 2017) | April 21 | "effective immediately" |
| 15 | Kayla DesLaurier, Associate Director | Chicago (Aon employee since 2021) | April 21 | "effective immediately" |
| 16 | Tyler Nielsen, Senior Associate Director | Chicago | April 21 | "effective immediately" |
| 17 | Marisa Varco, Director | Chicago (Aon employee since 2017) | April 21 | "immediate" |
| 18 | Timothy Janeway, Senior Director | Chicago (Aon employee since 2021) | April 21 | "effective 4/21/23" |

| 19 | William Beckemeier, Managing Director | Chicago (Aon employee since 2018) | April 22 | "effective immediately" |
|----|----|----|----|----|
| 20 | Juan Aponte, Managing Director | Miami (Aon employee since 2009) | April 23 | "effective today" |
| 21 | Wilson Brickner, Associate Director | Philadelphia (Aon employee since 2018) | April 23 | "effective immediately" |
| 22 | Stephen R. McCarthy, Senior Director | Boston (Aon employee since 2020) | April 24 | "effective immediately" |
| 23 | Thomas Uzzo,[9] Senior Director | New York (Aon employee since 2018) | April 25 | resigning "effective today," and only employee offering 2 week notice period |
| 24 | Jessica Sherry, Account Representative | Philadelphia (Aon employee since 2021) | April 25 | "effective immediately" |
| 25 | Anacony Chea Dobles, Senior Client Advocate | New York (Aon employee since 2014) | April 25 | "effective immediately" |
| 26 | Maria Lara, Senior Client Advocate | San Francisco (Aon employee since 2018) | May 4 | "will not be giving a 2 week notice (my apologies)" |

102.     Aon expects that the Former Employees' direct and indirect solicitation efforts, and Alliant's inducement of same, will not cease until they have converted (or at least attempted to convert) all of the Aon Facultative Reinsurance group employees to Alliant. Indeed, **N. Ambriano** was recently quoted as saying that his focus "is on attracting reinsurance professionals to Alliant Re." In addition, in Alliant CEO's (Tom Corbett's) email announcement concerning **N. Ambriano's** hiring, Corbett likewise stated: "Nicholas Ambriano has joined Alliant as Executive Vice President, Managing Director, Alliant Re, the **newly launched reinsurance brokerage division of Alliant**. In this role, Nick **will build a client-focused reinsurance operation and grow a team of top reinsurance**

---

[9] Upon information and belief, Thomas Uzzo resigned from Aon to join Alliant; Alliant's counsel has ambiguously stated that he is not "yet" an Alliant employee.

**professionals** to deliver best-in-class resources and client services to the marketplace." (Emphasis added).

103. Alliant's solicitation strategy is also obvious from the Aon employees it is targeting. First, Alliant took the reinsurance brokers who have the critical client and business relationships. Now, Alliant is aggressively pursuing the Former Employees' support staff at Aon, including Aon's Client Service Advocates. The Client Service Advocates are the critical employees that service clients on a daily basis. Alliant is still aggressively pursuing the Client Service Advocates who previously supported the Former Employees (the identities of whom Alliant would have learned from the Former Employees), who are essential employees that Alliant needs to service the clients they are improperly soliciting. Indeed, **N. Ambriano's** and **Medlicott's** support personnel were (not coincidentally) some of the first Aon Client Service Advocates contacted. N. Ambriano's Client Service Advocate was solicited as recently as April 27. Maria Lara, the most recent Aon employee to resign to join Alliant, was also a Client Service Advocate who worked closely with Ameruoso. In addition, while employed by Aon, Ameruoso hired another individual to join Aon's Facultative Reinsurance group, but her start date was after the departures. On May 5, Aon contacted the individual to inquire whether she had any questions prior to her start date. She responded stating that she "decided to pursue another career opportunity." Upon information and belief, this individual is likewise joining Alliant. Furthermore, on May 8, Aon learned that Alliant was pursuing another long-tenured (almost 37-year) leader.

104. Even Alliant admits that customer lists and information like that which the Former Employees accessed in the days leading up to their resignations (and forwarded to their personal email) are indisputably intangible assets and goodwill. In Alliant's Consolidated Financial Statement from December 2015, Alliant admits:

> Intangible assets primarily represent customer lists and restrictive covenants of employment agreements. Customer lists are records and files obtained from acquired businesses that contain information on clients and their… insurance policies and other information that is essential to maintaining and expanding services provided to clients.

105. Indeed, Alliant, itself, requires its employees to sign similar confidentiality and non-solicitation agreements. *See Corp. Synergies Group v. Andrews,* No. 18-cv-13381, Dkt. No. 11-2.

106. Accordingly, immediate injunctive relief is necessary; money damages cannot fully address the harm Aon has incurred and will continue to incur due to Alliant's continued campaign to take additional employees and clients from Aon's Facultative Reinsurance group, and injury to Aon's goodwill relating to same. Defendants must be compelled to honor their contractual obligations.

107. Further, injunctive relief is necessary to protect Aon's investment in its confidential information and trade secrets. **It cannot be understated that Alliant Re did not exist before Alliant's raid on Aon**. Alliant has no previous experience in reinsurance broking, and its entire competitive business is now based entirely on Aon employees who worked for Aon for decades as well as Aon's confidential and proprietary information that the former Aon employees obtained by sole virtue of their employment with Aon, including that relating to Aon clients, reinsurance structures and business solutions, pricing, strategies, financial metrics, and the like. Without an injunction, Defendants will inevitably use and disclose the decades' worth of confidential and trade secret information they obtained from their employment with Aon.

108. What is also abundantly clear is that the coordinated raid was strategically designed to occur at the end of April, immediately before a number of May 1st client renewals. Defendants intentionally attempted to create chaos to maliciously and seriously harm Aon's ability to compete for these imminent renewals, service its clients, and in order to destroy Aon's goodwill with its long-term and established client base. The departures were plainly timed to harm Aon.

<u>Aon Tells Alliant and its Legal Counsel
to Cease and Desist; They Ignore Aon</u>

109. On April 21, 2023, Aon (through counsel) received a letter from Alliant's long-time outside counsel. The letter included a spreadsheet of emails that Masse sent from his Aon email to his

45

personal email, including emails that show that a mere five (5) days before joining Alliant, Masse forwarded from his Aon email to his personal email information concerning renewals coming up in May, June, and July 2023. There is absolutely no defensible argument that Masse did this for purposes of servicing Aon; instead, he was doing it to prepare for his departure to Alliant. Alliant's counsel went on to describe how they had accessed and reviewed 69 Aon work-related emails.

110.     Aon's counsel responded the very next day (April 22), and told Alliant's agents that it was very concerned about this development, and that it objected to Alliant's agents unilaterally reviewing Aon information, especially in light of Masse's contractual prohibition of sharing Aon confidential information. Aon demanded that Alliant and its counsel immediately cease and desist from any "remediation" process they were purporting to perform, and immediately notify Aon if any of the Alliant new hires had any Aon information to be returned so that Aon could take appropriate steps to recover its information without Alliant or its agents reviewing same. Aon's concern about spoliation and hiding of evidence through Alliant's sham procedures is not misplaced – a Court previously found Alliant's procedures to be a false façade, and that Alliant used its counsel in an effort to conceal evidence through the shield of privilege. *See Mountain W. Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.*, No. CV 2019-0226-JTL, 2019 WL 2536104, at *18 (Del. Ch. June 20, 2019) (finding that "Alliant engaged in a credibility-impairing pattern of behavior," which included the "**apparent efforts by counsel to conceal evidence, both during the underlying recruitment process and through a facially inadequate privilege log**") (Emphasis added).

111.     Then, on April 24, Aon again (through counsel) sent Alliant and the Former Employees notice of their contractual restrictions, and attached copies of certain of their contractual agreements. Aon expressly noted that if the Former Employees had any Aon documents or information in their possession, they were to immediately contact Aon to arrange for the return of

such information, and not unilaterally attempt to remediate it themselves, in order to ensure the preservation of data in the event of litigation as Aon is all too familiar with Alliant's Playbook.

112.     Despite this, and despite Alliant's and its counsel's knowledge that the Aon employees are contractually prohibited from disclosing Aon confidential information to any third-party (and especially Alliant and its agents), Alliant and its counsel completely ignored Aon's warning. On April 25, Alliant's counsel doubled down and stated that they continued to search for Aon work-related files, and review Aon documents, despite Aon's express direction to the contrary. Alliant's counsel also admitted that: (a) Kayla DesLaurier used her personal phone to take screenshots of work materials (i.e., quotation summaries), with the latest dated March 16, 20, 21, 2023 (information that, to date, has not been returned to Aon); and (b) Owen Buscaglia sent work emails to his personal email. Further, Alliant's counsel expressly represented to Aon the following:

- To the best of the Former Employees' current recollections, the Former Employees have not solicited Aon clients to transfer business from Aon to Alliant.  Furthermore, the Former Employees have been directed by Alliant to refrain from soliciting any of their clients at Aon to transfer business from Aon to Alliant.

113.     As set forth above and below, this representation is completely, utterly, and irrefutably *false.*

## Alliant And Former Employees Solicited Aon's Top Reinsurance Clients, Despite Their Representations To The Contrary

114.     Indeed, consistent with Alliant's Playbook, shortly after the Former Employees left Aon, they and Alliant commenced a coordinated campaign to solicit Aon's top reinsurance clients (clients that the Former Employees were privy to at Aon, and again in a space where Alliant had no prior presence, expertise, or contacts). These solicitations were done in violation of the Former Employees' Client Non-Solicit obligations.

115.     For example, on April 20, just one (1) day after he resigned from Aon to join Alliant,

**Medlicott** immediately began soliciting reinsurance coverage for Aon cedent-client Client Q, with an effective date of May 1. Medlicott received confidential information concerning Client Q through (among other ways) his receipt of GRiDS reports, including most recently as April 13, 2023 (a mere seven days prior).

116.     In addition, while employed by Aon, **Medlicott** worked to set up meetings for Aon's cedent-clients (Client O, Client N, Client J, and Client M, among others) with a large reinsurer traveling from abroad, which meetings were to occur on April 24/25 in Bermuda. He then resigned from Aon, tried to cancel these meetings on behalf of Aon, and replace them with meetings on behalf of himself and Alliant. Upon his departure, **Medlicott** never notified Aon about the meetings. Instead, the reinsurer (who was flying in to Bermuda from abroad for the meeting), contacted Aon. When Aon arrived for the meetings, Aon learned that Medlicott (just days after joining Alliant) also traveled to Bermuda on April 23rd for the meetings (now on behalf of Alliant), and was able to successfully manipulate an Aon client (Client O) to cancel its meeting with Aon before Aon could even speak to the client. **Medlicott** then went on to call upon Client O himself at the very time of the cancelled meeting with Aon. Aon later learned that **Medlicott** also called on Client N (and, upon information and belief, all of the other clients) stating that Medlicott was still planning on doing the meetings he originally set up for Aon, only on behalf of Alliant now.

117.     Further, in early April 2023, Aon worked on a reinsurance renewal submission for Client N. On April 24, through a misdirected email, Aon learned that **McAllister** (who resigned from Aon and joined Alliant four days earlier) contacted the client for business related purposes.

118.     On April 21, **Buscaglia** submitted a renewal for a client to reinsurers at 7:34 am, and received a quote back approximately 2 hours later, at 9:44 am. He then resigned from Aon at 11:17 am and within hours Aon received notice that the clients (Client K and Client R) were transferring business to another broker, instead. Client K was a client that Buscaglia worked with while employed

48

by Aon. This was also a client whose renewal **Masse** worked on. Masse resigned from Aon and joined Alliant the day before (on April 20).

119.     Aon also learned that, on April 25, **Masse** met with and called upon Aon cedent client, Client E. Client E is one of Aon's top clients for the Facultative Reinsurance group. Client E Construction is identified on the "May renewals" and "June 23 renewals" email/spreadsheets that Masse sent from his Aon email to his personal email just days earlier.

120.     Similarly, through a misdirected email, Aon learned that on April 25, **L. Ambriano** communicated with reinsurers on behalf of Aon cedent client, Client C. Client C is one of Aon's Facultative Reinsurance group's largest clients. L. Ambriano's expense reports refer to "lunch with Client C," a client he plainly had a relationship with while employed by Aon.

121.     In addition, Aon learned that on April 26, **Masse** met for lunch with and called upon Aon cedent Client C. Client C is identified on the renewal email/spreadsheets that Masse sent from his Aon email to his personal email just days earlier.

122.     Through a misdirected email, Aon also learned that on April 26, **Osborne** was seeking to place facultative reinsurance for Aon cedent client, Client C, on behalf of Alliant Re. Osborne serviced this client while employed by Aon.

123.     Through another misdirected email, Aon learned on April 26, **McAllister** was seeking to place facultative reinsurance for Aon cedent client, Client Q, on behalf of Alliant Re. This is a client that McAllister assisted in servicing while she was employed by Aon, and about which she obtained confidential information.

124.     Through another misdirected email, Aon learned that on April 28, **Buscaglia** was seeking to place facultative reinsurance for Aon cedent client, Client E. This was an Aon renewal that originally **N. Ambriano** worked on at Aon.  Buscaglia also served Client E while employed by Aon.

125. Through a misdirected email, Aon learned that on April 28, **L. Ambriano** was seeking to place facultative reinsurance for Aon cedent client, Client A. This was a client that L. Ambriano worked with at Aon.

126. In addition, on/about April 28, Brickner contacted Aon cedent Client E and advised the client of his new role at Alliant—plainly to solicit the client to ultimately transact business with Alliant. This was a client that Brickner serviced at Aon.

127. Aon learned, through another misdirected email, that on May 3, Strange attempted to place facultative reinsurance for Aon cedent client, Client E. Strange described this as a "rush," and needing a response by "Friday" (i.e., May 5). Strange serviced this client while employed by Aon.

128. Also on May 3, DesLaurier (on behalf of Justin Conway) solicited reinsurance "obo [Client M]" (one of Aon's top reinsurance clients) for an underlying insured "effective May 31, 2023." DesLaurier referred to this as a "long-term renewal for [Client M] with 10 years on risk." Client M is a client that DesLaurier and Conway serviced at Aon.

129. Through a misdirected email, Aon learned that on May 3, **L. Ambriano** solicited Aon client, Client S, specifically emailing him from his Alliant email address, sending his Alliant contact information, and requesting to "get together soon."

130. Also on May 3, Aon learned that **Medlicott** (on behalf of Alliant) is seeking reinsurance quotes for Aon client, Client T. This was a client that Medlicott learned information about at Aon. On his expense report, for example, he even expensed the following to Aon in/about May 2022: "drinks at hotel discuss [Client T] FAC deal for [Client M]."

131. On May 5, Alliant solicited another one of Aon's large Facultative Reinsurance group clients (Client K), on behalf of the Former Employees. It did so by sending the client a "complete packet of information" about Alliant Re. Alliant wrote: "Our **teams** [i.e., led by N. Ambriano] are eager to get started so **time is of the essence**." (Emphasis added.) Alliant plainly knew that this

lawsuit was imminent and attempting to pressure the client to transition business from Aon to Alliant before injunction proceedings. What's more, in connection with the solicitation, the Alliant representative sent the client a "roster" of the Alliant "group." The "roster" contained the names, Alliant emails, and cell phone numbers of 25 Alliant employees – **24 of them were the former Aon employees that left Aon as part of the Alliant raid**, including **all of the Former Employees**.

132.    On May 9, Aponte, copying another former Aon employee, Anacony Chea Dobles, sought reinsurance coverage for Client A. This was a client that Aponte had a relationship with at Aon, and expensed "lunch," "dinner," and "cocktails" with this client to Aon.

133.    Also on May 9, A. Cusack, who works closely with **N. Ambriano**, sought to place reinsurance for Aon client, Client Q, effective June 1, 2023. A. Cusack and **N. Ambriano** serviced this client while employed by Aon.

134.    Aon also learned that **Buscaglia** planned to travel to New York City on/about May 12 to meet with Aon cedent client, Client A.

135.    A different Aon cedent client, Client M, also informed Aon that Alliant was calling on the client to solicit business.

136.    **Aponte** is also communicating with Aon clients on LinkedIn.

   a)   On/about April 28-30, **Aponte** received LinkedIn notifications indicating he was messaging with representatives from the following Aon clients:

      i.   Client A – Aponte previously expensed gifts for this client contact to Aon. This contact was also identified on the placement renewal reports taken by Aponte as a contact with contracts with impending expiration dates.

      ii.   Client G;

      iii.   Client D;

    iv.    Client B – including a contact listed as a "client producer" on the renewal reports Aponte emailed to his personal email address immediately prior to his resignation from Aon.

b) On/about May 1/2, **Aponte** likewise:

    i.    Received a notice that "2 people have accepted your invitation to connect," including a representative from Aon Client J. The client contact is listed on the placement renewal report Aponte requested immediately before he resigned, as a contact with renewals between July 2023-December 2023.

    ii.    Received a notice that "15 people have accepted your invitation to connect," including a representative from Aon Client B. The client contact is identified as a "client producer" in reports Aponte emailed to his personal email address prior to joining Alliant.

c) On/about May 3, **Aponte** received a notification from LinkedIn that "11 people have accepted your invitation to connect," including a representative at Aon Client G. The client contact is similarly listed on the information that Aponte took, as a contact with a May 2023 expiration date.

d) On/about May 4/5, **Aponte:**

    i.    Received another notification from LinkedIn stating that "3 people have accepted your invitation to connect," including a representative from Aon Client A.

    ii.    LinkedIn also sent **Aponte** notifications indicating that he was messaging with other Aon clients, including representatives from Client B.

    e)   LinkedIn notifications from May 6, 8, and 10 continue to indicate that Aponte requested to connect with, and is messaging with, numerous Aon clients on LinkedIn.

137.     Furthermore, within days of their resignations and (again) consistent with Alliant's all too familiar Playbook, Aon started receiving notice that client business was transferring to Alliant for clients that the Former Employees previously serviced at Aon. For example:

    a)   On April 27, Aon Client C (one of the Facultative Reinsurance group's largest client) requested to have "three 5/1s accounts that I would like to have BORed to Alliant RE ASAP."

    b)   On April 28, Aon learned that Client U issued a BOR in favor of Alliant Re. Ameruoso worked with this client at Aon.

    c)   On May 2, Aon learned that Client V was replacing Aon with Alliant on a renewal (a/k/a repeat placement for Aon). **Osborne** was the main broker for this client while employed by Aon.

    d)   On May 3, Aon learned that Client P "has elected to work with Alliant going forward" on a piece of business. **Medlicott** started working with this client on the same business before he left Aon.

    e)   On May 8, Aon learned that Client K was also transferring business from Aon to Alliant. This was a client with renewal business that was previously serviced by **Masse** at Aon.

138.     The harm to Aon from Defendants' unlawful conduct is immense. Alliant has reduced Aon's Facultative Reinsurance group by nearly one-third in terms of personnel, including by taking the leader of the overall business, the leader of the National Casualty business, and the most tenured/experienced (at Aon's expense) client-facing brokers. Alliant has created the false client

perception that there is "nobody left" to service their accounts. For example, one client who was working with Nielsen as recently as April 10, emailed Aon on April 25 and stated that she just learned about "what has happened," and issued formal notice that she was transferring business from Aon as a result. What's more, Alliant's actions have caused nervousness and insecurity amongst Aon's remaining employees.

139. As noted, Alliant's raid was intentionally timed to launch the previously non-existent Alliant Re right before May 1 renewals, and designed to blindside Aon, create misconceptions amongst its client and employee base, and eliminate its ability to save its employees. What's more, given the nature of the facultative reinsurance broking business, it is virtually impossible for Aon to track client losses without access to Alliant's documents and in most instances Aon would have no way of knowing if one of its decades-long and institutional clients (much less newer and/or shorter-term clients) moved renewal business to Defendants or awarded new business to Defendants based on solicitation or servicing by the Former Employees, further underscoring the harm to Aon and its ability to try and save its clients in the wake of Alliant's coordinated raid on its business.

140. According to Alliant's website about its newly created "Alliant Re" and "Reinsurance Solutions," Alliant boasts: "Alliant Re is committed to providing our reinsurance clients with a consistent competitive advantage, with **unparalleled industry knowledge** and **technical underwriting expertise** to vet your risks exposure, analyze loss data and negotiate **favorable retention levels, pricing, coverage terms and conditions**." (Emphasis added.) This is all information that the former Aon employees obtained at Aon, by virtue of their employment at Aon.

141. Alliant's website further states: "Our **industry expertise** [again, expertise it obtained via the Former Employees] and **integrated team approach** [again, teams created by Aon] allow us to leverage proprietary data, cutting-edge insurance analytics and actuarial services to navigate complex market conditions and provide strategic value-added advisory support." (Emphasis added.)

54

142.    Alliant's website further states, under the heading, "Trusted Relationships" that Alliant takes "pride in our commitment to building and maintaining strong insurer and reinsurer relationships. **For decades, or team of leading reinsurance brokers has cultivated industry relationships and built a foundation of trust which is at the root of every reinsurance deal.**" (Emphasis added.) The "decades" of industry relationships are the relationships the Former Employees and other former Aon employees developed at Aon, using Aon information, and at Aon's expense.

143.    According to Alliant's April 25, 2023 press release announcing Alliant Re, and specifically Alliant's CEO, Tom Corbett: "**Our established reinsurance brokers have the relationships and experience** to help ensure clients have the financial resources to pay out large claims when appropriate and remain viable in the insurance market." (Emphasis added.) Again, those "established reinsurance brokers" and the "relationships" referenced by Mr. Corbett are the "relationships" which Aon itself funded, and Alliant stole to create the brand-new Alliant Re without having to make Aon's same investment. Alliant must be stopped.

144.    An injunction is crucial here. As in *Mountain West*: "Before the raid, Alliant did not have the benefit of the Producer Members or their teams, and Alliant had no ability to use the Former Employees to attract [Aon's] clients. Alliant also did not have access to the knowledge that the Former Employees have about [Aon's] business plans, prospect lists, and confidential customer information. It is true that before the raid, Alliant could have solicited [Aon's] clients using its existing employees, but Alliant had little chance of taking business from [Aon] under those circumstances…. Alliant therefore will suffer relatively minimal harm from having to live by an injunction pending a final decision on the merits after trial." *Mountain W. Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.,* No. CV 2019-0226-JTL, 2019 WL 2536104 (Del. Ch. June 20, 2019).

55

## COUNT I
## FEDERAL DEFEND TRADE SECRETS ACT
### (Against All Defendants)

145.     Aon incorporates the preceding allegations as if fully set forth herein.

146.     The actions of Defendants, as described above, constitute violations of one or more provisions of the DTSA.

147.     The DTSA applies because Aon's trade secrets are related to products and services used in, and intended for use in, interstate or foreign commerce, which are provided to clients across the United States and globally, and which are serviced by Aon locations across the United States.

148.     By engaging in the above conduct, Defendants misappropriated, threatened to misappropriate, or inevitably will misappropriate Aon's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

149.     In particular, the Aon client information described above, including the identities of clients that utilize Aon's services, the relevant contacts at the Aon clients who utilize Aon's services, the types of services those Aon clients require, and their preferences, the revenue information for Aon's clients and reinsurance business, the insurance solutions for Aon's clients, impending renewal dates, strategies to meet the client's needs, and other client information obtained by the Former Employees by virtue of their employment with Aon, are trade secrets. Aon expended substantial time, energy, money, and ingenuity in obtaining, collecting, and compiling this information based on its own efforts and communications with Aon clients and others. Aon invests significant time, effort, and financial resources in developing and maintaining its client relationships, including by, among other things, employing individuals, such as the Former Employees, whose job it is to exclusively develop such relationships, and by allowing employees to expense client meals and entertainment in order to develop such relationships, among other things.

150. In addition, insider information concerning Aon's employees, including compensation information, their skill sets, key client relationships, and information concerning Aon employee's books of business, are Aon trade secrets. Likewise, financial information concerning Aon's reinsurance business, such as revenues, profits, and budgets, are Aon trade secrets.

151. The following is a non-exhaustive list of examples of misappropriated trade secrets referenced in the above allegations:

a) At least **N. Ambriano, Aponte, Masse, McAllister, Medlicott,** and **O'Brien** improperly accessed Aon trade secret information, including compilations of confidential client information as described above, in the days and weeks prior to their resignations from Aon and while they were in discussions with Alliant.

b) In the days prior to his departure, **Masse** sent from his Aon email to his personal email address images from excel spreadsheets titled "May renewals," "June 23 renewals," and "July 23 renewals." The information in the emails included a trade secret compilation of client names, underlying insureds, renewal dates, and other data points – all information that Masse could use at Alliant to target clients with impending renewals.

c) Similarly, **Aponte** emailed from his Aon email address to his personal email address renewal and brokerage spreadsheets containing detailed trade secret compilations of customer information.

d) **N. Ambriano** likewise took a copy of, and has not returned, the [Client D] terms and conditions for facultative reinsurance contracts (i.e., the client's prescribed terms and conditions for each and every one of their many facultative reinsurance transactions).

e) **Alliant** is targeting Aon employees about whom it obtained insider information (including skill sets, compensation information, and contact information), and Aon clients using the Former Employees and the information they obtained from Aon about the Aon clients to do so.

f) All **Former Employees**, by virtue of their positions with Aon, had access to inside information and trade secrets, including marketing strategies, financial information concerning the business, and client-related information (such as client needs and preferences, which contact people at the client to "connect" with, renewal dates, client challenges, strategies to overcome same, growth opportunities and expectations, Aon pricing, insider knowledge of the reinsurance market provided by Aon, and proprietary reinsurance programs, like GRiDS). They were exposed to volumes of confidential client information through their access to Aon's proprietary data and systems, and developed detailed insider knowledge concerning clients that they only obtained by virtue of their employment at Aon.

152. Aon has taken reasonable measures to keep this information secret by, among other things: (1) requiring employees who have access to such information to sign confidentiality agreements, (2) promulgating confidentiality and information security policies, (3) limiting the disclosure and distribution of such information to only a small number of employees on a need to know basis, and (4) requiring that such information be saved on password protected networks or servers.

153. Aon's trade secret information is sufficiently secret to derive independent economic value due to not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure and use, such as Aon's competitors like Alliant (who never before competed against Aon in the reinsurance broking industry and who would obtain immense value from the disclosure and use of this information which Aon developed with significant time and expense).

154. Without authorization, Defendants misappropriated, threaten to misappropriate, or inevitably will misappropriate these trade secrets in a willful manner and with a deliberate intent to injure Aon and improve Alliant for their own financial gain, by among other things:

a) **Masse** and **Aponte** forwarding the above-referenced trade secrets to their personal email;

b) **N. Ambriano** printing the above-referenced trade secrets, removing them from Aon, and not returning them to Aon;

c) **N. Ambriano, Aponte, Masse, McAllister, Medlicott,** and **O'Brien** accessing the above-referenced trade secrets without authorization (they were only authorized to access for legitimate business purposes, not for competitive use at Alliant), and for an improper purpose (to feed to or use at Alliant);

d) All **Defendants** will inevitably disclose Aon trade secret information, described above, as they are performing identical services to those previously provided by the Former Employees to Aon. The Former Employees will have substantial input in Alliant Re's strategic plans, including pricing, costs, marketing, products, and services – which gives **Alliant** an unfair advantage in competition with Aon. The **Former Employees** and **Alliant's** actions already show that they intend to use the Aon trade secrets at

Alliant by targeting client contacts and soliciting reinsurer market contacts using information they obtained at Aon, coupled with the fact that Alliant Re would not even exist but for its employ of the Former Employees and use of Aon trade secrets. Defendants' false representations also show their disavowal of their post-employment covenants to Aon. Simply put, the **Former Employees**, and **Alliant**, cannot help to rely on Aon's trade secrets as they plot Alliant Re's new course, and strategically position Alliant Re as an Aon competitor, anticipate Aon's moves, and use that knowledge to their competitive advantage. **Alliant** is well aware (having never competed in the reinsurance broking industry before the emergence of Alliant Re) that all of the information utilized by the Former Employees to solicit clients, bring in business to Alliant, and ultimately service and accept business from the clients is information that they learned while employed by Aon. Alliant is aware that they are using all of this information to convert clients from Aon to Alliant.

155. The Former Employees owed duties to Aon to maintain the secrecy of the trade secrets and to limit the use of the trade secrets. Defendants acquired trade secrets by improper means, and/or disclosed and utilized the trade secrets, or inevitably will disclose and utilize the trade secrets, without Aon's consent to create a competitive product and services and poach Aon clients on behalf of Alliant Re.

156. The Former Employees are agents of Alliant, and are using Aon's trade secrets in the course and scope of their employment with, and for the benefit of, Alliant.

157. Aon communicated these trade secrets to the Former Employees in confidence. At the time of disclosure, Defendants knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

158. Defendants can obtain economic value for the disclosure and use of Aon's trade secrets, for example, by avoiding years and millions of dollars in investment that it took Aon to develop the trade secret information and client relationships, and to convert Aon clients to Alliant for their own financial gain.

159. As a consequence of the foregoing, Aon has suffered and will continue to suffer irreparable harm, injury, and loss. Pursuant to the DTSA, actual or threatened misappropriation of trade secrets can be enjoined. Unless enjoined, Defendants will continue to use Aon's trade secret

information to unfairly compete and Aon will continue to suffer irreparable harm that cannot be remedied through money damages.

160.     As a direct and proximate result of the conduct of Defendants, Aon is entitled to actual damages in an amount to be determined at trial. The acts and conduct of Defendants were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

**COUNT II**
**BREACH OF CONTRACT**
**(Against All Former Employees)**

161.     Aon incorporates the preceding paragraphs as if fully set forth herein.

162.     Aon and **L. Ambriano** entered into valid and enforceable contracts, the RSU Agreements, attached as **Exhibit 1**. Aon performed all duties and obligations under L. Ambriano's RSU Agreements. And, in return for L. Ambriano's promises set forth in the RSU Agreements, L. Ambriano received substantial consideration in the form of RSU grants and other good and valuable consideration.

163.     As set forth above, **L. Ambriano** breached the terms of the RSU Agreements by, among other actions described more fully above, soliciting and calling upon Aon clients, using and disclosing Aon confidential information, and servicing and accepting business from Aon clients.

164.     Aon and **N. Ambriano** entered into valid and enforceable contracts, the RSU Agreements, attached as **Exhibit 2**. Aon performed all duties and obligations under N. Ambriano's RSU Agreements. And, in return for N. Ambriano's promises set forth in the RSU Agreements, N. Ambriano received substantial consideration in the form of RSU grants and other good and valuable consideration. In return for good and valuable consideration, N. Ambriano also executed a valid, enforceable Employment Agreement (**Exhibit 10**) containing similar Client Non-Solicit, Employee Non-Solicit, and Confidential Information Provisions as those found in his RSU Agreements with Aon.

165. As set forth above, **N. Ambriano** breached the terms of the RSU Agreements and his Employment Agreement by, among other actions, misappropriating Aon's confidential and trade secret information to use on behalf of Alliant. Upon information and belief, N. Ambriano also worked with Alliant to solicit Aon employees, including (without limitation) the Client Service Advocate that N. Ambriano worked closely with while employed by Aon and other of the defecting employees. Further, upon information and belief, N. Ambriano is also working with Alliant to call upon, solicit, service, and accept business from Aon clients. Indeed, it is contained in his Alliant job description.

166. Aon and **Aponte** entered into valid and enforceable contracts, the RSU Agreements, attached as **Exhibit 3**. Aon performed all duties and obligations under Aponte's RSU Agreements. And in return for Aponte's promises set forth in the RSU Agreements, Aponte received substantial consideration in the form of RSU grants and other good and valuable consideration.

167. As set forth above, **Aponte** breached the terms of the RSU Agreements by, among other actions, misappropriating Aon's confidential and trade secret information to use on behalf of Alliant; and, directly or indirectly, soliciting Aon's clients for purposes of those clients transferring their business to Alliant.

168. Aon and **Buscagila** entered into a valid and enforceable contract, the RSU Agreement, attached as **Exhibit 4**. Aon performed all duties and obligations under Buscagila's RSU Agreement. And in return for Buscagila's promises set forth in the RSU Agreement, Buscagila received substantial consideration in the form of RSU grants and other good and valuable consideration.

169. As set forth above, **Buscagila** breached the terms of the RSU Agreement by, among other actions, directly or indirectly calling upon and soliciting an Aon client to transfer its business from Aon to Alliant, and using and/or disclosing Aon's confidential and trade secret information.

170. Aon and **Masse** entered into valid and enforceable contracts, the RSU Agreements, attached as **Exhibit 5**. Aon performed all duties and obligations under Masse's RSU Agreements.

And, in return for Masse's promises set forth in the RSU Agreements, Masse received substantial consideration in the form of RSU grants and other good and valuable consideration.

171.     As set forth above, **Masse** breached the terms of the RSU Agreements by, among other actions, misappropriating Aon's confidential and trade secret information to use on behalf of Alliant; and soliciting Aon cedent clients to transfer their business from Aon to Alliant, and/or accepting business from and servicing Aon cedent clients on behalf of Alliant.

172.     Aon and **McAllister** entered into valid and enforceable contracts, RSU Agreements, attached as **Exhibit 6**. Aon performed all duties and obligations under McAllister's RSU Agreements. And in return for McAllister's promises set forth in the RSU Agreements, McAllister received substantial consideration in the form of RSU grants and other good and valuable consideration. In return for good and valuable consideration, McAllister also executed a valid, enforceable Confidentiality and Non-Solicitation Agreement (**Exhibit 11**) containing similar Client Non-Solicit and Confidential Information Provisions as those found in her RSU Agreement with Aon.

173.     As set forth above, **McAllister** breached the terms of the RSU Agreements and Confidentiality and Non-Solicitation Agreement by, among other actions, misappropriating Aon's confidential and trade secret information to use on behalf of Alliant; and directly or indirectly calling upon and soliciting Aon clients to transfer business from Aon to Alliant, and/or accepting business from and servicing Aon clients on behalf of Alliant.

174.     Aon and **Medlicott** entered into valid and enforceable contracts, the RSU Agreements, attached as **Exhibit 7**. Aon performed all duties and obligations under Medlicott's RSU Agreements. And, in return for Medlicott's promises set forth in the RSU Agreements, Medlicott received substantial consideration in the form of RSU grants and other good and valuable consideration. In return for good and valuable consideration, Medlicott also executed a valid,

enforceable Non-Solicitation Agreement (**Exhibit 12**) containing the same Client Non-Solicit and Confidential Information Provisions as those found in his RSU Agreements.

175.    As set forth above, **Medlicott** breached the terms of the RSU Agreements and his Non-Solicitation Agreement by, among other actions, misappropriating Aon's confidential and trade secret information to use on behalf of Alliant; soliciting Aon clients and employees; soliciting Aon clients to transfer their business from Aon to Alliant, including through a solicitation trip to Bermuda, and/or accepting business from and servicing Aon cedent clients on behalf of Alliant; and, upon information and belief, directly or indirectly, soliciting Aon employees to terminate their employment with Aon and to join Alliant.

176.    Aon and **O'Brien** entered into valid and enforceable contracts, the RSU Agreements, attached as **Exhibit 8**. Aon performed all duties and obligations under O'Brien's RSU Agreements. And in return for O'Brien's promises set forth in the RSU Agreements, O'Brien received substantial consideration in the form of RSU grants and other good and valuable consideration. In return for good and valuable consideration, O'Brien also executed a valid, enforceable Employment Agreement (**Exhibit 13**) containing similar post-employment restrictions to those found in his RSU Agreement with Aon. O'Brien's Employment Agreement also contains a 45-day notice provision.

177.    As set forth above, **O'Brien** breached the terms of the RSU Agreements and his Employment Agreement by, among other actions, resigning immediately and without notice; misappropriating Aon's confidential and trade secret information to use on behalf of Alliant; upon information and belief, directly or indirectly, soliciting Aon cedent clients to transfer their business from Aon to Alliant and/or accepting business from and servicing Aon cedent clients on behalf of Alliant; and, upon information and belief, directly or indirectly, soliciting Aon employees to terminate their employment with Aon and to join Alliant.

178.     Aon and **Osborne** entered into valid and enforceable contracts, RSU Agreements, attached as **Exhibit 9**. Aon performed all duties and obligations under Osborne's RSU Agreements. And in return for Osborne's promises set forth in the RSU Agreements, Osborne received substantial consideration in the form of RSU grants and other good and valuable consideration.

179.     As set forth above, **Osborne** breached the terms of the RSU Agreements by, among other actions, misappropriating Aon's confidential and trade secret information to use on behalf of Alliant; and directly or indirectly calling upon, soliciting, and/or accepting business from Aon clients on behalf of Alliant.

180.     In addition to the above, each of the Former Employees breached (or threatens to breach) their respective agreements, by (among other things): (1) directly or indirectly calling upon, soliciting, accepting, engaging in, servicing, or performing, other than on behalf of Aon, business of the same type or kind as the business performed by Aon, from or with respect to those clients to whom they had provided services, had a business relationship, or on whose account they worked or supervised servicing activities at Aon; (2) directly or indirectly soliciting or inducing, or causing others to solicit or induce, employees of Aon to work for Alliant and to leave the employ of Aon; and (3) by disclosing or using Aon's confidential, proprietary, and trade secret information.

181.     In addition, due to the overlap between their jobs at Aon and new jobs at Alliant, course of conduct to date, and their failure to provide truthful assurances, the Former Employees either have already used or disclosed, or inevitably will use or disclose, Aon's confidential information and trade secrets.

182.     As a direct and proximate result of the above breaches, Aon suffered and continues to suffer damages, including, but not limited to, lost business, lost revenues, lost profits, costs of retaining clients, costs of retaining employees, costs of recovering its information, and damage to goodwill, in an amount to be determined at trial. Aon has also suffered and will continue to suffer

immediate, irreparable harm warranting temporary, interlocutory, and permanent injunctive relief. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent this harm to Aon.

183.     Pursuant to the above-referenced agreements and as warranted by governing law, Aon is entitled to injunctive relief, as well as its costs and expenses, including without limitation attorneys' fees, incurred in bringing this action. (*See, e.g.*, **Exhibits 1-9, § 9(f)**). Indeed, without immediate relief in the form of an Order enjoining the Former Employees, as set forth herein, Aon will continue suffering losses, experiencing harm to its name, reputation, and other goodwill — something traditional legal remedies cannot adequately address, and which are particularly critical in the relationship-driven reinsurance industry.

**COUNT III**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against Alliant)**

184.     Aon incorporates the preceding paragraphs as if fully set forth herein.

185.     As set forth above, Aon and the Former Employees entered into valid and enforceable contracts, the RSU Agreements, attached as **Exhibits 1-9**. N. Ambriano, McAllister, Medlicott, O'Brien, and Osborne also entered into valid and enforceable employment, confidentiality, and non-solicitation agreements containing similar restrictive covenants to those found in their RSU Agreements. *See* **Exhibits 10-12**. O'Brien entered into an Employment Agreement that required him to provide 45-days advance notice. *See* **Exhibit 13**. Aon performed all duties and obligations under Former Employees' RSU  and other agreements. In return for the Former Employees' promises set forth in those agreements, the Former Employees received substantial consideration.

186.     At all times relevant to this action, Alliant was aware of the existence of the above-referenced agreements between Aon and the Former Employees. Indeed, O'Brien's agreement required that he provide notice to Alliant, and Aon sent Alliant notice of the RSU Agreements. In addition, Alliant has been sued multiple times by Aon for breach of Aon's restrictive covenants.

187. Nevertheless, Alliant, as the Former Employees' new employer, induced and continues to induce breaches of the Former Employees' contractual obligations by and through their conduct, including but not limited to: (a) facilitating the Former Employees' solicitations and placement/acceptance of business with Alliant of Aon clients with whom the Former Employees worked, serviced, or became familiar with prior to their departures from Aon; (b) strategically timing the raid to injure Aon's ability to compete and in order to encourage and induce the transfer of restricted Aon clients from Aon to Alliant; (c) encouraging and enticing the Former Employees to provide information to Alliant to solicit other Aon employees, and solicit Aon clients; and (d) theft of Aon confidential, proprietary, and trade secret information in order to do so and to unlawfully jumpstart the launch of the brand new Alliant Re, which never previously existed prior to the coordinated raid.

188. Alliant therefore intentionally induced multiple breaches of the Former Employees' contractual obligations owed to Aon and has no justification for its intentional and tortious conduct.

189. As a direct and proximate result of Alliant's actions by and through the subsequent breaches of the Former Employees' contractual obligations described above, Aon suffered and continues to suffer damages, including, but not limited to, lost business, lost revenue, lost profits, costs of retaining clients, costs of retaining employees, cost of hiring new employees, and damage to its goodwill, in an amount to be determined at trial. Aon has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, interlocutory, and permanent injunctive relief. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent this harm to Aon.

190. Indeed, without immediate relief in the form of an order enjoining Alliant as set forth above and below, Aon will continue suffering losses, and experiencing harm to its name, reputation, and other good will – something traditional legal remedies cannot adequately address, and which are particularly critical in the relationship-driven reinsurance industry.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants)**

191.  §Aon incorporates the preceding allegations as if fully set forth herein.

192.  Aon has/had protectable business relationships with the Former Employees, and the other employees Defendants improperly solicited/induced, and the clients Defendants solicited/induced or attempted to solicit/induce to leave Aon (the "Prospective Business Relationships").

193.  Aon had a reasonable expectation that: (1) its employees would continue employment with Aon (indeed many of the targeted employees were Aon employees for many years, sometimes decades, and recently promoted); and (2) its clients would continue utilizing Aon for its services. Indeed, one of the targeted employees even expressed regret in resigning from Aon, but stated they were given no choice. Similarly, many of the clients that Defendants are now openly soliciting have been Aon clients for decades, and a number have impending renewals.

194.  Aon would have a greater prospective business advantage with the Prospective Business Relationships, absent improper interference including Alliant's intentional fearmongering.

195.  At all relevant times, Defendants have and had knowledge of the Prospective Business Relationships.

196.  Defendants permitted, encouraged, and induced Aon's customers and employees to leave Aon by their acts described above, and have thereby interfered with Aon's prospective business advantage.

197.  Defendants' actions were purposeful, with malicious and unjustifiable intent.

198.  As a direct and proximate result of the above activities, Aon suffered and will continue to incur actual damages, including but not limited to lost business, lost profits, damage to goodwill, and the costs of hiring and retaining former and new employees, among other things.

199. Defendants succeed in ending Aon's relationship with its employees and clients, and interfering with Aon's expectancy in those Prospective Business Relationships.

200. Aon suffered and will continue to suffer immediate irreparable harm until Defendants are enjoined. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent this harm to Aon and which are particularly critical in the relationship-driven reinsurance industry.

201. Punitive damages are warranted due to the malicious nature of the above conduct.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (Against L. Ambriano, N. Ambriano, Aponte, Masse, Medlicott, and O'Brien)

202. Aon incorporates the preceding paragraphs as if fully set forth herein.

203. At all times pertinent hereto, **L. Ambriano, N. Ambriano, Aponte, Masse, Medlicott, and O'Brien**, by virtue of their positions at Aon, owed a fiduciary duty of loyalty to Aon. Each was a senior employee, entrusted by Aon with access to its valued clients, trade secrets, and confidential information that allowed them to perform their duties as an executive and to develop the relationships and goodwill which form the basis of Aon's business relationships with its clients, all at Aon's expense and direction. Each also owed Aon a fiduciary duty which required them to, among other things, devote all of their time and attention during business hours to the business of Aon, to refrain from engaging in a business or business activity which competed with Aon, and to refrain from conducting activities in any manner inimical to Aon's best interest.

204. As set forth in detail above, each breached his fiduciary duty to Aon by (among other things): (a) assisting Alliant to launch Alliant Re while still employed at Aon; (b) while still employed by Aon, taking Aon information to create a competitive reinsurance practice at Alliant; (c) facilitating the transfer of Aon employees, clients, and business opportunities to Alliant while still employed by Aon; (d) soliciting, calling upon, and meeting with clients while still employed by Aon for the purpose of bringing those clients to Alliant; (e) coordinating a mass group departure while still employed by

Aon, and failing to notify senior management of same; and/or (f) utilizing Aon funds and resources to solicit clients on behalf of Alliant. These actions are in direct violation of the fiduciary duties they owed to Aon.

205. As a direct and proximate result, Aon sustained and will incur damages, including, but not limited to, lost business, lost revenue, lost profits, damage to its goodwill, and costs of retaining existing clients and employees in an amount to be proven at trial.

206. The aforementioned conduct was intentional, malicious, and in bad faith, and has subjected and will continue to subject Aon to cruel and unjust hardship in conscious disregard of Aon's rights, so as to justify an award of exemplary and punitive damages.

207. Further, Aon suffered and will continue to suffer immediate irreparable harm until Defendants are enjoined, as Aon continues to suffer from the above-referenced Defendants' fiduciary breaches – fruit of the poisonous tree. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent this harm to Aon and which are particularly critical in the relationship-driven reinsurance industry.

**COUNT VI**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Alliant)**

208. Aon incorporates the preceding paragraphs as if fully set forth herein.

209. At all times pertinent hereto, **L. Ambriano, N. Ambriano, Aponte, Masse, Medlicott,** and **O'Brien** each owed Aon a fiduciary duty of loyalty to safeguard its confidential information, to protect the stability of its workforce, to not scheme against it while employed by Aon, not to orchestrate a mass employee exodus, and not to use Aon funds and other documents and information to compete against it.

210. By the conduct set forth herein, **L. Ambriano, N. Ambriano, Aponte, Masse, Medlicott,** and **O'Brien** performed wrongful acts that injured Aon.

211.     Alliant was at all relevant times aware of **L. Ambriano, N. Ambriano, Aponte, Masse, Medlicott,** and **O'Brien's** duty of loyalty to Aon and aware of their role in their fiduciary breaches at the time the fiduciary breaches occurred. Upon information and belief, Alliant did so by incentivizing this behavior by offering these employees financial incentives (and upon information and belief) indemnification, among other things, all for the benefit of Alliant.

212.     Aon was and continues to be damaged by Alliant's wrongful inducement of **L. Ambriano, N. Ambriano, Aponte, Masse, Medlicott,** and **O'Brien** to breach their fiduciary duties to Aon.  Alliant's actions were intentional, malicious, and warrant an award of punitive damages here.

213.     Further, Aon suffered and will continue to suffer immediate irreparable harm until Alliant is enjoined, as Aon continues to suffer from Alliant's aiding and abetting of the fiduciary breaches – the fruit of the poisonous tree. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent these harms to Aon and which are particularly critical in the relationship-driven reinsurance industry.

<u>**COUNT VII**</u>
<u>**CIVIL CONSPIRACY**</u>
**(Against Alliant, N. Ambriano, Medlicott, and O'Brien ("Civil Conspiracy Defendants"))**

214.     Aon incorporates the preceding paragraphs as if fully set forth herein.

215.     Alliant was aware of the Former Employees' contractual and legal obligations under their RSU Agreements, other Aon agreements, and common law. More generally, Alliant is also aware that Aon employees (as well as the employees of Alliant's other competitors in the insurance brokerage industry) are subject to post-employment covenants, including client and employee non-solicitation provisions. Alliant is aware of this fact due to the *numerous* lawsuits filed against Alliant over the past decade, including many filed by Aon, as described above.

216.     Despite Alliant's awareness of these post-employment covenants, Alliant has executed, and continues to execute, numerous nationwide corporate raids on competitors – in violation of the

law – in order to injure the competition. Alliant knowingly, willingly, and purposefully conspires to induce the breaches of the competitor agreements (generally), and Aon agreements (specifically), along with the employees' common law and other legal obligations to their employers (generally) and Aon (specifically).

217. Here, Civil Conspiracy Defendants conspired and agreed with one another (via meetings, phone calls, and the like as set forth above) to: (a) breach the Former Employees' agreements with Aon, (b) misappropriate and exploit Aon's information, (c) induce breaches of contractual provisions requiring the return and protection of confidential information, the solicitation of Aon customers, and the solicitation of Aon employees, and (d) compete unfairly against Aon in violation of the law.

218. Civil Conspiracy Defendants committed numerous overt acts in furtherance of the conspiracy including, but not limited to: (a) working together while the Aon employees were still employed by Aon to directly or indirectly solicit other Aon employees to join Alliant, (b) breach Aon agreements containing post-employment covenants, inducing Aon's employees to improperly access and taken Aon information before their employment with Aon ended, (d) inducing Aon's employees to breach contractual provisions requiring the return and nondisclosure of Aon confidential information, (e) inducing Aon employees to breach contractual provisions prohibiting the solicitation, servicing, and acceptance of business from Aon customers, (f) unlawfully participating in prohibited acceptance and servicing of Aon customers, and (g) unlawfully obtaining Aon information from Aon's former employees and using that information to create an entity competitive with Aon, with knowledge illegally obtained.

219. The object Civil Conspiracy Defendants sought to accomplish, successfully accomplished, and continue to accomplish is an improper competitive advantage over its competitors (generally) and Aon (specifically), designed to irreparably injure competition, misappropriate Aon's

investments, and steal for itself business instead of expending the time and money necessary to develop business themselves.

220. Alternatively, even if the objectives of Civil Conspiracy Defendants' conspiracy were to accomplish a lawful purpose, they were in fact accomplished after a meeting of the minds, and by unlawful means, including (a) illegally breaching the Aon agreements, (b) obtaining and possessing Aon's information, and (c) inducing breaches of contractual provisions requiring the return and non-disclosure of confidential information and prohibiting the solicitation of Aon employees and clients, and acceptance of business of Aon clients.

221. Civil Conspiracy Defendant's conspiracy was willful and malicious and performed with an evil motive and reckless indifference to the rights of others, entitling Aon to punitive damages.

222. As a direct and proximate result of Civil Conspiracy Defendant's actions, Aon sustained and will incur damages, including, but not limited to, lost business, lost revenue, lost profits, fees, damage to its goodwill, and costs of retaining existing clients and employees in an amount to be proven at trial.

223. Further, Aon suffered and will continue to suffer immediate irreparable harm until these Defendants are enjoined, as Aon continues to suffer from the conspiracy – the fruit of the poisonous tree. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent these harms to Aon and which are particularly critical in the relationship-driven reinsurance industry.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Aon demands judgment against Defendants as follows:

1. A preliminary and permanent injunction:

A. Enjoining and restraining the Former Employees, and anyone acting in concert with them, including Alliant, from violating, or participating in the violation of, any of the terms of their respective agreements with Aon (*see* **Exhibits 1-13**);

B. Enjoining and restraining Alliant, and anyone acting in concert with it, from directly or indirectly calling upon, soliciting, accepting, engaging in, servicing, or performing reinsurance broking business (including any other advisory, analytics or consulting services performed by Aon for its clients) from or with respect to cedent and underlying-insured clients the Former Employees worked with, supervised the work for, or obtained confidential information about during the last two years of their employment with Aon as well as referral or production sources as defined in the Former Employees' respective agreements with Aon;

C. Enjoining and restraining Alliant, and anyone acting in concert with it, from directly or indirectly hiring, soliciting, or inducing (or causing any other person or entity such as a third-party recruiter to hire, solicit, or induce) any employee of Aon who performs reinsurance broking services (including any advisory or broking support functions, including administrative, accounting, claims and contracts services) to work for Alliant, or for any other third-party or entity, or to otherwise leave the employment of Aon;

D. Enjoining and restraining Defendants, or anyone acting in concert with them, from utilizing, divulging, disclosing, or misusing any Aon Confidential Information (as defined by the Former Employees' agreements with Aon) and trade secrets, including, without limitation, lists of clients and prospective clients; contract terms and conditions; client-specific information (including contact personnel and renewal dates); employee-specific information (including compensation information, other than an employee's own information); and Aon financial information, including concerning revenues, budgets, forecasts, and profits;

E. Requiring Defendants to preserve all documents, electronically stored information and other information relevant to the factual allegations and claims contained within this Verified Complaint, including any communications, text messages, WhatsApp messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by

and between the Former Employees (or any of the other Aon employees that joined Alliant); between Alliant and the Former Employees (or any of the other Aon employees that joined Alliant); between Defendants and any Aon employee; and between Defendants and any Aon client or prospective client;

        F.  Requiring Alliant to produce to Aon all forensic images of the Former Employees' devices it obtained from the Former Employees wherein it's counsel purported to search for Aon's information;

        G. Requiring Defendants to return all copies of all Aon documents in their possession, custody, and control, and a forensic examination of Defendants' devices and accounts (including cloud storage accounts, such as Google Drive). In order to do so, the Order should require Defendants to, at Defendants' expense: (i) stipulate to and agree with counsel for Aon on a non-party forensic vendor; (ii) jointly submit to the Court a forensic protocol to accomplish the return and remediation of Aon's documents from the Defendants' possession (i.e., to permanently remove the documents from the Defendants' possession), and disclosure of communications concerning Defendants' solicitation of Aon employees and solicitation, servicing, or acceptance of Aon clients, with Defendants bearing all costs of the return and remediation; and (iii) require sworn declarations from Defendants and the non-party forensic vendor attesting to the return and remediation of all Aon-related documents and communications on Defendants' devices.

        2.      An Order granting preliminary and permanent injunctive relief in accord with Paragraph 1 above, and as separately may be requested at a preliminary injunction hearing and any trial;

        3.      An Order awarding Aon its actual and exemplary damages, in an amount to be determined at trial;

        4.      An Order awarding Aon pre- and post-judgment interest as allowed by law, as well as its attorneys' fees and costs of this action; and

5. An Order awarding any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

Respectfully submitted,

**AON PLC, AON CORPORATION, AON FAC, INC.**

*/s/ James M. Witz*
One of Their Attorneys

James M. Witz
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654
(312) 372-5520

Jessica F. Pizzutelli
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, NY 14450
(585) 203-3400
*Pro hac application forthcoming*

Dated: May 15, 2023