**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AON PLC, AON CORPORATION, and AON FAC, INC., | |
| Plaintiffs, | |
| v. | Case No. 23-cv-03044 |
| ALLIANT INSURANCE SERVICES, INC., LOUIS AMBRIANO, NICHOLAS AMBRIANO, JUAN APONTE, OWEN BUSCAGLIA, ANDREW MASSE, RACHEL MCALLISTER, CHRISTOPHER MEDLICOTT, MICHAEL O'BRIEN, and ROBERT OSBORNE, | Hon. John J. Tharp, Jr. |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**<u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

ARGUMENT ................................................................................................................... 3

I.      The Legal Standard for a Temporary Restraining Order ................................... 3

II.     Aon Is Not Likely To Succeed On Its Claim For Misappropriation Of Trade
Secrets. ............................................................................................................... 4

      A.     Aon Cannot Establish The Existence Of Trade Secrets............................ 4

      B.     Aon's DTSA Claim Is Not Likely to Succeed On The Merits. .......................... 6

             1.     Any Aon Information Which Remained In Possession Of A Few
Defendants After They Resigned From Aon Has Already Been
Remediated. ........................................................................................ 6

             2.     Mere "Access" of Trade Secrets During Employment Does Not
Constitute "Misappropriation" Under The DTSA. .................................... 8

             3.     Aon Cannot Prevail On A Theory Of Inevitable Disclosure. ................... 9

                  a.     Inevitable Disclosure Is Not Cognizable Under The DTSA.......... 9

                  b.     Even If Cognizable, Inevitable Disclosure Does Not Apply. ....... 10

      C.     Aon's Common Law Claims Are All Preempted By The ITSA. ....................... 13

      D.     Aon's Civil Conspiracy Claim Is Not A Valid Cause of Action. ...................... 14

III.    Aon Is Not Likely To Succeed On Claims For Alleged Breach Of Restrictive
Covenants Or Tortious Interference........................................................................ 15

      A.     Aon's Overbroad Covenants Are Unreasonable And Unenforceable. ............... 15

             1.     Aon's Client And Referral Source Covenants Do Not Protect A
Legitimate Interest In "Near Permanent" Customers ........................... 15

                  a.     Aon PLC has no capacity to have customers.............................. 15

                  b.     Insurer-cedents are not protectible "near permanent"
customers under Illinois law. ......................................................... 16

                  c.     "Prospective" clients and "referral sources" are not
protectible ....................................................................................... 17

             2.     Aon's Restrictions Are Overbroad And Injurious To The Public By
Precluding Merely "Accepting" Or "Servicing Business" ..................... 18

             3.     Aon's Expansive Definitions Of "Business" and "Covered Client"
Render the Covenants Unenforceable......................................................... 20

             4.     Aon's Confidentiality Restrictions Are Unenforceable............................ 22

## TABLE OF CONTENTS
(continued)

**Page**

5.    Enforcement Of Aon's Restrictive Covenants Would Sanction An Unlawful Ban On Competition And Impose Undue Hardship On The New Hires. ........................................................................... 22

6.    Aon's Restrictive Covenants Are Far Too Broad and Fatally Flawed For "Blue Penciling." .................................................. 23

IV.   Aon Has Not Established A Likelihood Of Immediate, Irreparable Harm ..................... 24

V.   The Balance Of Harms Weighs Against Granting Provisional Relief ........................... 24

CONCLUSION ............................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott-Interfast Corp. v. Harkabus*,
    250 Ill. App. 3d 13 (2d Dist. 1993) ........................................................................... 19

*Aon Risk Servs. Co. v. Alliant*,
    415 F. Supp. 3d 843 (N.D. Ill. 2019) ...................................................................... 19

*Arthur J. Gallagher & Co. v. Reisinger*,
    No. 07–271, 2007 WL 1877895 (W.D. Pa. June 11, 2007) .................................... 24

*Arthur J. Gallagher & Co. v. Tarantino*,
    No. 20-cv-05505, 2022 WL 4092673 (N.D. Cal. July 27, 2022) ........................... 14

*Arthur J. Gallagher & Co. v. Youngdahl*,
    No. 05-1890, 2005 WL 8164161 (D. Minn. Sept. 9, 2005) .................................... 24

*AssuredPartners, Inc. v. Schmidt*,
    398 Ill. Dec. 434 (1st Dist. 2015) .......................................................... 18, 21, 22, 23

*Broidy Cap. Mgmt. LLC v. Muzin*,
    No. 19-cv-0150, 2020 WL 1536350 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th
    789 (D.C. Cir. 2021) ............................................................................................... 15

*Busey Bank v. Turney*,
    No. 21 C 2900, 2022 WL 4079462 (N.D. Ill. Sept. 6, 2022) .................................. 8

*C-Ville Fabricating, Inc. v. Tarter*,
    NO. 5:18-cv-379, 2019 WL 1368621 (E.D. Ky. Mar. 26, 2019) ........................... 14

*Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*,
    378 Ill. App. 3d 437 (1st Dist. 2007) ............................................................... 18, 23

*Cassell v. Snyders*,
    990 F.3d 539 (7th Cir. 2021) .................................................................................... 4

*Checker Car Club of Am., Inc. v. Fay*,
    262 F. Supp. 3d 621 ................................................................................................. 4

*Christie Clinic, LLC v. Youse*,
    No. 20-CV-2340, 2021 WL 1095332 (C.D. Ill. Jan. 27, 2021) .............................. 23

*D.U. v. Rhoades*,
    825 F.3d 331 (7th Cir. 2016) .................................................................................. 24

*Davis Bros., Inc. v. Thornton Oil Co.*,
    12 F. Supp. 2d 1333 (M.D. Ga. 1998) ..................................................................7

*Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*,
    331 Ill. App. 3d 777 (1st Dist. 2002) ..................................................................5

*DM Trans, LLC v. Scott*,
    38 F.4th 608 (7th Cir. 2022) ..............................................................................4

*Dressander v. Simplicity Fin. Mktg., Inc.*,
    No. 19-cv-1395, 2023 WL 2561733 (N.D. Ill. Mar. 17, 2023) ..................... *passim*

*Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*,
    308 Ill. App. 3d 337 (1st Dist. 1999) ................................................................18

*Elim Romanian Pentecostal Church v. Pritzker*,
    613 F. Supp. 3d 1102 (N.D. Ill.), *aff'd*, 962 F.3d 341 (7th Cir. 2020) ....................4

*Ennenga v. Starns*,
    677 F.3d 766 (7th Cir. 2012) ............................................................................16

*ExactLogix, Inc. v. Job Progress, LLC*,
    508 F. Supp. 3d 254 (N.D. Ill. 2020) ...........................................................13, 14

*Fishbaugh v. Bulgadarian*,
    No. 2:20-cv-01135, 2021 WL 3598579 (C.D. Cal. July 8, 2021) .........................14

*Fisher/Unitech, Inc. v. Computer Aided Technology, Inc.*,
    No. 13 C 02090, 2013 WL 1446425 (N.D. Ill. Apr. 9, 2013) (Tharp, J.).........11, 12

*Fleetwood Packaging v. Hein*,
    No. 14 C 9670, 2014 WL 7146439 (N.D. Ill. Dec. 15, 2014) (Tharp, J.).........11, 13

*Genentech, Inc. v. JHL Biotech, Inc.*,
    No. C 18-06582, 2019 WL 1045911 (N.D. Cal. Mar. 5, 2019).............................15

*Grand Veh. Works Hold. Corp. v. Frey*,
    No. 03 C 7948, 2005 WL 1139312 (N.D. Ill. May 11, 2005) ...............................15

*Hay Grp., Inc. v. Bassick*,
    No. 02 C 8194, 2005 WL 2420415 (N.D. Ill. Sept. 29, 2005)..............................19

*IDEXX Laboratories, Inc. v. Bilbrough*,
    No. 2:22-cv-00056, 2022 WL 3042966 (D. Me. Aug. 2, 2022), *R. & R.*
    *adopted*, 2022 WL 4940200 (D.Me., Oct. 4, 2022)............................................10

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021)........................4

*Inmar, Inc. v. Vargas*,
   No. 18-cv-2306, 2018 WL 6716701 (N.D. Ill. Dec. 21, 2018)..............................13

*Jordan v. Lashbrook*,
   No. 19-cv-00305, 2019 WL 1505853 (S.D. Ill. Apr. 5, 2019) ...................................7

*Kinship Partners, Inc. v. Embark Veterinary, Inc.*,
   No. 3:21-cv-01631, 2022 WL 72123 (D. Or. Jan. 3, 2022)......................................10

*Lee/O'Keefe Ins. Agency, Inc. v. Ferega*,
   163 Ill. App. 3d 997 (4th Dist. 1987)........................................................................16

*M-F-G Corp. v. EMRA Corp.*,
   817 F.2d 410 (7th Cir. 1987) ......................................................................................7

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997).....................................................................................................4

*Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*,
   No. 14 C 4957, 2015 WL 3637740 (N.D. Ill. June 11, 2015) ..................................13

*Morgan Stanley Smith Barney LLC v. Sayler*,
   No. 1:19-cv-01067, 2019 WL 3459237 (D. Or. July 31, 2019) ...............................24

*NAV Consulting, Inc. v. Sudrania Fund Servs. Corp.*,
   2023 IL App (1st) 211015-U ...............................................................................13, 14

*NW Monitoring LLC v. Hollander*,
   534 F. Supp. 3d 1329 (W.D. Wash. Apr. 15, 2021) .................................................15

*Office Mates 5, North Shore, Inc. v. Hazen*,
   234 Ill. App. 3d 557 (1st Dist. 1992) ........................................................................17

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*,
   No. 17 C 923, 2017 WL 4340123 (N.D. Ill. Sept. 29, 2017)....................................14

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*,
   No. 17 C 923, 2018 WL 1156246 (N.D. Ill. Mar. 5, 2018) ........................................9

*Packaging Corp. of Am., Inc. v. Croner*,
   419 F. Supp. 3d 1059 (N.D. Ill. 2020) (Tharp, J.) ......................................8, 9, 10, 11

*PepsiCo, Inc. v. Redmond*,
   54 F.3d 1262 (7th Cir. 1995) .........................................................................9, 12, 13

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) .....................................................................................16

*Rapp Ins. Agency, Inc. v. Baldree*,
    597 N.E.2d 936 (Ill. App. Ct. 1992) ...................................................................6, 16

*Reliable Fire Equip. Co. v. Arredondo*,
    358 Ill. Dec. 322 (2011) ...................................................................................15, 23

*Rogers v. LJT & Assocs. Inc.*,
    No. GLR-14-2823, 2015 WL 11027599 (D. Md. Apr. 21, 2015) ...........................15

*Rubloff Dev. Group, Inc. v. SuperValu, Inc.*,
    863 F. Supp. 2d 732 (N.D. Ill. 2012) .....................................................................22

*SKF USA, Inc. v. Bjerkness*,
    636 F. Supp. 2d 696 (N.D. Ill. 2009) .....................................................................20

*Sonrai Sys., LLC v. Waste Connections, Inc.*,
    --- F. Supp. 3d ----, 2023 WL 2266147 (N.D. Ill. Feb. 28, 2023)..........................14

*Spitz v. Proven Winners N. Am., LLC*,
    759 F.3d 724 (7th Cir. 2014) .................................................................................13

*Steves & Sons v. JELD-WEN, Inc.*,
    271 F. Supp. 3d 835 (E.D. Va. 2017) ....................................................................14

*Sys. Dev. Servs. v. Haarmann*,
    389 Ill. App. 3d 561 (5th Dist. 2009)......................................................................5

*Teradyne, Inc. v. Clear Commc'ns Corp.*,
    707 F. Supp. 353 (N.D. Ill. 1989) ...........................................................................8

*Trailer Leasing Co. v. Assocs. Commercial Corp.*,
    No. 96 C 2305, 1996 WL 392135 (N.D. Ill. July 10, 1996) ...........................18, 23

*U.S.A. Glas, Inc. v. Webb*,
    No. 94 C 0958, 1995 WL 59252 (N.D. Ill. Feb. 11, 1995).....................................17

*Unisource Worldwide, Inc. v. Carrara*,
    244 F. Supp. 2d 977 (C.D. Ill. 2003) .......................................................................5

*Vendavo, Inc. v. Long*,
    397 F. Supp. 3d 1115 (N.D. Ill. 2019), *overruled in part on other grounds,*
    *DM Trans, LLC v. Scott*, 38 F.4th 608 (7th Cir. 2022)...........................................12

*Wells Fargo Ins. Servs. USA, Inc. v. Tyndell*,
    No. 2:16-CV-89, 2016 WL 7191692 (E.D. Wash. Dec. 12, 2016).........................24

*Wells Fargo Ins. Servs. v. King*,
    No. 15-CV-4378, 2016 WL 299013 (D. Minn. Jan. 25, 2016)...............................24

*Willis Re Inc. v. Herriot*,
   550 F. Supp. 3d 68 (S.D.N.Y 2021) ................................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..............................................................................................4

**Statutes**

18 U.S.C. § 1836(b)(3)(A)(i)(I) ......................................................................9

18 U.S.C. § 1839(3) ..........................................................................................5

18 U.S.C. § 1839(5)(A), (B) ............................................................................8

18 U.S.C. § 1839(6)(B) .....................................................................................8

28 U.S.C. § 1836(b)(3)(A) ...............................................................................9

Defend Trade Secrets Act of 2016 ("DTSA") ................................... *passim*

Ill. Comp. Stat. 1065/8 ...................................................................................13

Ill. Comp. Stat. Ann. § 1065/3 ........................................................................9

Illinois Trade Secrets Act ("ITSA") ...............................................1, 9, 13, 14

Defendants Louis Ambriano, Nicholas Ambriano, Juan Aponte, Owen Buscaglia, Andrew Masse, Rachel McAllister, Chris Medlicott, Michael O'Brien, and Robert Osborne (collectively, the "New Hires"), and Alliant Insurance Services, Inc. ("Alliant"), respectfully submit this opposition to Plaintiffs' motion for a temporary restraining order.

## INTRODUCTION

Since Aon's failed merger with Willis Towers Watson, many insurance professionals have left Aon to seek better opportunities. After waiting *four* weeks after these employee departures, Aon filed an application for a temporary restraining order seeking emergency relief and claiming immediate and irreparable harm. The only emergency is likely Aon's desire to unlawfully stifle competition in the facultative reinsurance policy business, effectively preventing the New Hires from earning a living. Aon's TRO should be denied for six independent reasons.

First, Aon has not established a likelihood of success on its claim for misappropriation of trade secrets under the federal Defend Trade Secrets Act of 2016 ("DTSA"). The information here is publicly available or comes from the third-party cedents—it is not a "trade secret" of Aon. Second, the emails sent by two individual defendants to personal email accounts while employed by Aon were fully remediated and never brought into Alliant. Given the lack of any improper taking, use, or disclosure of trade secrets, Aon focuses on the individual defendants' "access" to trade secrets before they resigned. But "access" does not constitute "misappropriation" under the DTSA. Otherwise, any former employee could be sued. Third, the inevitable disclosure doctrine is inapplicable under the DTSA where no Illinois Trade Secrets Act ("ITSA") claim is asserted, and this state-law doctrine does not prevent the New Hires from using their skill, experience and general knowledge of the industry when changing jobs. Fourth, Aon's common law tort claims based on misuse of confidential, proprietary, and trade secret information are preempted even though Aon intentionally omitted an ITSA claim. Fifth, Aon's restrictive covenants are overbroad,

1

unenforceable, and injurious to the public. Moreover, Plaintiffs do not have a "near permanent" protectible interest in its cedent-clients. In fact, Aon plc, the party to the RSU agreements containing the restrictive covenants, has no operations in the United States and no client relationships. And its grossly overbroad restrictive covenants cannot be saved through "blue penciling." Sixth, a temporary restraining order should not issue because money damages give Aon an adequate remedy at law.

Accordingly, Aon's emergency request for a business-stopping TRO should be denied.

## BACKGROUND

This case arises out of the departure of reinsurance professionals who left Aon Re to join Alliant. Alliant hired each individual separately[1] and has onboarding protocols which include forensic remediation of personal devices and accounts and other IT security measures to ensure that new hires do not improperly take, use, or disclose any confidential, proprietary, or trade secret information of their former employers. The specific allegations made against each individual defendant are addressed in their accompanying declarations. Aon's case boils down to a handful of emails that were sent to personal email accounts of two defendants, one hard copy document that was allegedly taken, routine "access" to Aon work-related folders, and an effort to enjoin everyone for everything based on the inevitable disclosure doctrine and conspiracy theories. However, the files and documents which give rise to this action have been remediated and/or

---

[1] *See* Declaration of Bledion Dizdari ("Dizdari Decl."), ¶ 3. Aon's claim that this was an orchestrated mass departure lacks two elements—orchestration among the departees and mass, especially considering Aon's elephantine size. The New Hires were recruited individually by Alliant, not in bunches, and there is no evidence otherwise. *Id.*, ¶ 3. The New Hires have denied soliciting other Aon employees, and they were provided written instructions not to do so. *See* declarations of New Hires, *passim*; Dizdari Decl., ¶ 6. In a free marketplace, Alliant (and any other employer) is at liberty to recruit new employees as it sees fit. Aon certainly does the same. Moreover, it is hardly surprising or suspicious that staff members will take advantage of a new employment opportunity when their bosses have departed to a new opportunity. If partners depart a law firm, it does not raise an eyebrow if some associates and paralegals then decide to go, too. Indeed, it would be odd and surprising were that not to occur.

returned to Aon and defendants are not in possession of any Aon information.

Reinsurance is the business of providing insurance for insurance companies to provide coverage for catastrophic losses. Insurance companies, known as "cedents," purchase reinsurance policies to mitigate their risks on particular insurance policies that they issue to their underlying insured clients. A "facultative" reinsurance policy is one in which, at the same time the insurer-cedent is considering issuing a policy to an underlying insured, the insurer purchases a reinsurance policy from a reinsurer to cover discrete risk or blocks of risk presented by the underlying insurance policy.[2] Typically, insurance companies each have numerous, functionally independent underwriting departments covering different areas of the insurer's business.[3]

Through their brokers, commonly referred to as "producers," all reinsurance brokerages (*e.g.*, Aon, Alliant, and many others) actively compete for facultative reinsurance business from the underwriters working for *the same dozen or so insurance companies*.[4] The identities of major insurance companies (*e.g.,* Travelers, Chubb, Hartford, AIG, etc.) are well-known. This commonly known core group of insurance companies produces *at least 80% or more* of the brokerage market for facultative reinsurance policies—in terms of both policy volume and revenue.[5] To enjoin business with the major insurance companies that everyone knows would effectively put a producer out of the reinsurance brokerage business.

## ARGUMENT

### I. The Legal Standard for a Temporary Restraining Order

Temporary restraining orders are "extraordinary and drastic remedies that should not be

---

[2] Declaration of Nicholas Ambriano ("N. Ambriano Decl."), ¶ 5; Declaration of Michael O'Brien ("O'Brien Decl."), ¶¶ 9, 10.
[3] O'Brien Decl., ¶ 16.
[4] N. Ambriano Decl., ¶ 8; O'Brien Decl., ¶¶ 11, 14.
[5] N. Ambriano Decl., ¶ 8; O'Brien Decl., ¶¶ 11, 14.

granted unless the movant, 'by a clear showing, carries the burden of persuasion.'"[6]  Aon must

show a likelihood of success on the merits, that it has no adequate remedy at law, and that it will

suffer imminent, irreparable harm in the absence of injunctive relief. To establish likelihood of

success, Aon must show more than a mere "possibility of success."[7]  It must make a "strong

showing" of a likelihood of "succe[ss] on the merits," which "normally includes a demonstration

of how the applicant proposes to prove the key elements of its case."[8]  The Court must also balance

the irreparable harm Aon would suffer if its motion were denied against the harm Alliant and the

New Hires would suffer if a TRO were granted.[9] "Finally, the court must also determine whether

the injunction is in the public interest, taking into account any effects on non-parties."[10]

## II.    Aon Is Not Likely To Succeed On Its Claim For Misappropriation Of Trade Secrets.

### A.    Aon Cannot Establish The Existence Of Trade Secrets.

Aon alleges as trade secrets "the relevant contacts at the Aon clients who utilize Aon's

services, the types of services those Aon clients require, and their preferences, the revenue

information for Aon's clients and reinsurance business, the insurance solutions for Aon's clients,

impending renewal dates, strategies to meet the client's needs, and other client information

obtained by the Former Employees . . . ."[11]  None of that qualifies as a protectable "trade secret"

under the facts here. Trade secrets do not include information "generally known to," or "being

---

[6] *Elim Romanian Pentecostal Church v. Pritzker*, 613 F. Supp. 3d 1102, 1107 (N.D. Ill.), *aff'd*, 962 F.3d 341 (7th Cir. 2020) (denying motion for temporary restraining order) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

[7] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (stating that injunctions cannot be based merely on the possibility of irreparable harm); *see also Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021); *see also DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022); *Checker Car Club of Am., Inc. v. Fay*, 262 F. Supp. 3d 621, 629–30.

[8] *Ill. Republican Party*, 973 F.3d at 762.

[9] *Id.* at 762–63; *see also Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) ("Such harm must also be balanced against any harm to the 'non-moving party' and 'the public interest,' which refers to the interests of people and institutions that are not parties to the case.") (citation omitted).

[10] *Elim Romanian Pentecostal Church*, 613 F. Supp. 3d at 1108.

[11] Complaint ¶ 149.

readily ascertainable through proper means by, another person . . . ."[12]  In the reinsurance brokerage industry, very little information, if any, is not generally known to or not readily ascertainable by brokers—especially brokers who, like here, have been in the business for years, if not decades. The categories of information identified by Aon are not legally protectable as trade secrets.[13]

All reinsurance brokers are familiar with the identities of the major cedents, and cedents' contact information is easily located on the internet or through other public sources.  The "relevant contacts" at a cedent, *e.g.*, the underwriters in cedents' underwriting departments that all brokers do business with, can be reached simply by calling or visiting a cedent and inquiring without expenditure of significant time or resources.  Those contacts also are ascertainable through, for example, third-party referral sources used by reinsurance brokers.

Nor are the cedents' insurance policy information, pricing, contract terms, renewal dates, or any other similar policy-related information "trade secrets" of Aon.  The insurer-cedents, not Aon as a brokerage, own their reinsurance policies and information, and reinsurance carriers, which issue the policies, are also privy to the cedents' information.  Underwriters can, and do, share information about a particular facultative reinsurance policy with any producer.  If an underwriter wants to switch producers servicing a policy, he issues a broker of record letter to the reinsurance carrier so that the new producer can obtain policy information directly from the

---

[12] *See* 18 U.S.C. § 1839(3) (defining "trade secret").

[13] *See, e.g.*, *Sys. Dev. Servs. v. Haarmann*, 389 Ill. App. 3d 561, 572–76 (5th Dist. 2009) (holding that contact information for potential clients was not a protectable trade secret because it was "general information," "common knowledge," and "readily available" to people in the trade, and that defendants' personal relationships developed with customers while working with the employer, not the employer's customer lists, enabled defendants "to lure those customers away"); *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 331 Ill. App. 3d 777, 791–93 (1st Dist. 2002) (holding that customer data, including pricing, service history, key decision-makers, and customer contract terms, were not trade secrets); *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 988 (C.D. Ill. 2003) (declaring that "general information regarding customer coverage, staffing, and how [a company] conducts its business is not protectable, because one who works for another cannot be compelled to erase from his mind all of the general skills, knowledge, acquaintances and the over-all experience that he acquired during the course of his employment," and that information regarding key personnel is not the type of information that Illinois law intends to protect as confidential).

carrier.[14]  Aon does not own or control the cedent's insurance "preferences," "solutions," or "strategies" (or anything else about the cedent's policies) and cannot preclude a competitor from obtaining or using any of that information when properly acquired from the cedents or carriers.[15]

**B.     Aon's DTSA Claim Is Not Likely to Succeed On The Merits.**

**1.     Any Aon Information Which Remained In Possession Of A Few Defendants After They Resigned From Aon Has Already Been Remediated.**

Aon alleges that, two weeks *before* leaving Aon, Nicholas Ambriano was seen placing a paper containing a cedent's contract "terms and conditions" into his briefcase and "upon information and belief is using this document now for the benefit of Alliant."[16]  Not true.  Mr. Ambriano took the document home to review in advance of a client call the following day, conducted that call, and then deposited the document in the recycle bin at Aon's office.[17]  Aon also alleges that defendants Osborne, Louis Ambriano, and McAllister were seen "taking stuff" from the office.[18]  While Aon fails to identify the "stuff" allegedly taken, these defendants confirm that they took nothing other than their personal belongings.[19]  Aon also alleges that defendants Masse and Aponte emailed certain information to their personal email accounts.[20]  However, the information emailed was remediated by a forensic vendor engaged by counsel and neither Masse nor Aponte currently possess the information.[21]  There is no evidence the emails were forwarded

---

[14] O'Brien Decl., ¶ 15.
[15] *Rapp Ins. Agency, Inc. v. Baldree*, 597 N.E.2d 936, 939 (Ill. App. Ct. 1992) ("[I]nsurance customers may be targeted or contacted randomly by any given insurance salesman for any company and, more often than not, will voluntarily disclose information about their policies in the hopes of obtaining better deals….").
[16] Complaint ¶ 78.b.
[17] N. Ambriano Decl., ¶ 15.
[18] Compl. ¶ 84.
[19] Declaration of Rachel McAllister ("McAllister Decl."), ¶ 4; Declaration of Louis Ambriano ("L. Ambriano Decl."), ¶ 5; Declaration of Robert Osborne, ¶ 2.
[20] *See* Compl. ¶¶ 79.b, 94.b.
[21] Declaration of Andrew Masse ("Masse Decl."), ¶¶ 8, 9; Declaration of Juan Aponte, ¶ 2; Declaration of Doris Little ("Little Decl."), ¶¶ 4-6.

to anyone at Alliant or that the information is being used for any purpose.

Upon hire, counsel worked with New Hires to identify data sources that may contain Aon-work related files and had such files removed from their possession. To the extent any such data sources were identified, the forensic consultant made preservation images of the devices or online accounts. The forensic consultant then searched the preservation images for Aon work-related files from the past two years and permanently removed such content from the device or online account (the preservation image was retained by the consultant to avoid spoliation). The New Hires also timely returned all of their Aon-issued computers and any hard copy work files they were able to locate.[22] The New Hires signed Prospective Employee Departure Protocols instructing them not to improperly take, disclose, or use trade secret, proprietary, or confidential information of their employer or bring such materials to Alliant.[23] At no time did Alliant take possession, custody, or control of any Aon documents, files or devices. Alliant uses IT measures to prevent new employees from downloading, uploading, saving or otherwise transferring information from their former employer to Alliant, including blocking USB ports and personal emails.[24]

Because the documents at issue have been fully returned or remediated, and Alliant has offered to cooperate with Aon in utilizing a neutral forensic consultant to confirm that no defendants possess Aon information, there is no need for extraordinary and drastic injunctive relief.[25]

---

[22] Declaration of Debra Fischer ("Fischer Decl."), Exs. D, E; New Hires' declarations, *passim*.
[23] Dizdari Decl., ¶¶ 4-7, Exs. A-I.
[24] Declaration of Nelson Andrada ("Andrada Decl."), ¶¶ 3-5; Dizdari Decl., ¶ 5.
[25] Fischer Decl., ¶ 7. *See also M-F-G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir. 1987) (voluntary discontinuation of alleged conduct "may make entry of an injunction unnecessary if there is little likelihood of recurrence"); *Jordan v. Lashbrook*, No. 19-cv-00305, 2019 WL 1505853, at *2 (S.D. Ill. Apr. 5, 2019) (deeming a "TRO unnecessary at this time" where plaintiff had already "received most of the relief he

### 2. Mere "Access" of Trade Secrets During Employment Does Not Constitute "Misappropriation" Under The DTSA.

The DTSA defines "misappropriation" to mean either the "acquisition of a trade secret of another . . . by improper means" or the "disclosure or use of a trade secret of another without express or implied consent" under enumerated circumstances.[26] Acquisition by "lawful means" is expressly excluded from the definition of "improper means."[27]

Here, Aon alleges that the New Hires "accessed" information that, in the ordinary course of business, they routinely used to perform their job of servicing cedents, and that the New Hires did so while still fulfilling those obligations to cedents until the point that they left Aon.[28] Aon alleges that, during their employment, the New Hires "had access to" information "by virtue of their positions with Aon," and "were exposed to volumes of" client information,"[29]

As many Illinois courts—including this Court—have concluded, allegations trying to equate "access" to improper acquisition, use, or disclosure of trade secrets are misplaced and do not justify a TRO.[30] Otherwise, any employee with access to trade secrets could be sued after

---

requested"); *Davis Bros., Inc. v. Thornton Oil Co.*, 12 F. Supp. 2d 1333, 1338 (M.D. Ga. 1998) (no injunction when remediation is underway).

[26] 18 U.S.C. § 1839(5)(A), (B).

[27] 18 U.S.C. § 1839(6)(B).

[28] *See, e.g.*, Compl. ¶¶ 5, 13, 57, 74, 75, 78, 79, 81; *see also* N. Ambriano Decl., ¶¶ 16-17; O'Brien Decl., ¶¶ 5, 6; McAllister Decl., ¶¶ 2, 3; Masse Decl., ¶ 3; Declaration of Chris Medlicott, ¶¶ 5, 6.

[29] Compl. ¶ 151.f.

[30] *See, e.g.*, *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) (Tharp, J.) (dismissing a trade secret misappropriation claim and denying motion for preliminary injunction because mere "access to confidential information and trade secrets" in the course of employment or "mere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets, even when considered in conjunction with solicitations of former clients"); *id.* at 1069 ("lost business" does not demonstrate "misappropriated trade secrets," "particularly in a highly competitive business" where "effective salesm[e]n . . . ha[ve] strong relationships with many of [their] clients"); *Teradyne, Inc. v. Clear Commc'ns Corp.*, 707 F. Supp. 353, 356–57 (N.D. Ill. 1989) ("The defendants' claimed acts, working for Teradyne, knowing its business, leaving its business, hiring employees from Teradyne and entering the same field (though in a market not yet serviced by Teradyne) do not state a claim of threatened misappropriation. All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. This is not enough."); *Busey Bank v. Turney*, No. 21 C 2900, 2022 WL 4079462, at *1, *7 (N.D. Ill. Sept. 6, 2022) (affirming dismissal of a misappropriation claim where the bank "raid[ed]" 21 employees of competitor bank, leaving

resigning to join a competitor. That is not the law. *See* 18 U.S.C. § 1836(b)(3)(A)(i)(I) (DTSA injunctions cannot be based "merely on the information the person knows").

### 3. Aon Cannot Prevail On A Theory Of Inevitable Disclosure.

#### a. *Inevitable Disclosure Is Not Cognizable Under The DTSA.*

Given the lack of evidence of improper acquisition, use, or disclosure of trade secrets, Aon invokes the inevitable disclosure doctrine, as described in *PepsiCo., Inc. v. Redmond,* to justify its request for a TRO.[31] But the "inevitable disclosure" theory provides no basis for injunctive relief under the DTSA, and Aon did not bring an accompanying state law claim under ITSA.

In *Croner*, this Court dismissed a DTSA claim without deciding whether to grant preliminary injunctive relief based on inevitable disclosure, a theory the Court noted was viewed with "skepticism" in this district.[32] The *Croner* Court observed that "[a]lthough the Seventh Circuit has permitted inevitable disclosure claims under the ITSA, it has not explicitly allowed them under the DTSA" where the federal claim is asserted without an ITSA claim.

Section 1836(b)(3)(A)(i)(I) of the DTSA states, in part, that the court may "grant an injunction . . . to prevent any actual or threatened misappropriation . . . provided the order does not . . . prevent a person from entering into an employment relationship, and that conditions placed on such employment *shall be based on evidence of threatened misappropriation and not merely on the information the person knows*[.]"[33] This provision of the DTSA is materially different from

---

competitor with "no remaining employees," because, even though some employees actually removed documents, the plaintiff failed to "identify any specific unauthorized disclosure or use of trade secrets . . . and cannot simply speculate that the Former Employee Defendants must have used its trade secrets to compete."); *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2018 WL 1156246, at *3–4 (N.D. Ill. Mar. 5, 2018) (finding allegations that defendants "accessed" confidential information insufficient to withstand motion to dismiss DTSA claim).

[31] *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995).

[32] *Croner*, 419 F. Supp. 3d at 1069-70.

[33] 28 U.S.C. § 1836(b)(3)(A) (emphasis added).

the injunction provision under ITSA[34] and was added to the DTSA out of a concern that the federal statute could be improperly used to restrict employee mobility, especially in states where covenants not to compete are unenforceable, such as California, Oklahoma, and North Dakota.

Courts in other jurisdictions have confirmed that the "inevitable disclosure" doctrine which arose under state law cannot provide a basis for injunctive relief under the DTSA. In *IDEXX Laboratories, Inc. v. Bilbrough*, for example, the court firmly concluded that "based on the plain language of the statute, the inevitable disclosure doctrine does not apply to claims brought pursuant to DTSA."[35] Likewise, in *Kinship Partners, Inc. v. Embark Veterinary, Inc.*, the court concluded that, "based on the plain language of the statute," "[p]ursuant to federal law, the DTSA specifically forecloses courts from granting relief based on the inevitable disclosure doctrine . . . ."[36]

The Legislative history shows the DTSA was drafted so it would not restrict employee mobility.[37] In 2016, a leading commentator on trade secrets—James Pooley—published an article entitled "Trade Secret Bill Resolves 'Inevitable Disclosure' Controversy."[38] Thus, the DTSA and its legislative history are clear—the inevitable disclosure doctrine doesn't apply under federal law.

> b.    *Even If Cognizable, Inevitable Disclosure Does Not Apply.*

Illinois federal courts—including this Court—also view the inevitable disclosure doctrine under state law with "skepticism."[39] In *Croner*, this Court explained that the inevitable disclosure

---

[34] 765 Ill. Comp. Stat. Ann. § 1065/3.

[35] No. 2:22-cv-00056, 2022 WL 3042966, at *6 (D. Me. Aug. 2, 2022), *R. & R. adopted*, 2022 WL 4940200 (D.Me., Oct. 4, 2022).

[36] No. 3:21-cv-01631, 2022 WL 72123, at *7 (D. Or. Jan. 3, 2022).

[37] "[T]he DTSA declines to adopt an inevitable disclosure rule that would override the public policy of states favoring employee mobility. . . . To avoid doing so, the DTSA requires that proof of threatened future misappropriation be based on evidence of conduct and intent and not simply inferred from the employee's position or knowledge. . . . The SENATE REPORT explains that "[t]hese limitations [by the DTSA] on injunctive relief were included to protect employee mobility . . . . S. REP., S. 1890 at 12." *See* Trade Secret Case Management Judicial Guide (2023), § 2.6.1.1.

[38] *See* https://pooley.com/trade-secret-bill-resolves-inevitable-disclosure-controversy/ (last visited May 23, 2023).

[39] *Croner*, 419 F. Supp. 3d at 1070.

doctrine requires "a showing of intent or a high probability" that the employee will use trade secrets . . . [and] Courts are 'cautious' in their application of the doctrine due to its significant potential to curb employee movement among competitors."[40] "Previous plaintiffs that have succeeded in stating claims for inevitable disclosure in this district have alleged that the defendant 'could not operate or function' in the new position without relying on the trade secrets."[41]

Here, all reinsurance producers either already know the identities of cedents and their underwriters or have easy access to that publicly available information, as producers openly compete for the cedents' business on an ongoing basis.  In *Fleetwood Packaging v. Hein*, this Court rejected the inevitable disclosure doctrine and denied a TRO in part because "customer identities and contact information were [not] protectable trade secrets," and because, just like reinsurance brokerages, the companies "competed" on customer pricing irrespective of any particular employee's knowledge and "sometimes won business over" the other without any particular employee's knowledge.[42]  The same reasoning supports denial of the TRO here.

Likewise, this Court's reasoning in rejecting inevitable disclosure in *Fisher/Unitech, Inc. v. Computer Aided Technology, Inc.*[43] warrants rejection of Aon's arguments that the doctrine should shield "decades of industry relationships and proprietary data cultivated by" Aon and the New Hires "will have an 'unfair advantage by avoiding the costly process of actually discovering' this information."[44]  Aon's arguments mirror those of the *Fisher/Unitech, Inc.* plaintiff, whose "supposedly unique and proprietary sales practices" were, as is the case for all reinsurance brokerages, "nothing more than general knowledge and experience that any . . . reseller would

---

[40] *Id.* (citations omitted).
[41] *Id.* (citations omitted).
[42] No. 14 C 9670, 2014 WL 7146439, at *7 (N.D. Ill. Dec. 15, 2014) (Tharp, J.).
[43] No. 13 C 02090, 2013 WL 1446425 (N.D. Ill. Apr. 9, 2013) (Tharp, J.).
[44] Aon's Mem. Supp. TRO, at pp. 1, 9.

likely develop through 'on the job training' and 'trial and error.'"[45]  Inevitable disclosure did not protect "knowledge obtained through painstaking trial and error that [the competitor], unfairly, would not have to replicate," because, according to this Court, "'legwork' is not confidential information, nor is one firm entitled to protection because it was the first to develop certain knowledge."[46]  The plaintiff conceded that, as with reinsurance brokerages, "similar on-the-job experience would have been available at the dozen other level-one Stratasys dealers."[47]  According to the Court, "how to use it to meet a particular customer's needs was also acquired through experience, and would be needed by anyone selling [the products and services]," "closing the deal—was the product of experience," and "[s]kills learned through employment are 'exactly the generalized knowledge and expertise' that are "'not subject to restriction.'"[48]  And just as cedents are the source of virtually all information Aon seeks to convert into Aon "trade secrets" or "proprietary" information, this Court rejected inevitable disclosure where "much of what Fisher/Unitech considers proprietary information is built upon a foundation of knowledge and resources that come from the [third-party] manufacturer."[49]

Moreover, application of the inevitable disclosure doctrine is unwarranted here given the steps Alliant has taken to prevent the New Hires' use of any Aon information.[50]  The "actions of the new employer to prevent the employee from using or disclosing trade secrets of the former employer" is a relevant factor for the Court to consider in the analysis.[51]

Thus, any application of the inevitable disclosure doctrine here would be contrary to

---

[45] *Fisher/Unitech, Inc.*, 2013 WL 1446425, at *5.
[46] *Id.*
[47] *Id.* at *6.
[48] *Id.*
[49] *Id.*
[50] *See* Little Decl., ¶¶ 4-7; Dizdari Decl., ¶¶ 4-8; Andrada Decl., ¶¶ 3-5.
[51] *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1140 (N.D. Ill. 2019), *overruled in part on other grounds, Dm Trans, LLC*, 38 F.4th 608.

*PepsiCo*, injurious to fair competition, and stifle mobility for the reinsurance brokerage profession.[52] This Court should not apply the doctrine, let alone under the DTSA.

### C.  Aon's Common Law Claims Are All Preempted By The ITSA.

The purpose of the *Uniform* Trade Secrets Act, which has been adopted by 49 states and the District of Columbia, is to bring uniformity to the law concerning theft of sensitive business information by preempting state-by-state shotgun blasts of tort claims.  The ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."[53]  Courts have consistently held that ITSA "preempts all common law claims based on misappropriation of trade secrets."[54]

Aon has tried to avoid preemption by omitting an ITSA claim and selectively recasting its purported "trade secrets" as "confidential" or "proprietary" information in various claims. Such pleading gamesmanship cannot evade the preemptive effect of ITSA.  As this Court has held, "the ITSA preempts claims of misappropriation of confidential information even if that information does not rise to the level of a trade secret."[55]  Here, Aon asserts common law claims of intentional interference with contract (Count III); tortious interference with prospective economic advantage

---

[52] This case concerns sales personnel competing with many other salesmen among many reinsurance brokerages for the placement of reinsurance policies. This is not *PepsiCo.*, where a single corporate executive had internalized the "playbook" on a novel corporate strategy for developing a first-to-market business and took that unique knowledge to the single direct competitor. *See, e.g.*, *Fleetwood Pkg.*, 2014 WL 7146439, at *7 (declining application of inevitable disclosure doctrine).

[53] 765 Ill. Comp. Stat. 1065/8.

[54] *NAV Consulting, Inc. v. Sudrania Fund Servs. Corp.*, 2023 IL App (1st) 211015-U, ¶ 30; *Inmar, Inc. v. Vargas*, No. 18-cv-2306, 2018 WL 6716701, at *10 (N.D. Ill. Dec. 21, 2018).

[55] *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *17 (N.D. Ill. June 11, 2015) (citing *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014)) (J., Tharp); *ExactLogix, Inc. v. Job Progress, LLC*, 508 F. Supp. 3d 254, 268-69 (N.D. Ill. 2020) ("At bottom, all common law claims based on misappropriation of trade secrets were codified, and preempted, by ITSA. This extends to confidential information, even where such confidential information does not actually fall within ITSA's statutory definition of a trade secret. . . . This extends to confidential information, even where such confidential information does not actually fall within ITSA's statutory definition of a trade secret.") (citations omitted) (collecting cases).

(Count IV); breach of fiduciary duty (Count V); aiding and abetting breach of fiduciary duty (Count VI); and civil conspiracy (Count VII) based on allegations concerning theft of information.

Aon not only incorporates by reference the allegations of misappropriation of "trade secrets" into each cause of action, but it also includes specific allegations in the claims themselves that demonstrates they are preempted. *See, e.g.,* Count III (alleging that Alliant induces the New Hires' "theft of Aon's confidential, proprietary, and trade secret information"); Count V (alleging that certain New Hires took "Aon information to create a competitive practice"); Count VI (alleging that the New Hires used Aon "information to compete against it"); and Count VII (alleging that certain New Hires conspired to "misappropriate and exploit Aon's information").[56]

### D. Aon's Civil Conspiracy Claim Is Not A Valid Cause of Action.

Aon asserts a claim of civil conspiracy to make everyone jointly and severally liable.[57] However, conspiracy is not viable for breach of contract claims and the DTSA does not authorize an express or implied private right of action for conspiracy to engage in the misappropriation of trade secrets.[58] When enacting the DTSA, Congress did not authorize a private claim for conspiracy.[59] As a result, and because the claim also is preempted, courts have consistently

---

[56] Compl. ¶¶ 187, 204, 209, 217; *see also NAV Consulting, Inc.*, 2023 IL App (1st) 211015-U, ¶ 32 (holding ITSA preempted tortious interference claim based on the allegation that the defendant "solicited the employees to sabotage the plaintiff's business"); *Sonrai Sys., LLC v. Waste Connections, Inc.*, --- F. Supp. 3d ----, 2023 WL 2266147, at *4 (N.D. Ill. Feb. 28, 2023) ("misappropriation of trade secrets cannot serve as a basis for a civil conspiracy claim because . . . ITSA preempts common law tort remedies for misappropriation of trade secrets."); *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2017 WL 4340123, at *5 (N.D. Ill. Sept. 29, 2017).

[57] Count VII incorporates Aon's DTSA claim by reference and seeks recovery for damages allegedly caused by misappropriation of Aon's alleged secret information. *See ExactLogix*, 508 F. Supp. 3d at 270-71 (holding that cause of action for conspiracy encompassed all claims because the cause of action incorporated all previous allegations).

[58] *Steves & Sons v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 843 (E.D. Va. 2017).

[59] *Id.* at 841-42 (holding that the DTSA does not create an express or implied private right of action for redress for conspiracy to engage in theft of trade secrets).

dismissed actions brought by private parties for conspiracy to misappropriate trade secrets.[60]

### III. Aon Is Not Likely To Succeed On Claims For Alleged Breach Of Restrictive Covenants Or Tortious Interference.

#### A. Aon's Overbroad Covenants Are Unreasonable And Unenforceable.[61]

The Restricted Stock Unit ("RSU") agreements with Aon PLC are governed by Illinois law.[62] "Illinois courts disfavor and closely scrutinize restrictive covenants because they are repugnant to the public policy encouraging an open and competitive marketplace."[63] "Illinois courts 'abhor restraints on trade.'"[64] In *Reliable Fire Equip. Co. v. Arredondo,* the Illinois Supreme Court held that restrictive covenants are only enforceable if they are (1) no more restrictive than necessary for the protection of a legitimate business interest of the employer, (2) not injurious to the public, and (3) do not impose undue hardship on the employee.[65] Aon's covenants fail under each these factors.

#### 1. Aon's Client And Referral Source Covenants Do Not Protect A Legitimate Interest In "Near Permanent" Customers

##### a. *Aon PLC has no capacity to have customers.*

---

[60] *See, e.g.*, *Arthur J. Gallagher & Co. v. Tarantino*, No. 20-cv-05505, 2022 WL 4092673, at *18 (N.D. Cal. July 27, 2022) (holding conspiracy liability is not available under the DTSA); *Fishbaugh v. Bulgadarian*, No. 2:20-cv-01135, 2021 WL 3598579, at *4 (C.D. Cal. July 8, 2021) (same); *C-Ville Fabricating, Inc. v. Tarter*, NO. 5:18-cv-379, 2019 WL 1368621, at *14 (E.D. Ky. Mar. 26, 2019) (same); *Genentech, Inc. v. JHL Biotech, Inc.*, No. C 18-06582, 2019 WL 1045911, at *12 (N.D. Cal. Mar. 5, 2019); *see also NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1338 (W.D. Wash. Apr. 15, 2021); *Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-cv-0150, 2020 WL 1536350, at *13 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021); *Rogers v. LJT & Assocs. Inc.*, No. GLR-14-2823, 2015 WL 11027599, at *3 n.4 (D. Md. Apr. 21, 2015).

[61] Aon's memorandum incorrectly asserts that "multiple courts" (three)—in decisions issued in 2011, 2013, and 2019—"held that materially similar covenants to those at issue here are enforceable under Illinois law." Aon's Mem. Supp. TRO, at p. 11. That is false. Aon changed the language of its restrictive covenants into what is now the convoluted, grossly overbroad iteration in the 2022 RSU agreements.

[62] For the purposes of this motion *only*, the New Hires will not challenge that Illinois law governs the covenants. The New Hires expressly reserve the right to argue that the law of the state where they worked or reside should govern the restrictive covenants.

[63] *Grand Veh. Works Hold. Corp. v. Frey*, No. 03 C 7948, 2005 WL 1139312, at *6 (N.D. Ill. May 11, 2005).

[64] *Dressander v. Simplicity Fin. Mktg., Inc.*, No. 19-cv-1395, 2023 WL 2561733, at *10 (N.D. Ill. Mar. 17, 2023) (citation omitted).

[65] *Reliable Fire Equip. Co. v. Arredondo*, 358 Ill. Dec. 322, 326 (2011).

In Illinois, courts will not enforce client non-solicitation covenants unless the employer can demonstrate a proprietary, protectible interest in "near-permanent" clients that, but for the employment, would not have had contact with the employee.

Aon plc is an ultimate parent entity with **no operations** in the United States. In 2012, in order to avoid paying U.S. taxes, Aon plc re-domesticated to the United Kingdom.[66] In April 2020, Aon plc's jurisdiction of incorporation was changed from the United Kingdom to the Republic of Ireland, this time, to shield Aon's officers and board members from suits brought by shareholders.[67] Aon plc has not established that it has any employees, insurance licenses or operations in Illinois, or any direct client relationships. Nor have Aon Corporation or Aon Fac, Inc. shown they have any legitimate interests to be protected by the enforcement of restrictive covenants against the defendants.

> b. *Insurer-cedents are not protectible "near permanent" customers under Illinois law.*

Plaintiffs have not established they have any direct—let alone near permanent—client relationships. Policy contracts are typically short-term, "somewhat transient," and dependent on "constant periodic renewals," and "insurance customers are frequently approached by competitors and . . . customers willingly give the competitor information regarding their premiums in hopes of obtaining a better deal."[68] This conclusion applies in the facultative reinsurance policy context as no reinsurance brokerage or producer enjoys an exclusive, "near-permanent" business relationship

---

[66] Aon Form 10-Q for quarterly period ending March 31, 2023 at 1; Aon Form 10-K for the period ending December 31, 2012 at 2; Aon Form 10-K for the period ending December 31, 2011 at 1; Aon 2012 Annual Financial Report at 3.

[67] Aon Form 10-K for the period ending December 31, 2020 at 14, 26. The Court may take judicial notice of matters of public record. *E.g., Ennenga v. Starns*, 677 F.3d 766, 777 (7th Cir. 2012); *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

[68] *Rapp Ins. Agency, Inc.*, 597 N.E.2d at 939; *see also Lee/O'Keefe Ins. Agency, Inc. v. Ferega*, 163 Ill. App. 3d 997, 1005 (4th Dist. 1987) (describing "short term" nature and "turnover" of policy contracts).

with the underwriters and shared cedent customers providing more than 80% of the business.

All reinsurance brokerages and producers have an opportunity to compete for the business of placing reinsurance policies for insurance companies in the core base—the identities of which are known to all in the industry, and with whom the New Hires would have done business regardless of which brokerage they were associated with.[69] Aon concedes that the "reinsurance-brokerage industry" is "highly competitive."[70] Cross-purchasing is the norm in this industry.[71] Producers from different brokerages separately service many facultative reinsurance policies insuring different aspects of an underlying insurance policy.[72] Given the competition, underlying policy demand, and cedents' fluctuating risk tolerances, at the reinsurance policy level, the business is transient, not "sticky"[73]: there is a roughly 60% retention rate annually.[74] The absurdity of the overbreadth of Aon's covenants is thrown into sharp relief when one considers that those covenants purport to block even an *Alliant-owned* managing general underwriter for Chubb from doing business with the New Hires.[75]

      c.    *"Prospective" clients and "referral sources" are not protectible.*

Even if the core group of cedents were a "near permanent" interest that Aon could control,

---

[69] *See supra* p. 3.

[70] Aon's Mem. Supp. TRO, at p. 15.

[71] O'Brien Decl., ¶¶ 11, 14; N. Ambriano, Decl. ¶ 8.

[72] O'Brien Decl., ¶ 11. In *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 572 (1st Dist. 1992), the court described the "fact pattern typifying" businesses in which the near-permanent customer requirement is missing—a type squarely fit by the facultative reinsurance policy business. *See also U.S.A. Glas, Inc. v. Webb*, No. 94 C 0958, 1995 WL 59252, at *5, *7 (N.D. Ill. Feb. 11, 1995) (citing Illinois cases holding that "[w]hen the employer's business is sales of a nonunique product, its customers also do business with its competitors, are generally known to the competitors, or are ascertainable by reference to telephone or specialized directories, the near-permanency test will not be satisfied").

[73] Aon cites to the *Herriot* decision for the contrary proposition, that facultative reinsurance business is not "sticky." *Herriot*, however, appears to have concerned only "treaty casualty" reinsurance relationships with insurance companies, not the transactional "facultative" reinsurance business at issue in this case, in which the business is measured at the individual policy account-by-account basis. *See Willis Re Inc. v. Herriot*, 550 F. Supp. 3d 68, 73 (S.D.N.Y 2021).

[74] N. Ambriano Decl., ¶ 6; O'Brien Decl., ¶ 14.

[75] *See* Declaration of Joan Miles ("Miles Decl.").

Aon's broad covenants cover *future* customers, and even *non-customer* relationships. Aon seeks to prevent the New Hires from "accepting," "servicing," or "performing" business offered by or through a third-party referral source with whom the New Hire may never have worked for but merely had "personal contact" with while at Aon.[76] Under Illinois law, non-solicitation covenants cannot extend beyond "*customer relations that . . . employees developed while working for the employer.*"[77] An employer "cannot possibly have a near-permanent relationship with a prospective customer," and a non-solicitation provision proscribing "prospective customer" contact "does not meet the requirements for finding a legitimate business interest."[78]

### 2. Aon's Restrictions Are Overbroad And Injurious To The Public By Precluding Merely "Accepting" Or "Servicing Business"

Section 9.b of the RSU agreements also defines "solicit" unfairly,[79] preventing the New Hires from "knowingly engag[ing] in any conduct that . . . could reasonably be expected to cause a Covered Client to stop or reduce doing business with Aon, or that would involve diverting business opportunities away from Aon."[80] A New Hire could violate this clause by simply informing the public of his competitive reinsurance services or engaging in conduct that results in a business opportunity they won but Aon lost. Section 9.b further unreasonably defines "solicit" as "irrespective of which party first initiates contact, and expressly includes notifying a client that the [New Hire] has left Aon's employ to go to a competitor.[81] Former employees would be liable

---

[76] RSU Agreement, § 9.d.
[77] *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 528 (1st Dist. 2007) (citation omitted) (emphasis added); *AssuredPartners, Inc. v. Schmidt*, 398 Ill. Dec. 434, 445 (1st Dist. 2015) (stating same).
[78] *Trailer Leasing Co. v. Assocs. Commercial Corp.*, No. 96 C 2305, 1996 WL 392135, at *3 (N.D. Ill. July 10, 1996) (concluding that "the phrase 'prospective customers' is too broad to be enforced"); *see also Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 308 Ill. App. 3d 337, 346 (1st Dist. 1999); *Dressander*, 2023 WL 2561733, at *12; *AssuredPartners, Inc.*, 398 Ill. Dec. at 441, 445.
[79] RSU Agreement, § 9.b.
[80] *Id.*
[81] *Id.*

when the *clients* solicit their services, and they cannot inform clients, to whom they owe duties, of their departure. Section 9.b is a gag order, preventing communication with customers.

Aon's ban on working for cedents absent employee solicitation also imposes a hardship on the public.[82] This restraint forces third-party cedents, who never consented to the covenants, to either continue to work with Aon with unfamiliar and perhaps less talented personnel or take their business elsewhere. And for those clients who have already left Aon, it would leave them without the trusted brokers of their choice even though they are no longer Aon clients. Courts applying Illinois law have found restrictions on simply "accepting" or "servicing" business to be injurious to the public interest.[83] The court in *Aon Risk Servs. Co. v. Alliant* declined to enjoin Alliant and former Aon employees from accepting or servicing business from Aon customers.[84] Aon misrepresents the April 12, 2023 *Aon plc v. Alpine Rewards* decision—*which denied a TRO involving the identical covenants here*—as having "only observed that some Illinois cases express skepticism toward non-acceptance clauses."[85] In denying the TRO, what the *Aon plc* decision actually stated is that "the covenant about performing work for Aon clients (even if they initiate the relationship) does not" appear to be enforceable.[86]

The same conclusion is warranted here. Aon has no legitimate business interest in prohibiting insurer-cedents from deciding that they want to continue doing facultative reinsurance

---

[82] *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 19 (2d Dist. 1993).
[83] *See, e.g.*, *Hay Grp., Inc. v. Bassick*, No. 02 C 8194, 2005 WL 2420415, at *6 (N.D. Ill. Sept. 29, 2005) ("a prohibition on solicitation alone is more likely to be upheld than one prohibiting a former employee from doing any business at all (even at the client's behest) with the employer's clients, as that prohibition would restrict the rights of the client without its consent.") (emphasis added); *Harkabus*, 250 Ill. App. 3d at 19-20 ("[p]rohibiting a former employee from accepting orders or doing business with a customer places restrictions on that customer even though it is not a party to the noncompetition agreement.").
[84] *Aon Risk Servs. Co. v. Alliant*, 415 F. Supp. 3d 843, 852–53 (N.D. Ill. 2019) (entering a TRO "that bars soliciting business but does not bar merely accepting or servicing former clients" because doing so would deny "clients their free choice of who to work with" and be contrary to the public interest).
[85] Aon's Mem. Supp. TRO, at p. 13, n.4 (falsely characterizing *Aon PLC*).
[86] *Aon PLC v. Alpine Rewards, LLC*, No. 22-cv-04762, Dkt. No. 51 (N.D. Ill. Apr. 12, 2023).

business with the New Hires instead of with brokers remaining at Aon. And Aon has no protectible interest in prohibiting current Alliant customers from receiving reinsurance brokerage services from the New Hires at Alliant. The New Hires should be permitted to accept or service the business of any insurer-cedent who independently opts to continue doing business with the New Hires, including those who have already transferred their accounts to Alliant.[87]

### 3. Aon's Expansive Definitions Of "Business" and "Covered Client" Render the Covenants Unenforceable.

Aon's expansive definitions of "Business" and "Covered Clients"—found in Sections 9.a and 9.b of the RSU agreements,[88] respectively—are also facially overbroad and unenforceable. Taken together, these flawed definitions impose restraints effectively barring the New Hires from working anywhere and for anyone in the insurance industry, or even in other industries.

Section 9.a of the RSU agreements is a more than 500-word provision addressing Aon's "Business Considerations."[89] Therein, Aon defines the scope of its purportedly protectible "Business" to ban the New Hires from, explicitly without geographic limitation, working in any realm of the insurance business in which they possibly might have developed their expertise and livelihood over the course of their careers. The ban extends to any business done by Aon's "Subsidiaries and Affiliates"[90]—notwithstanding that Aon is a multinational corporation. The definition forecloses any employee from providing what Aon vaguely and broadly characterizes as "conventional and alternative risk management products and services."[91] In other words, the New Hires cannot provide any product or service that might conceivably be provided, not only in

---

[87] *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 716 (N.D. Ill. 2009) (finding an injunction prohibiting a former employee from servicing customers for two years "injurious to the public" and "unjust to the customers").

[88] *See* RSU Agreement, §§ 9.a & 9.b.

[89] *See* RSU Agreement, § 9.a.

[90] RSU Agreement, § 9.a.

[91] *Id.*

the insurance industry, but in any of the many other professional services.[92] On its face, this definitional defect alone invalidates the entirety of Aon's client and referral source covenants.[93]

Consistent with its sweeping definition of "Business," Aon's definition of "Covered Client" ensures that the New Hires will be unable to make a living in their chosen profession. "Covered Client" includes "prospective" clients, which were not Aon clients at all, and the definition further bars past employees from working with any Aon client with whom the employee "had a business relationship" in any context—regardless of whether that relationship had any connection to Aon.[94] Past employees are also banned from working with any Aon client with whose account they had "became familiar."[95] Be there any doubt of its overbreadth, the "Covered Client" definition establishes "*presumptions*" for becoming "familiar" or having any form of "business relationship" with Aon clients.[96]

The blatant overreach of Aon's "Covered Client" definition is perhaps best evinced by its specific articulation in the reinsurance context, which purports to cover "all risk protection buyers, cedents and retrocedents (a/k/a reinsureds), and, in respect of facultative reinsurance Business, the original policyholders (a/k/a underlying insureds) and wholesale and retail brokers.[97]

Not only is this articulation overbroad, it attempts to misconstrue, or outright misrepresent, the nature of relationships between parties in the facultative reinsurance business in which the New Hires work. The reinsurance producer's clients in the facultative reinsurance policy transaction are the insurer-cedents, not "all risk protection buyers" generally, not the underlying insured

---

[92] *Id.*
[93] *See, e.g.*, *Dressander*, 2023 WL 2561733, at *11 (concluding that the provision's definition of "competitive business" "restrict[ed] more activity than necessary" and would not be enforced); *AssuredPartners, Inc.*, 398 Ill. Dec. at 443 (finding the provision "overbroad" and "unreasonable").
[94] RSU Agreement, § 9.b.
[95] *Id.*
[96] *Id.*
[97] RSU Agreement, § 9.b.

(which is the insurer-cedent's client),[98] and not "wholesale and retail brokers"—which may be referral sources or competitors, but not clients.

### 4.      Aon's Confidentiality Restrictions Are Unenforceable.

Section 9.h of Aon's RSU agreements overbroadly define "Confidential Information" to include all information the New Hires conceivably may have encountered while performing their jobs. It includes information received from third parties, as well as "methods, procedures, techniques, processes, know how, systems and innovations used to improve the Company's performance and operations, marketing plans, research, data and analyses."[99]  As a catch-all, the provision purports to cover everything to do with "the conduct of the affairs of Aon," making essentially *everything* about Aon's business confidential. "Illinois views post-employment restrictive covenants that insist on absolute secrecy of any and all information as unreasonable and unenforceable because a person is allowed to make a living, and cannot possibly not utilize any information from his past job."[100]  Accordingly, Aon's all-encompassing definition of confidential information renders its confidentiality covenant unenforceable under Illinois law.[101]

### 5.      Enforcement Of Aon's Restrictive Covenants Would Sanction An Unlawful Ban On Competition And Impose Undue Hardship On The New Hires.

Aon's restrictive covenants would put the New Hires out of business in their field of trade and thus impose an unlawful, *de facto* ban on competition in the facultative reinsurance industry. A very small and finite class of insurer-cedents purchase the overwhelming amount of facultative

---

[98] N. Ambriano Decl., ¶ 5; O'Brien Decl., ¶¶ 10, 11, 14, 16.

[99] RSU Agreement, § 9.h(i).

[100] *Dressander*, 2023 WL 2561733, at *12 (quoting *Rubloff Dev. Group, Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732 (N.D. Ill. 2012)).

[101] *See*, *e.g.*, *AssuredPartners, Inc.*, 398 Ill. Dec.  at 475–76 (holding that a definition of confidential information that included "information … concerning the business or affairs of [plaintiffs]" would "include virtually every fact, plan, proposal, data, and opinion" that the employee became aware of during employment and was unenforceable).

reinsurance policies, measured by both policy volume and coverage amounts: roughly a dozen cedents purchase 80% or more of the facultative reinsurance policies in the industry.[102] The cedents in this finite pool are customers of large numbers of producers associated with reinsurance brokerages of all sizes, and, not surprisingly, that includes Aon, which has a global presence in the industry.[103] The New Hires of course did business with those cedents while they were associated with Aon—and in some cases before they were associated with Aon. Stopping the New Hires from doing any business with those cedents—which producers competing in the field must do— would prevent them from earning a living in their chosen field,[104] function as a non-compete, and impose an undue burden on the New Hires, violating *Reliable Fire*. Illinois "courts will not enforce non-solicitation covenants designed to restrict competition."[105]

### 6. Aon's Restrictive Covenants Are Far Too Broad and Fatally Flawed For "Blue Penciling."

The self-inflicted defects resulting from Aon's effort to craft grossly overbroad, anti-competitive non-solicitation provisions are pervasive and cannot simply be "blue penciled" away. Courts void non-solicitation restrictions far less flawed than Aon's restrictions here and refuse to "blue pencil" the offending language, particularly if doing so requires a court to effectively rewrite a new agreement to which the parties never agreed."[106] Blue penciling here would require the Court first to deconstruct the over 3,000 words comprising Aon's employment restrictions and then reform the parties' agreement so that it would not offend Illinois law.

---

[102] N. Ambriano Decl., ¶ 8; O'Brien Decl., ¶ 11.
[103] N. Ambriano Decl., ¶ 4.
[104] N. Ambriano Decl., ¶ 8; O'Brien Decl., ¶ 12.
[105] *Trailer Leasing Co.*, 1996 WL 392135, at *5 (non-solicitation provision too broad because of the "size of [the employer's] operations and its extensive customer list").
[106] *Dressander*, 2023 WL 2561733, at *8, *12; *Christie Clinic, LLC v. Youse*, No. 20-CV-2340, 2021 WL 1095332, at *16 (C.D. Ill. Jan. 27, 2021); *AssuredPartners, Inc.*, 398 Ill. Dec. at 446, 448; *Cambridge Eng'g, Inc.*, 378 Ill. App. 3d at 456.

**IV.     Aon Has Not Established A Likelihood Of Immediate, Irreparable Harm.**

Aon has an adequate remedy at law in the form of a money damages award at trial.  It is well settled that alleged harms are not irreparable if they are quantifiable and fully compensable with money damages.[107]  Because Aon is a multi-billion-dollar insurance brokerage firm with sophisticated and publicly available financial statements and records, an expert witness using standard lost profits metrics can easily calculate lost profits.  In fact, Aon does not even need to retain an expert to calculate the alleged damages as it routinely makes these types of calculations itself.  Aon regularly makes acquisitions and knows how to value client relationships and associated goodwill based on multiple times last twelve months revenue or EBITDA.[108]  Aon's 2023 Form 10-K demonstrates that it assigns precise monetary values for, among other things, "Goodwill" and "Intangible assets" associated with acquired assets.[109]  Given Aon's admissions in its 10-K that revenues, profits, and valuations of goodwill and other intangible assets can be calculated according to generally accepted accounting principles, Aon cannot credibly argue that the purported damages arising from the New Hires' departures is unquantifiable.

**V.     The Balance Of Harms Weighs Against Granting Provisional Relief.**

As discussed above, Aon cannot show irreparable harm in the absence of a TRO. Furthermore, the impact of the departures of the New Hires on Aon is miniscule.  Aon is one of the largest and most profitable insurance brokerage firms in the world.  According to Aon's SEC

---

[107] *D.U. v. Rhoades*, 825 F.3d 331, 338–39 (7th Cir. 2016) (stating, the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *Morgan Stanley Smith Barney LLC v. Sayler*, No. 1:19-cv-01067, 2019 WL 3459237, at *5 (D. Or. July 31, 2019) (denying a preliminary injunction); *Wells Fargo Ins. Servs. USA, Inc. v. Tyndell*, No. 2:16-CV-89, 2016 WL 7191692, at *7 (E.D. Wash. Dec. 12, 2016) (same); *Wells Fargo Ins. Servs. v. King*, No. 15-CV-4378, 2016 WL 299013, at *1–2, 8–9 (D. Minn. Jan. 25, 2016); *Arthur J. Gallagher & Co. v. Reisinger*, No. 07–271, 2007 WL 1877895, at *18, 24 (W.D. Pa. June 11, 2007); *Arthur J. Gallagher & Co. v. Youngdahl*, No. 05-1890, 2005 WL 8164161, at *2 (D. Minn. Sept. 9, 2005).

[108] Aon completed five acquisitions in 2022.  Aon Form 10-K for period December 31, 2022 at 68.

[109] *Id*. at 69.

filings, Aon's revenue in 2022 was $12.48 billion.[110]  On the other hand, granting Aon's motion would cause immediate and irreparable injury to both Defendants and the public.  If a TRO is entered and the unreasonable and overbroad terms of the covenants are enforced, the New Hires and the clients with whom they have worked—in some cases, for decades—would be unable to do business.  The public is doubtlessly harmed by the suppression of competition in the market.

## CONCLUSION

Accordingly, Defendants respectfully request the Court deny Aon's motion for a TRO.

---

[110] Aon Form 10-K for period ending December 31, 2022 at 7.

DATED:  May 24, 2023

Respectfully Submitted,

*/s/ Seth M. Gerber*

Debra L. Fischer (ARDC# 6326317)
Seth M. Gerber (ARDC# 6326316)
MORGAN, LEWIS & BOCKIUS LLP
2049 Century Park East, Suite 700
Los Angeles, California 90067
Tel:  (310) 907-1000
Fax: (310) 907-1001
*debra.fischer@morganlewis.com*
*seth.gerber@morganlewis.com*

Sari M. Alamuddin (ARDC# 6215689)
Eric L. Mackie (ARDC# 6335348)
MORGAN, LEWIS & BOCKIUS LLP
110 N. Wacker Drive, Suite 2800
Chicago, Illinois 60606
Tel:  (312) 324-1000
Fax: (312) 324-1001
*sari.alamuddin@morganlewis.com*
*eric.mackie@morganlewis.com*

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on May 24, 2023, he filed the foregoing

using the Court's CM/ECF system, which will provide notice of the same to all counsel of record.

*/s/ Seth M. Gerber*