**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

AON PLC, AON CORPORATION, and
AON FAC, INC.,

        Plaintiffs,

v.

ALLIANT INSURANCE SERVICES, INC.,
LOUIS AMBRIANO, NICHOLAS
AMBRIANO, JUAN APONTE, OWEN
BUSCAGLIA, ANDREW MASSE, RACHEL
MCALLISTER, CHRISTOPHER
MEDLICOTT, MICHAEL O'BRIEN, and
ROBERT OSBORNE,

        Defendants.

Case No. 23-cv-3044

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER**

*s/ James M. Witz*

James M. Witz
Orly Henry
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1100
Chicago, Illinois 60654
(312) 372-5520

Dated: May 31, 2023.

## TABLE OF CONTENTS

I.      Preliminary Statement.................................................................................................1

II.     Aon Is Likely To Succeed On Its DTSA Claim. ...................................................3

        A.     Aon Established The Existence Of Protectable Trade Secrets. ....................3

        B.     Defendants Misappropriated Aon's Trade Secrets..........................................4

        C.     Defendants' Purported "Remediation" Is A Non-Starter. ...........................6

        D.     The Dtsa Recognizes Claims Based On Inevitable Disclosure. .....................8

III.    Aon is Likely to Succeed on Its Tortious Interference Claims..............................9

IV.    Aon is Likely to Succeed on Its Breach of Contract Claims..............................11

        A.     The Covenants Are Enforceable; Defendants Do Not Dispute
              They Breached...............................................................................................11

        B.     Defendants' Attacks On Aon Plc Are A Red-Herring. .................................12

        C.     Defendants' Argument About "Near-Permanent" Clients Is Incorrect. ....................13

        D.     Aon's Non-Servicing And Non-Acceptance Covenants Are Enforceable.................15

        E.     Aon's Confidential Information Provision Is Enforceable.............................18

        F.     There Is No Undue Hardship On The Former Employees. ........................19

        G.     The Court May Blue Pencil...........................................................................19

V.     Aon's Immediate, Irreparable Harm if Defendants Are Not Enjoined....................20

VI.    The Balance of Equities Tips in Aon's Favor......................................................23

i

## TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*Abbott-Interfast Corp. v. Harkabus,*
  619 N.E.2d 1337 (Ill. App. Ct. 1993) ........................................................................ 16

*Alpha Sch. Bus. Co. v, Wagner,*
  910 N.E. 2d 1134 (Ill App. Ct. 2009) ....................................................................... 10

*Aon PLC v. Alpine Rewards, LLC,*
  No. 22-cv-04762, Dkt. No. 51 (N.D. Ill. Apr. 12, 2023) .......................................... 16, 17

*Aon PLC v. Infinite Equity, Inc.,*
  2021 WL 4192072 (N.D. Ill. Sept. 15, 2021) .......................................................... 4, 5

*Aon Risk Services Cos., Inc. v Alliant Ins. Servs., Inc.,*
  415 F. Supp. 3d 843 (N.D. Ill. 2019) .................................................................. 4, 6, 11

*Audio Props., Inc. v. Kovach,*
  655 N.E.2d 1034 (Ill. App. Ct. 1995) ....................................................................... 14

*Bankers Life & Cas. Co. v. Miller,*
  2015 WL 515965 (N.D. Ill. Feb. 6. 2015) ................................................................ 10

*Benefield, Inc. v. Moline,*
  2004 U.S. Dist. LEXIS 32818 (D. Minn. Aug. 10, 2004) ......................................... 17, 21

*Busey Bank v. Turney,*
  2022 WL 4079462 (N.D. Ill. Sept. 6, 2022) .............................................................. 5

*Coady v. Harpo, Inc.,*
  719 N.E.2d 244 (1999) .............................................................................................. 19

*Credit Suisse First Bos., LLC v. Vender,*
  2004 WL 2806191 (N.D. Ill. Dec. 3, 2004) ............................................................. 1, 14

*Curtis 1000, Inc. v. Suess,*
  24 F.3d 941 (7th Cir. 1994) ....................................................................................... 14

*D.U. v. Rhoades,*
  825 F.3d 331 (7th Cir. 2016) ..................................................................................... 22

*Davis Bros., Inc. v. Thorton Oil Co.,*
  12 F. Supp. 2d 1333 (M.D. Ga. 1998) ........................................................................ 7

*Dawson v. Newman,*
  419 F.3d 656 (7th Cir. 2005) ..................................................................................... 15

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
  31 F.3d 506 (7th Cir. 1994) ............................................................................23

*Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*,
  719 N.E.2d 1141 (Ill. App. Ct. 1999) ..............................................................12

*Gen. Elec. Co. v. Uptake Techs., Inc.*,
  394 F. Supp. 3d 815 (N.D. Ill. 2019) .................................................................8

*Groupon, Inc. v. Shin*,
  2022 U.S. Dist. LEXIS 2685 (N.D. Ill. Jan. 6, 2022) ......................................23

*Hess Newmark Owens Wolf, Inc. v. Owens*,
  415 F.3d 630 (7th Cir. 2005) .....................................................................22, 24

*Jordan v. Lashbrook*,
  2019 WL 1505853 (S.D. Ill. Apr. 5, 2019) ........................................................7

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) .......................................................................22, 23

*loanDepot.com, LLC v. Schneider*,
  2022 WL 17818550 (N.D. Ill. Dec. 20, 2022) ...................................................7

*M-F-G Corp. v. EMRA Corp.*,
  817 F. 2d 410 (7th Cir. 1987) ...........................................................................7

*Maximum Indep. Brokerage, LLC v. Smith*,
  218 F. Supp. 3d 630 (N.D. Ill. 2016) ...............................................................18

*McRand, Inc. v. van Beelan*,
  486 N.E.2d 1306 (Ill. App. Ct. 1985) ...............................................................12

*Medcor, Inc. v. Garcia*,
  2022 WL 124163 (N.D. Ill. Jan. 13, 2022) .........................................................8

*Moss Holding Co. v. Fuller*,
  2020 WL 1081730 (N.D. Ill. Mar. 6, 2020) ......................................................18

*Mountain West Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*,
  2019 WL 2536104 (Del. Ch. June 20, 2019) ........................................1, 6, 7, 24

*Optimas OE Sols., LLC v. Grimes*,
  2020 WL 4365917 (N.D. Ill. July 30, 2020) .....................................................10

*Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*,
  2018 WL 1156246 (N.D. Ill. Mar. 5, 2018) .......................................................5

*Orthofix Inc. v. Gordon,*
   2016 WL 1170896 (C.D. Ill. Mar. 24, 2016) ......................................................18

*Outsource Int'l, Inc. v. Barton,*
   192 F.3d 662 (7th Cir. 1999) ..........................................................................14

*Packaging Corp. of America, Inc. v. Croner,*
   419 F. Supp. 3d 1059 (N.D. Ill. 2020) .......................................................... 5, 8, 9

*Promatek Indus. Ltd. v. Equitrac Corp.,*
   300 F. 3d 808 (7th Cir. 2002) ..........................................................................23

*Reed v. Farmers Ins. Grp.,*
   720 N.E.2d 1052 (Ill. 1999) .............................................................................16

*Reliable Fire Equipment Co. v. Arrendondo,*
   965 N.E.2d 393 (Ill. App. Ct. 2011) ................................................................13

*Russell Dean, Inc. v. Maher,*
   2018 WL 4679573 (N.D. Ill. Sept. 28, 2018) ..............................................19, 20

*Sabre Indus. v. Waller,*
   2021 WL 6129000 (C.D. Ill. Aug. 13, 2021) ..............................................14, 18

*Teradyne, Inc. v. Clear Communications Corp.,*
   707 F. Supp. 354 (N.D. Ill. 1989) ......................................................................5

*Uncle B's Bakery, Inc. v. O'Rourke,*
   920 F. Supp. 1405 (N.D. Iowa 1996) ..................................................................8

*Willis v. Herriott,*
   550 F. Supp. 3d 68 (S.D.N.Y. July 22, 2021) ......................................15, 17, 21

*XPO Logistics, Inc. v. Best Dedicated Sols., LLC,*
   2017 WL 4150779 (N.D. Ill. Sept. 18, 2017) ....................................................10

*YCA, LLC v. Berry,*
   2004 WL 1093385 (N.D. Ill. May 7, 2004) .......................................................17

I. **Preliminary Statement.**

Defendants' opposition (Dkt. 23) establishes two things. *First*, Alliant's illicit "Playbook" is indisputably "in play." Just as Aon predicted, Alliant cites to its PEDP and farce remediation procedures to try and avoid a TRO. The *Mountain West* court saw through these tactics, and so should this Court. *Second*, the key facts justifying a TRO are undisputed:

- Defendants admit that insurer-cedents are "clients" in the reinsurance brokerage industry generally, as well as under their Aon agreements. *See* Dkt. 23-27, ¶ 11; Dkt. 23, p. 21.

- Defendants do not dispute that the Former Employees solicited, called upon, serviced, and accepted business from **the same cedent-clients** that they worked with or were familiar with at Aon—and intend to continue to do so. They do not dispute that this is a breach of the express terms of their Aon covenants. *See* Dkt. 23-1, ¶ 5; Dkt. 23-13, ¶¶ 8, 9; Dkt. 23-25, ¶ 4; Dkt. 23-26, ¶¶ 3-4; Dkt. 23-27, ¶ 8; Dkt. 23-29; Dkt. 23-30, ¶ 5; Dkt. 23-32, ¶ 3.

- Medlicott admits to traveling to Bermuda after his resignation to attend meetings that he set up for Aon, while employed by Aon, with Aon cedent-clients. Dkt. 23-13, ¶ 8. Aponte admits that he expensed Broadway tickets to Aon for a cedent-client, and does not deny that he is now soliciting, accepting, and servicing new business from that same cedent-client on behalf of Alliant. Dkt. 23-25, ¶ 3; Dkt. 1, ¶¶ 94(c), 132. Buscaglia admits he is working with an Aon cedent-client he recently worked with at Aon. Dkt. 23-30, ¶ 5.

- Alliant does not deny that it was aware of the Former Employees' Aon agreements; it intentionally placed them in identical positions at Alliant; and it encouraged and is facilitating the Former Employees' solicitation and servicing of Aon cedent-clients. Dkt. 23, pp. 8-9, 20-21. The PEDP upon which it relies does not prohibit such solicitation. *See* Dkt. 23-4, p. 2.

- It is undisputed that the Former Employees had access to Aon's trade secret information. As head of Aon's Facultative Reinsurance group, N. Ambriano helped developed and was intimately familiar with Aon's strategic plan, including recently participating in a global facultative leadership meeting on April 4, 2023 just weeks before joining Alliant (and despite the fact he had been talking to Alliant since January), where he is tasked with growing Alliant's reinsurance division. He was steeped in the most current financials, forecasts, pipeline reports, market assessments, and strategic plans for how to increase market share both short term and through 2025. It was part of his job to convey key initiatives to the Former Employees and others in Aon's reinsurance operations. Laing Sup. Decl. ¶¶ 8-10. All of this information would be priceless to a brand-new market player like Alliant Re.

- Defendants do not dispute that client non-solicits are enforceable under Illinois law, or that the Former Employees solicited their former clients, breaching the same. Dkt. 10, p. 10-19. Further, while they (incorrectly) assert that non-servicing and non-acceptance provisions are not enforceable in Illinois (ignoring the multitude of cases and Illinois legislature's position

to the contrary), they do not dispute that non-servicing and non-acceptance provisions are enforceable under New York and New Jersey law—and that N. Ambriano, McAllister, and Medlicott are bound by (and breached) such provisions. *Id.*

- Alliant does not submit a declaration from either Peter Arkley or Michael Cusack, the architects of the group departure, explaining how they came to allegedly "individually" solicit each of the 26 Aon employees now at Alliant. Indeed, nowhere does Alliant explain how it came to independently identify for solicitation the Client Service Advocates that worked closely with N. Ambriano and O'Brien, how it obtained any of the 26 former employees' (or other Aon employees they unsuccessfully solicited) cellphone numbers, why it offered them immediate employment without an interview process, from whom the Aon employees came "highly recommended," or how it knew what compensation to offer. Dkt. 1, ¶¶ 13, 73, 103. Nor does Alliant distinguish the cases cited by Aon holding that the timing of the group departure alone supports a finding of employee solicitation. Dkt. 10, p. 17.

- Former Employees admit they accessed substantial amounts of Aon information on the eve of their departures for Alliant, knowing they were imminently joining Alliant. O'Brien's assertion that he accessed a version of the "forecast 2023b.xlsx" or "forecast 2023a.xlsx" excel files "regularly" is contradicted by the forensic analysis of O'Brien's Aon device, showing he only accessed these documents on March 15, 2023 and April 18, 2023—i.e., while he was talking to Alliant. Dkt. 23-27, ¶¶ 3, 5-6 (privy to "Aon's growth plans").

- Alliant does not dispute that its agents continued to search for and review Aon documents taken by the Former Employees and their cohorts despite Aon's request that it cease and desist and that the Former Employees instead work with Aon to secure the return of its information. Dkt. 23-15.

- Alliant does not deny that it provided salary guarantees to the Former Employees, totally, undermining any harm to the Former Employees from a TRO. *See* Dkt. 1, ¶¶ 8, 65, 69.

Simply put, Alliant hired 26 Aon employees, including its most senior facultative reinsurance leaders, despite their post-employment covenants and expressly because they had insider knowledge of Aon's trade secret information, to allow Alliant to create a start-up reinsurance division for Alliant. Now that Aon filed a lawsuit and requested a TRO, Defendants claim that if they are forced to comply with the law and the Former Employees' covenants, the effect would be "business-stopping." But as noted below, and in the accompanying Supplemental Declaration of Andrew Laing ("Laing Sup. Decl."), this dramatic assertion is neither true (there are hundreds of potential clients and billions of dollars of reinsurance premium for Defendants to pursue), nor the correct legal

standard. Defendants must face the consequences of their actions. A TRO is critical to protect Aon's facultative reinsurance operations and its remaining employees.

## II.   Aon Is Likely To Succeed On Its DTSA Claim.

### a.   Aon Established the Existence of Protectable Trade Secrets.

Aon identified protectable trade secrets. The trade secret information here consists of:

> [E]mployee-specific compensation information, financial information, competencies, and knowledge concerning employee-client relationships; budgets and forecasts (including broken down by individual employee, including numerous of the employees targeted by Alliant); client reinsurance submissions; renewal lists; client lists; renewal information; confidential pricing information; and renewal and brokerage spreadsheets.

Dkt. 10 at p. 6 (record citations omitted). Defendants ignore this, focusing only on client identities, contact information, and contract terms. But Aon identified far more than that; much of which Defendants do not dispute are protectable trade secrets.

Respecting client information, Aon enters into contracts with its cedent-clients that reinforce that client information constitutes confidential information. *See* Laing Sup. Decl., ¶ 25. For example, the contract provides that "confidential information" includes "any information" provided by one party (e.g., the client) to the other (e.g., Aon) that is non-public. *Id.*

Further, Defendants' claim that all of the client information at issue here is publicly available is untrue. Indeed, Defendants cite no support for their claim that "[a]ll reinsurance brokers are familiar with the identities of the major cedents, and cedents' contact information is easily located on the internet or through other public sources." Dkt. 23, at p. 5. They do not attach any internet printout with this information. Their argument also puts the cart before the horse: the Former Employees would not know ***whose*** contact information to search for without insider knowledge of the insurance underwriters (who buy facultative reinsurance) at each cedent-client. *See* Laing Sup. Decl., ¶ 25. Defendants also lack any support for their claim that a cedent's policy information,

pricing, contract terms, renewal dates, or other policy information are publicly available.[1] Defendants ignore all other categories of information identified by Aon, and fail to address Aon's sworn declarations establishing the client information here is a protected trade secret. Defendants also do not dispute that the **compilations** of client information taken and accessed by the Former Employees are protectable trade secrets.

Notably, other courts have recognized that the same types of information at issue here are protectable trade secrets. For example, in *Aon Risk Services Cos., Inc. v Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019), the court rejected Alliant's arguments, finding that much of the same information (client lists, client information, data compilations, and insurance company intelligence) can be protectable trade secrets. Similarly, in *Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4192072, at *16 (N.D. Ill. Sept. 15, 2021), the Court held that the identities of Aon's highest revenue producing clients, client contacts, and client needs and preferences likely warranted trade secret protection. This Court should find the same.

### b. <u>Defendants Misappropriated Aon's Trade Secrets.</u>

Defendants claim that they did no more than "access" Aon's information, and therefore did not commit misappropriation. Defendants are wrong on the facts and law.

**First**, it is not true that Defendants only "accessed" Aon's information. At least Aponte and Masse sent compilations of Aon client information to their personal email accounts immediately before their departure from Aon and with no legitimate reason to do so. Dkt. 10, pp. 7-9. Other Defendants engaged in similar patterns of accessing key files and folders containing Aon trade secrets with no legitimate reason to do so. *Id.* The fact that five employees, working in a coordinated

---

[1] Defendants cite to the O'Brien Declaration ¶ 15 on this point, but the Declaration says nothing of the sort. It simply says that once the cedent decides to switch brokers, it can send a BOR letter authorizing the new broker to receive (undefined) "policy information." This makes Aon's point: this information is **not** publicly available and is only shared with the broker of record. And the whole point of Aon's claim is that Defendants

fashion and all resigning abruptly at the same time and all accessed critical files that would benefit them in their new employment at Alliant without any legitimate reason for doing so, shows that Defendants were working to take this information and exploit it to harm Aon. Similarly, Aponte tried to surreptitiously obtain additional Aon renewal information by falsely claiming he needed it for "budgeting" purposes. Dkt. 1, ¶ 94(a). Further, Defendants contacted the same clients they were taking information about just **days** after their resignations. Dkt. 10, p. 8. This short timeframe demonstrates that Defendants took and are exploiting the information they either improperly accessed or stole from Aon. *See Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4192072, at *17-20 ("[former employees] could not have immediately initiated contact with Aon's clients without misappropriating confidential client contact information.").

    **Second,** Defendants' cases do not support their positions. In *Packaging Corp. of America, Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020), this Court found that the plaintiff had not properly alleged misappropriation where plaintiff **admitted** that defendant legitimately acquired the information at issue in the course of performing his business duties. In *Teradyne, Inc. v. Clear Communications Corp.*, 707 F. Supp. 354, 356-57 (N.D. Ill. 1989), the complaint was exclusively based on a theory of inevitable disclosure, and plaintiff failed to explain how or why its trade secrets would inevitably be disclosed. *Id.* at 356. In *Busey Bank v. Turney*, 2022 WL 4079462, at *1, 7 (N.D. Ill. Sept. 6, 2022), while plaintiff alleged some defendants emailed themselves documents, it was unclear what was sent or to where, and there was no evidence that they did so outside the scope of their normal job duties. *Id.* at *7-8. Finally, in *Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*, 2018 WL 1156246, *3-4 (N.D. Ill. Mar. 5, 2018), the plaintiff merely alleged that the defendants had "improperly acquired" trade secrets "without any factual assertion of why it was improper."

---

used the information they stole to improperly solicit and obtain business from the cedents, which happens **before** a BOR notification is issued.

Here, there is far more evidence of improper acquisition, use, and disclosure of trade secrets than in those cases. Aon does not assert that Defendants accessed this information in the regular course of business and then happened to join a competitor. Just the opposite, Defendants accessed and took information shortly before their departures, **because** they were going to a competitor, they had **no legitimate business reason** to do so; they attempted to acquire information under false pretenses; and they not only solicited the clients that they stole information about, but they did so on such a quick timeline that they could not have done so without the use of Aon's trade secrets. Accordingly, Aon demonstrated misappropriation. *See Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d at 848 (finding likelihood of success on trade secret claim where employee sought access to "detailed client specific premium data" two weeks before he resigned).

### c. <u>Defendants' Purported "Remediation" Is a Non-Starter.</u>

Defendants **admit** that Masse and Aponte emailed compilations of Aon information to their personal email accounts and improperly retained Aon's information following their departures from Aon.[2] Despite this, Defendants claim that an injunction is not necessary because they engaged in a self-determined "remediation" (which is itself an admission that Defendants gave Aon's information to a third party under Alliant's control, in breach of their agreements and the DTSA). But this does not eliminate the need for an injunction. Defendants took Aon's information as part of a well-documented and frequently executed illegal playbook, which includes these transparently ineffective efforts to "remediate" information.

Alliant's "remediation" efforts are nothing more than an effort to disguise their wrongdoing. At least one court has already seen through Alliant's sham procedures. In *Mountain West Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104 (Del. Ch. June 20, 2019), Alliant tried

---

[2] Masse implausibly claims that this was part of "routine" practice, even though he knew he was going to Alliant and had no Aon-related reason to take these documents. *See* Dkt. 1, ¶ 79. Aponte, who also emailed himself detailed renewal information just days before resigning, provides **no explanation** for his theft.

to claim that it could not have used competitor information because it takes preventative measures. The Court rejected the argument, finding Alliant employed "secretive and underhanded behavior in violation of contractual obligations and legal requirements" and "demonstrated their willingness and ability to mask their activities under a façade of compliance measures and through misleading representations and averments." *Id.* at *22; Dkt. 1, ¶¶ 65-67. To make matters worse, Defendants engaged in these sham procedures here despite Aon's request that they cease and desist, and that the Former Employees work directly with Aon to secure the return of its information. If Defendants truly intended to return and remediate Aon information, they would have complied.

The cases relied upon by Defendants are inapposite. None are trade secret cases or involve confidential information.[3] None of these cases are even remotely analogous to the facts here. To the contrary, Alliant is a demonstrable repeat offender. That Defendants rest their argument on such inapposite authority demonstrates its weakness. Indeed, in the trade secret context, courts recognize that self-serving claims of remediation are insufficient. For example, in *loanDepot.com, LLC v. Schneider*, 2022 WL 17818550, *6 (N.D. Ill. Dec. 20, 2022), defendant argued that a further injunction was unnecessary because a court-ordered forensic remediation was already underway. The court rejected the argument, noting that "the Court has not received any certification . . . that all the documents" were returned, and because there was a dispute over whether certain information was a trade secret (and defendants had already solicited business), there was an ongoing threat of harm. *Id.*

---

[3] In *M-F-G Corp. v. EMRA Corp.*, 817 F. 2d 410, 411 (7th Cir. 1987), the court noted that "voluntary discontinuation of the offending conduct does not invariably make a case moot, but it may make entry of an injunction unnecessary if there is little likelihood of recurrence." *M-F-G* was a trademark case, not a trade secret case and the defendant had not used plaintiff's logo for **years**. *Id.* Accordingly, the court found a further injunction unnecessary **after trial**. In *Jordan v. Lashbrook*, 2019 WL 1505853, at *2 (S.D. Ill. Apr. 5, 2019), the plaintiff brought an Eighth Amendment claim seeking to transfer to a correctional facility and placement in protective custody. The court found a TRO unnecessary where the plaintiff already received the transfer, was placed in protective custody, and identified no current threat or actual harm otherwise. *Id. Davis Bros., Inc. v. Thorton Oil Co.*, 12 F. Supp. 2d 1333, 1338 (M.D. Ga. 1998) involved a claim that a gas station contaminated plaintiff's hotel site. The court found an injunction was unnecessary because "the state is overseeing the cleanup more effectively than the court ever could." *Id.*

at *7; *see also Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1437 (N.D. Iowa 1996) (recognizing that while voluntary remedial actions can be considered, an injunction was still necessary because the threat of harm was not fully eliminated).

Here, Defendants' self-serving claim of remediation is insufficient. No forensic neutral is appointed nor has any competent review of Defendants' electronic devices and accounts been conducted.[4] Defendants contest whether the information at issue is even a trade secret (indicating they intend to continue using that information), and Defendants already solicited Aon's clients, meaning there is a continued threat of harm. Accordingly, an injunction remains necessary.

### d. **The DTSA Recognizes Claims Based on Inevitable Disclosure.**

Defendants also contend that the DTSA does not permit inevitable disclosure claims. While the Court need not reach this question because, as set forth above, Aon produced considerable evidence (both direct and circumstantial) of actual misappropriation, Defendants are incorrect. *See Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 834 (N.D. Ill. 2019) ("[T]his Court finds that a DTSA claim based on inevitable disclosure may survive a motion to dismiss."); *Medcor, Inc. v. Garcia*, 2022 WL 124163, at *9 (N.D. Ill. Jan. 13, 2022) ("The [DTSA] authorizes courts to enjoin threatened misappropriation, which applies when a plaintiff shows the inevitability of trade secret disclosure.").

Defendants primarily rely on *Packaging Corp. of America, Inc. v. Croner* for the proposition that the DTSA does not recognize inevitable disclosure, but this Court in *Croner* held just the opposite. The court recognized that the DTSA explicitly allows for injunctive relief to prevent "threatened" misappropriation (citing 18 U.S.C. § 1836(b)(3)) and that prior Seventh Circuit decisions recognize

---

[4] Defendants' consultant claims that she collected, searched, and remediated the personal email accounts of Masse and Aponte. Dkt. 23-23, ¶ 4. She does not explain in detail how she performed the search (other than to say she searched for emails containing the @aon.com domain, which is insufficient). Further, Defendants could easily save this information to another location before their emails were examined, taken a picture of it on their phone, forwarded it to Alliant or another account, or printed it. The consultant also apparently did not check, or explain what, if anything, she did to remediate other devices or locations where the data might

the availability of injunctive relief based on the "inevitable" disclosure of trade secrets. 419 F. Supp. 3d at 1069 (citing *PepsiCo., Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). Similarly, in *Aon plc v. Infinite Equity, Inc.*, 2021 WL 4034068, at *13, defendants moved to dismiss plaintiff's claims under the DTSA. The court rejected defendants' arguments, upholding plaintiff's claim under the DTSA that its information would inevitably be disclosed. *Id.*

Defendants then contend that even if inevitable disclosure were available, it does not apply here because "all reinsurance producers either already know the identities of cedents and their underwriters or have easy access to that publicly available information[.]" Dkt. 23 at p. 11. As set forth above, this mischaracterizes the information at issue and is incorrect. There is no dispute that Alliant hired the Former Employees and placed them in materially identical positions to create Alliant Re. The Former Employees will have substantial input in Alliant Re's strategic plans, including costs, marketing, products, salaries, and services. The same month, the Former Employees were exposed to Aon's most top secret information, its strategic playbook and growth plan through 2025. Laing Sup. Decl., ¶¶ 8-10. The Former Employees cannot help but use Aon's trade secret information, now on behalf of Alliant, which Alliant encouraged. Indeed, Alliant condoned their solicitation, servicing, and acceptance of business from the same clients that the Former Employees obtained trade secret information about at Aon. *See* Dkt. 1, ¶ 154. This case is a quintessential example of inevitable, threatened trade secret disclosure.

## III.   <u>Aon is Likely to Succeed on Its Tortious Interference Claims.</u>

Defendants do not contest Aon's assertion that it will succeed on its claims for tortious interference with prospective economic advantage ("TIPEA") and tortious interference with contract ("TIC"), other than to assert that these claims are preempted by the ITSA. But, the ITSA

---

reside. Without a neutral forensic review and remediation, there is no way to ensure Aon's information is truly remediated and returned.

does not preempt claims that are "not based upon misappropriation of a trade secret." 765 ILCS 1065/8. "Where a claim would survive regardless of whether the information at issue was non-confidential . . . that claim is not preempted." *XPO Logistics, Inc. v. Best Dedicated Sols., LLC*, 2017 WL 4150779, at *2 (N.D. Ill. Sept. 18, 2017). "In other words, when considering whether the ITSA preempts a separate claim, a court must determine whether that separate claim seek[s] recovery for wrongs beyond the mere misappropriation." *Id.* (internal quotation omitted). In particular, claims for interference with a non-solicitation provision are not preempted by ITSA. *Id.* at *3; *Optimas OE Sols., LLC v. Grimes*, 2020 WL 4365917, at *12 (N.D. Ill. July 30, 2020) (no ITSA preemption of tortious interference claims because plaintiff could proceed with and prevail on both claims "even if no trade secret misappropriation occurred"); *see also Bankers Life & Cas. Co. v. Miller*, 2015 WL 515965, at *8 (N.D. Ill. Feb. 6. 2015) (collecting cases and holding that plaintiff's claim not preempted by the ITSA because plaintiff "alleges more than the mere taking of trade secrets"); *Alpha Sch. Bus. Co. v. Wagner*, 910 N.E. 2d 1134, 1150 (Ill App. Ct. 2009) (no preemption where plaintiff claimed that defendant established a competing business while still employed by plaintiff, solicited plaintiff's employees to work for the competing business, and converted property of plaintiff).

Here, Aon's TIPEA and TIC claims are not preempted by the ITSA.[5] Aon's TIC claim is based on Alliant's actions to intentionally induce the Former Employee's to breach their contracts with Aon, including the client and employee non-solicitation provisions. Dkt. 10, pp. 20-21. Defendants do not and cannot claim that such claims are pre-empted by the ITSA. The Former Employees' contractual breaches, and Alliant's inducement of same, are wrongful whether or not confidential information was used in the course of these acts. Accordingly, preemption does not apply. *XPO Logistics*, 2017 WL 4150779, at *2. Similarly, Aon's TIPEA claim is based on Defendants'

---

[5] Defendants' challenges to Aon's claims for breach of fiduciary duty and civil conspiracy are baseless, but not addressed here given that Aon has not moved for a TRO on these claims.

improper tactics to recruit and convert Aon's employees and clients. Dkt. 10, p. 21. It is not based on misappropriation of confidential information, so preemption does not apply. 765 ILCS 1065/8.

### IV. Aon is Likely to Succeed on Its Breach of Contract Claims.

#### a. The Covenants Are Enforceable; Defendants Do Not Dispute They Breached.

Before addressing the issues in dispute, it is worth noting what is decidedly **not** at issue:

- **First**, Defendants do not dispute that they are subject to agreements with Aon that are governed by Illinois law, and in the case of N. Ambriano, McAllister, and Medlicott, New York and New Jersey law.

- **Second**, Defendants do not dispute that client non-solicit provisions are enforceable under Illinois law,[6] and that client non-solicit, non-acceptance, and non-servicing provisions are enforceable under New York and New Jersey law. Defendants further do not dispute that cedents are "clients" and that the Former Employees solicited, serviced, and accepted business from cedent-clients, in violation of the letter and spirit of their agreements.

- **Third**, Defendants do not dispute that employee non-solicits are enforceable in Illinois, New York, and New Jersey. Instead, they devote a single footnote to the issue, half-heartedly denying breach. *See* Dkt. 23, p. 2 n.1. Defendants offer no substantive response to Aon's evidence to the contrary. This is not a case of bosses departing, then other staff slowly trickling away to follow the leader. The Former Employees and their cohorts resigned on the same day or within less than a week of each another. Only O'Brien denied providing Alliant with cell-phone numbers. The Court may infer the others **did** provide numbers to Alliant to aid in its solicitations. Alliant knew whom to call, at what number, and what to offer. Under these circumstances Aon has a strong likelihood of success on the merits. The Former Employees are tellingly silent regarding whether they provided information to Alliant about Aon employees. And, Defendants do not distinguish or address Aon's numerous authorities that support the mere timing of this departure alone is proof of solicitation.

Instead, Defendants claim only that certain aspects of the client non-solicit and confidentiality provisions are unenforceable. However, as set forth in Aon's opening brief, the post-employment restrictions are reasonable and enforceable under Illinois law (and New York and New Jersey law as applicable). Dkt. 10, pp. 10-16. Other courts have found materially similar covenants

---

[6] *Aon Risk Servs. Co. v. Alliant*, 415 F. Supp. 3d at 851 (finding materially similar Aon non-solicitation covenant is "enforceable" under Illinois law).

enforceable. *Id.* at p. 11. Although Defendants argue that the covenants here are different than those courts previously enforced, the cases themselves belie that argument. *Id.* at p. 15 (citing three *Aon* cases). Aon's agreements are narrowly tailored to protect Aon's legitimate interests in its client (including cedent-client) relationships, stability of its workforce, and confidential information.[7] The non-solicitation covenants are closely tailored to Aon's business interests and facially reasonable: they are activity restraints, narrowly define the clients to whom the restricted activities apply, and endure for a reasonable time (two years). This time period is especially reasonable considering the narrowed segment of Aon clients from whom the Former Employees are restricted—here, collectively among the Former Employees, approximately 55 cedent-clients out of hundreds of available cedent-clients. Laing Sup. Decl., ¶ 11. Aon's covenants should be enforced as written, and Defendants' arguments to the contrary should be swiftly rejected.

### b. **Defendants' Attacks on Aon plc Are a Red-Herring.**

Defendants first try to evade the covenants by claiming that Aon plc has no capacity to have clients and therefore no legitimate interests to protect. Defendants are wrong. First, Aon plc is the parent company of the other Plaintiffs, including the Former Employees' employer (Aon Fac, Inc.), and the consideration under the RSU Agreements includes Aon plc stock. Dkt. 1, ¶ 18.[8] Second, Defendants' argument is moot because the agreements' definition of "Aon" includes Aon Corporation and its subsidiaries and affiliates, and explicitly state that "each Aon entity, including the Employer, is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in

---

[7] *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999) (non-solicit valid when purpose is to "protect the employer from losing customers to a former employee who, by virtue of his employment, gained special knowledge and familiarity with the customers' requirements."); *see also McRand, Inc. v. van Beelan*, 486 N.E.2d 1306, 1315 (Ill. App. Ct. 1985).

[8] The non-solicits are limited to clients the Former Employees worked with or serviced. Defendants do not cite any authority for the proposition that restrictive covenants are invalid where a controlling parent company (here, Aon plc) issues the consideration on behalf of the direct employer (Aon Fac, Inc.). Nor is it logically the case that Aon plc would not have a legitimate business interest to protect the business relationships, goodwill, and trade secrets belonging to its subsidiaries, which in turn influence its stock value.

any subsequent suit brought by Aon to enforce the terms of this Agreement." *E.g.*, Ex. 1 §§ 9(a), (g). Here, Aon Fac, Inc. is a Plaintiff and was the Former Employees' employer. Laing Sup. Decl., ¶ 3. It is also the U.S.-based operating entity that contracts with and represents cedent-clients in their facultative reinsurance placements. *Id.* Accordingly, Aon Fac, Inc. has a legitimate interest in its client and employee relationships, and standing to bring suit under the Agreements for breach of same.

### c. **Defendants' Argument About "Near-Permanent" Clients Is Incorrect.**

Defendants next argue that the life blood of any reinsurance-brokerage business—the cedent-clients—are not a protectable, valid business interest because these are not "near permanent" client relationships. In doing so, Defendants ask the Court to impose a higher burden than the law requires, and also misstate crucial facts.

**First**, Defendants misstate the law. Whether or not a client relationship is "near permanent" does not dictate whether Aon has a legitimate protectible interest in its clients. Under the Illinois Freedom to Work Act and *Reliable Fire Equipment Co. v. Arrendondo,* 965 N.E.2d 393, 403 (Ill. App. Ct. 2011), whether or not an employer has a legitimate business interest is based on the "totality of the facts and circumstances of the individual case," and relevant factors include not only the near-permanence of client relationships, but also: (a) the employee's exposure to the employer's client relationships or other employees (here, this is undisputed); (b) the employee's acquisition, use, or knowledge of confidential information (here, this is likewise undisputed); and (c) the scope and nature of the restrictions (here, the restrictions are narrow activity restrictions). *Id.* at 393; 820 ILCS § 90/7. Crucially, "no factor carries any more weight than any other" and "the above factors are only 'non-conclusive aids in determining the employer's legitimate business interest," which is "grounded in the totality of circumstances." *Id.*

**Second**, the client relationships here (cedent and underlying insured) are "near permanent":

- The vast majority of Aon's major cedent-clients, including the at-issue clients here, have been Aon clients for at least a decade. Laing Sup. Decl., ¶ 13.

- There are approximately 55 cedent-clients at issue here, out of hundreds of available cedent-clients, constituting only a fraction of the billions of dollars of reinsurance premium available in the facultative reinsurance industry. *Id.*, ¶ 11.

- Most large cedents use not more than two or three facultative reinsurance brokerage firms—these relationships are not "transient," but instead clients consistently return to their same professional service provider as demonstrated by Aon's decades-long relationships with its cedent-clients. *Id.*, ¶¶ 16-17.

- Aon invested millions in developing these relationships, as evidenced by (among other things) the Former Employees' expense reports. Dkt. 1, ¶¶ 42-43. This alone evidences that reinsurance is an inherently relationship-driven industry.

- Defendants even argue that the cedent-client renewal rate is typically 70%, which by their own admission demonstrates the "stickiness" of these relationships.

These facts plainly pass the "near permanent" test.[9] Indeed, Defendants' only argument attempting to undermine the "near permanence" of Aon's cedent-client relationships is that these relationships are non-exclusive. Dkt. 23 at pp. 16-17. But to meet the "near permanent" definition, a business "is not required to show that the customer relationship is perpetual or indissoluble." *Audio Props., Inc. v. Kovach*, 655 N.E.2d 1034, 1037 (Ill. App. Ct. 1995). Nor "does the employer have to have an exclusive relationship with its clients to satisfy the near permanent test." *Id.; see also Sabre Indus. v. Waller*, 2021 WL 6129000, at *12 (C.D. Ill. Aug. 13, 2021) (same).

Moreover, in Illinois "a near-permanent relationship with **clients is inherent in the provision of professional services**." *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 667 (7th Cir. 1999) (emphasis added); *see also Credit Suisse First Bos., LLC v. Vender*, 2004 WL 2806191, at *2 (N.D. Ill. Dec. 3, 2004) (same); *see also Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 948 (7th Cir. 1994) (in professional services industries, "trust is a valuable business asset, created by years of careful management, that

---

[9] Defendants' assertion that cedent relationships are "somewhat transient" and "dependent on constant renewals," Dkt. 23 at p. 16, is unsupported by the record. Instead, they rely on two thirty-year old cases

the employee is not allowed to take away with him"). Reinsurance-brokerage services are indisputably professional services. And, contrary to Defendants' assertion that Aon's covenants are "absurd," another Court enjoined a reinsurance broker from "soliciting or servicing" cedent-clients, reasoning: "Although insurance companies are free to change their insurance broker at any time, the business is 'sticky' and clients tend to place their reinsurance needs through the same broker year after year, evidenced by the length of time many of the insurance companies at issue here were clients of [plaintiff]." *Willis v. Herriott,* 550 F. Supp. 3d 68, 105 (S.D.N.Y. July 22, 2021). This Court should find the same, and reject Defendants' specious near-permanence arguments.[10]

### d. <u>Aon's Non-Servicing and Non-Acceptance Covenants Are Enforceable.</u>

Aon's opening brief explained why the post-employment non-servicing and non-acceptance covenants are enforceable, and cited caselaw and legislative authority supporting the argument, including cases that have enforced such provisions. Dkt. 10, pp. 10-16. Defendants' opposition does not sway the result.

**First**, as noted above, Defendants assume that Illinois law governs. Dkt. 23, p. 15 n.62. By doing so, they ignore Aon's arguments that N. Ambriano, McAllister, and Medlicott breached similar agreements governed by New York and New Jersey law, Dkt. 10, p. 14, and in doing so either waive or concede that argument. Dkt. 1, Exs. 10-12. *See Dawson v. Newman*, 419 F.3d 656, 660 (7th Cir. 2005). Aon will succeed on the merits of the New York and New Jersey law-based claims.

**Second**, the other cases Aon cites in its opening brief are consistent with the General Assembly's expression of public policy. In relation to the judicial branch, the General Assembly

---

involving small general-policy brokerages where it was undisputed that the clients were generated from "cold calls" and not significant investments in time and resources. *Id.* at p. 16 n. 68. These are not the facts here.

[10] Having no valid basis to attack Aon's request for a TRO, Defendants attempt to rebut arguments Aon does not make concerning prospective clients and referral sources. Aon is **not** seeking a TRO as to prospective clients or referral sources. While these provisions are enforceable under Illinois law, Aon does not address this point further here, given their irrelevance to the TRO motion.

occupies a superior position in determining Illinois public policy. *See Reed v. Farmers Ins. Grp.*, 720 N.E.2d 1052, 175 (Ill. 1999). Thus, "when the legislature has declared, by law, the public policy of the State, the judicial department must remain silent." *Id.* (cleaned up). Here, the Illinois Freedom to Work Act allows covenants not to compete as long as the worker earns enough—which the Former Employees do here. Had the General Assembly intended to bar non-acceptance and non-servicing covenants, the recent amendments would have said so. *Cf.* Nev. Rev. Stat. § 615.195(2) (explicitly limiting restrictions on post-employment servicing). Accordingly, the authoritative expression of Illinois' public policy is that the covenants here are enforceable. Defendants' arguments that the public is unreasonably harmed by the non-acceptance and non-servicing covenants cannot stand in the face of the legislature's clear expression that even full non-competes are enforceable. Tellingly, Defendants do not address this argument in their brief.

**Third**, Defendants overstate the few cases that raised any question as to the viability of non-acceptance clauses and to the extent those cases support Defendants' position, they are incongruent with Illinois law and policy. For example, *Aon PLC v. Alpine Rewards, LLC,* No. 22-cv-04762, Dkt. No. 51 (N.D. Ill. Apr. 12, 2023) did not address the legislature's expression of public policy (as set forth above), or give appropriate weight to the numerous cases that have enforced such provisions in both the insurance industry and with respect to materially similar Aon provisions. Indeed, after reciting the proposition that it is more difficult to enforce a non-acceptance covenant than a non-solicitation covenant, which the underlying case tied to the customer's interest (inapplicable here), the *Alpine* court omitted a key point from the very same case: "However, such a restriction can be reasonable where there are a large number of other competitors with which the general public is free to do business." *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993) (emphasis added). Here, it is undisputed that there are other competitors besides Aon and Alliant with whom the public can do business. The *Alpine* case is an outlier.

Moreover, where the General Assembly has determined that the public is not harmed by full-blown non-compete covenants, the judiciary cannot declare a lesser restriction to be injurious to the public and therefore unenforceable. Defendants ask this Court to do what the General Assembly would not. In fact, Aon could have prohibited the Former Employees from competing against it altogether. It did not, and instead agreed with the Former Employees to narrow activity restrictions tailored to the clients they worked with at Aon. Defendants do not address this dispositive distinction.

**Fourth**, Defendants' argument that a ban on working for cedents imposes a "hardship on the public" is belied by their own admission that cedents work with multiple brokers. That being the case, there is no harm to the public if the covenants are enforced, and another reason why this reinsurance brokerage case is distinguishable from *Alpine*. Indeed, other courts that have addressed similar restrictions in the reinsurance-brokerage context have entered injunctions prohibiting brokers from both **accepting business from** and **servicing** the clients with whom they formerly worked. *See Willis*, 550 F. Supp. 3d at 107 (injunction from "soliciting or servicing"); *Benefield, Inc. v. Moline*, 2004 U.S. Dist. LEXIS 32818 (D. Minn. Aug. 10, 2004) (injunction from "soliciting," "accepting the business of," or "providing services to" former employer clients).

**Fifth**, Defendants' claim that Aon has "no protectible interest" in the non-service/non-acceptance provisions is (of course) untrue. Aon's legitimate interest in the non-servicing and non-acceptance provisions is, among other things, clearly articulated in the agreements the Former Employees signed, which state these terms are required: "so that Aon may renew or restore its business relationship with its clients…." Dkt. 1, Ex. A, § 9(a).[11]

---

[11] Defendants argue the definition of "solicit" is overbroad, asserting a Former Employee could "violate this clause by simply informing the public of his competitive reinsurance services." Dkt. 23 at p. 18. But solicitation is limited to "Covered Clients," not the "public." Dkt. 1, Ex. A, § 9(b). The agreements are consistent with the dictionary definition of "solicit," and Illinois law. *See, e.g.,* BLACK'S LAW DICTIONARY, 2D ED. (defining solicit as "to lure or tempt somebody"); *YCA, LLC v. Berry*, 2004 WL 1093385, at *10 (N.D. Ill.

**e. Aon's Confidential Information provision is enforceable.**

The agreements' prohibition on the Former Employees' post-employment use or disclosure of Confidential Information is also enforceable. It defines explicit categories of Aon information covered by the agreements and carves from coverage Aon information that is publicly available or otherwise generally known. *See id.* § 9(h) ("Confidential Information provision"). Moreover, the confidentiality restrictions are temporally limited when the information at issue does not qualify (or no longer qualifies) as a trade secret—expiring three years following the Former Employee's termination of their Aon employment. *Id.* Defendants contend that the Confidential Information provision makes "everything about Aon's business confidential," but a plain reading of the provision belies that assertion. *See Moss Holding Co. v. Fuller*, 2020 WL 1081730, at *8–9 (N.D. Ill. Mar. 6, 2020) (agreement prohibiting use/disclosure of certain categories of non-public business information, including "[a]ny other confidential or secret aspect of the business, product, or activities" of company enforceable at preliminary-injunction stage); *Orthofix Inc. v. Gordon*, 2016 WL 1170896, at *7 (C.D. Ill. Mar. 24, 2016) (non-disclosure agreement enforceable where it included "information acquired by the Employee in the course and scope of his activities for Orthofix that is not generally known or disseminated outside the Company").

The Confidential Information provision does not, unlike the circumstances presented in Defendants' authority, "insist on absolute secrecy of any and all information" without any tangible

---

May 7, 2004) ("[U]nder Illinois law, an employee violates a non-solicitation covenant even if he contacts clients merely to inform them he has changed employers, as the clients might understand that as a request to move with him to the new company."). Defendants further argue that "Covered Client" and "Business" are broadly defined to preclude working "anywhere and for anyone in the insurance industry, or even in other industries." Dkt. 23, pp. 20-21. There is no textual support for this argument. The activity restrictions are expressly limited to "Covered Clients," which is narrowly defined in the agreements to only include recent clients, with whom the Former Employees worked or became familiar while employed by Aon. Dkt. 1, Ex. A., § 9(b); *Sabre*, 2021 WL 6129000, at *14 (no geographic limitation required for activity restraints); *Maximum Indep. Brokerage, LLC v. Smith*, 218 F. Supp. 3d 630, 637–38 (N.D. Ill. 2016) (same). Defendants cite no authority supporting that the definition of "Covered Client" is overbroad. It is also undisputed that cedents are "Covered Clients," undermining Defendants' challenge to this term.

exceptions. Instead, it covers only Aon's "confidential, proprietary, and trade secret information which is not generally known to others," describes such information, and temporally limits its post-employment application when non-trade secrets are involved. Under Illinois law, the Confidential Information provision is appropriately tailored and enforceable. *See Coady v. Harpo, Inc.*, 719 N.E.2d 244, 250 (1999) (upholding post-employment non-disclosure restrictions defining "Confidential Information" to include, without limitation, "any and all information which is not generally known to the public, related to or concerning" company's business activities).

### f.   <u>There Is No Undue Hardship on The Former Employees.</u>

A TRO will not inflict undue hardship. The Former Employees are only prohibited from, collectively, working with approximately 55 cedent-clients, out of hundreds of potential cedents. *See* Laing Sup. Decl., ¶ 11. They are free to compete against Aon for billions of dollars of unrestricted reinsurance premiums and may continue to work for Alliant. *Id.*, ¶¶ 6-7. Indeed, in 2022, Aon captured less than 20% of the total facultative reinsurance premium in North America. *Id.* That still leaves billions of dollars in premium available to Defendants. *Id.*, ¶¶ 6-7, 11. They are simply restricted from soliciting, servicing, or accepting business from the same clients, which includes the cedent-clients, with whom they developed relationships at Aon, at Aon's expense, and through Aon's investment. And Defendants do not dispute that the Former Employees received salary guarantees from Alliant, knowing that they might be enjoined.

### g.   <u>The Court May Blue Pencil.</u>

Even if the Court were to find that Aon's covenants are overbroad (they are not), courts have discretion to reform or sever provisions of a non-compete or non-solicit, rather than hold such covenants unenforceable. *See* 820 ILCS 90/35(b). Ironically, Illinois courts have held that modifying a non-solicit only as to clients that the former employee serviced is permissible—which is essentially what the agreements already do here. *See, e.g.*, *Russell Dean, Inc. v. Maher*, 2018 WL 4679573, at *6-7

(N.D. Ill. Sept. 28, 2018). Further, the presence of a severability clause (which the agreements have here) is a factor weighing in favor of blue-penciling. *Id.* at *6 (citing cases); RSUs, ¶ 10(i).

## V. Aon's Immediate, Irreparable Harm if Defendants Are Not Enjoined.

Without an injunction, Aon will suffer immediate, irreparable harm to its client relationships, goodwill, and competitive position. Indeed:

- Defendants do not deny that Aon invested years, and millions of dollars, to develop its client relationships (Dkt. 1, ¶¶ 42, 43);

- Alliant reduced Aon's Facultative Reinsurance group by nearly one-third in terms of personnel, including by taking the leader of the overall business and its most tenured/experienced client-facing brokers (*Id.*, ¶ 138);

- As part of Alliant's tactics to convert client business, Alliant is telling clients there is "nobody left" to service their accounts (*Id.*); and

- As a consequence of Defendants' tactics, Aon lost and will continue to lose an indeterminate amount of business to Alliant, as well as other brokerage firms. (*Id.*; *see also* Laing Sup. Decl., ¶¶ 23; Dkt. 1, ¶ 15).

This case is not a typical one-off breach of restrictive covenant case; but instead involves a massive group departure in the "unique" reinsurance brokerage industry. Dkt. 23-27, ¶ 9. Cedent-clients, while "sticky," send an indeterminate amount of business to Aon, which varies based on several external factors, including carrier appetite and capacity, capital/balance sheet strength, changes in risk appetite and buying habits, weather events and other systemic risk dynamics, and other market conditions. Laing Sup. Decl., ¶ 26. Defendants' declarations concede these points. *See* Dkt. 23-27, ¶ 11; Dkt. 23-29, ¶ 7. For these reasons, it is difficult to quantify the amount of business any cedent will send to Aon in a given year. It is also difficult to ascertain if a cedent-client sends new placements to another brokerage, instead of Aon (where it likely would have but for Defendants' unlawful actions), given that Aon only receives BOR notifications if renewal or existing business transfers. There is no similar notification mechanism for new placements from its decades-

long clients. Consequently, Aon's current and future client losses are not easily determined. These are irreparable harms courts recognize in **the reinsurance brokerage industry**.

For example, in *Willis v. Herriott,* the Court held "loss of client relationships and customer goodwill" generally "constitutes irreparable harm." 550 F. Supp. 3d at 105. This is because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Id.* (internal quotations omitted). Relevant here, the court acknowledged:

> That is precisely the situation here. **Reinsurance broker[]… clients are free to switch reinsurance brokers at any time. Nevertheless, the business is sticky and the insurance company clients tend to develop long-term relationships with their reinsurance brokers, placing coverage through them year after year – as evidenced by the multiyear relationships that each of the Relevant Clients at issue had enjoyed with Willis Re**. Thus, the total monetary value of Willis Re's loss of clients would be very difficult, if not impossible, to calculate with any exactitude. Nor could the lost goodwill that Willis Re has built with these clients be easily quantified and compensated.

*Id.* at 105-106 (internal citations and quotes omitted) (emphasis added). The *Willis* Court concluded: "In sum, Plaintiffs have shown that they are likely to suffer irreparable harm – in the form of lost client relationships (and the associated indeterminate amount of business and loss of goodwill) and loss of the opportunity to transition responsibility for client relationships internally without interference – in the absence of injunctive relief." *Id.* at 107.

Similarly, in *Benfield, Inc. v. Moline,* the court held: "Based on the close relationships that [former reinsurance broker employees] cultivated with their clients while at [plaintiff], and the recent exodus of former [employees'] clients from [plaintiff] to [competitive broker], the Court finds that [plaintiff] is likely to suffer irreparable harm if the [TRO] is not granted, as it will likely lose valuable business relationships and goodwill." 2004 U.S. Dist. LEXIS 32818 at *11-12.

Defendants' sole argument in response is that Aon has an "adequate remedy at law" in the form of monetary damages. *See* Dkt. 23, p. 24. But none of Defendants' cases involve reinsurance

brokerage, or a massive raid of the scale here. *Id.* The cases are not even from the Seventh Circuit or Illinois.[12] Further, Defendants' reliance on Aon plc's 2022 Annual Financial Report ("Report"), and claim that Aon completed acquisitions in 2021 and 2022 where it recorded "goodwill" and "intangible assets," is misplaced. The Report explains: "Goodwill represents the excess of purchase price over the fair market value of the net assets acquired in the acquisition of a business." Dkt. 23-16, p. 61. But here, there was no purchase price, sale, or lawful acquisition of a business. There was an illicit taking with indeterminate business losses. The Report is backwards looking, assessing goodwill (as defined in the Report) based on past acquisitions. It says nothing about the threat of future harm to goodwill based on Defendants' continued unlawful activities—which is unquantifiable and forward-looking.

Defendants' argument also ignores (and asks this Court to issue a holding inconsistent with) decades of Seventh Circuit precedent, establishing that loss of client relationships and associated goodwill are irreparable harms, especially in cases such as this where: (a) lost business is not easily identifiable; (b) it is difficult to pin down what business will be lost in the future; (c) the harm is ongoing; and (d) the defendants' actions deprived the plaintiff of its ability to transition the client relationships. *See Life Spine, Inc. v. Aegis Spine, Inc.,* 8 F.4th 531, 545-546 (7th Cir. 2021) (plaintiff irreparably harmed by loss of "customers and market share" where lost customers or contracts are "not fully identifiable"… it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury irreparable."); *Hess Newmark Owens Wolf, Inc. v. Owens,* 415 F.3d 630, 632-633 (7th Cir. 2005) ("Competition changes probabilities [where principal violates restrictive covenant and assists rival in setting up new offices]: a [competitor] with stronger east-coast offices may improve by 5% of 10% the chance of receiving particular business from a particular studio. Over

---

[12] The only Seventh Circuit case cited by Defendants, *D.U. v. Rhoades,* 825 F.3d 331 (7th Cir. 2016), has nothing to do with client losses, reputational harm, or loss of client goodwill. Instead, it involves a Medicaid recipient's request for a preliminary injunction due to the reduction in hours of her private duty nurse.

many years… a 5% swing can represent a lot of business – but "[plaintiff] will not be able to identify which contracts slipped from its grasp. Illinois recognizes this… It treats ongoing competition itself as a sufficient basis for [injunctive] relief…"); *Promatek Indus. Ltd. v. Equitrac Corp.,* 300 F. 3d 808, 813 (7th Cir. 2002) ("[b]ecause of the difficulty in assessing the damages associated with a loss of [consumer] goodwill, the district court was correct in finding that [plaintiff] lacked an adequate remedy at law"); *Duct-O-Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509-10 (7th Cir. 1994) (plaintiff's "irreparable harm is that it will lose sales and the opportunity to maintain and develop relationships with existing and potential customers of [plaintiff's] products").[13]

Finally, Defendants do not address the reputational harm to Aon, as well as the irreparable harm to Aon due to the taking of its confidential information and trade secrets. *Life Spine,* 8 F. 4th at 546 ("it is well established that the loss of… reputation, if proven, can constitute irreparable harm"); *Duct-O-Wire,* 31 F. 3d at 509-510 (finding irreparable harm where "confusion caused by all of this" could damage the plaintiff's "commercial reputation"); Dkt. 10, at pp. 22-23 (citing cases finding irreparable harm due to use/disclosure of trade secrets). Given Defendants' failures to contest these irreparable harms, any opposition is waived.

## VI. <u>The Balance of Equities Tips in Aon's Favor.</u>

Finally, the balancing of equities tips decidedly in Aon's favor. Without injunctive relief, Aon will suffer irreparable harm. Alliant's claim that the impact on Aon is "miniscule" is wrong. As noted, Alliant took one-third of Aon's entire Facultative Reinsurance group, and its most senior and experienced professionals. Moreover, simply because Aon is larger than Alliant does not mean that Alliant has carte blanche to pilfer Aon's business and employees. Aon's existing employees, and their

---

[13] *See also* recent case of *Groupon, Inc. v. Shin,* 2022 U.S. Dist. LEXIS 2685 (N.D. Ill. Jan. 6, 2022) ("[T]he loss of fair competition that results from the breach of a non-competition covenant may irreparably harm an employer… without an injunction, [plaintiff] stands to have the considerable time, expense, and resources it invested to grow its… products undone. Monetary damages would be insufficient….").

families, rely on the continued sustainability of the Facultative Reinsurance group, and are directly

threatened by Defendants' continuing unlawful conduct.

Further, granting Aon's motion would cause no harm to Defendants or the public.

- **Alliant:** Alliant is at liberty to legitimately and lawfully compete. It just cannot compete against Aon by allowing the Former Employees to breach their post-employment covenants with Aon, or by utilizing Aon's trade secret and confidential information. As the *Mountain West* court observed: "Before the raid, Alliant did not have the benefit of the [Former Employees], and Alliant had no ability to use the Former Employees to attract [Aon's] clients. Alliant also did not have access to the knowledge that the Former Employees have about [Aon's] business plans, prospect lists, and confidential customer information. It is true that before the raid, Alliant could have solicited [Aon's] clients using its existing employees, but Alliant had little chance of taking business from [Aon] under those circumstances... Alliant therefore will suffer relatively minimal harm from having to live by an injunction pending a final decision on the merits after trial." 2019 WL 2536104 at *24; Dkt. 1, ¶ 144.

- **Former Employees:** The Former Employees do not deny that they received salary guarantees from Alliant. Accordingly, they will suffer no harm. Further, as noted, there are hundreds of potential cedent-clients in the reinsurance brokerage market; they are free to solicit and service any of these clients, just not those that they worked with at Aon.

- **Public:** Alliant concedes that there are many reinsurance brokers in the market, and clients may work with more than one broker. Accordingly, "No third parties are adversely affected; plenty of competition remains to protect... customers." *Hess,* 415 F.3d at 634. Clients can simply work with other brokers at Aon or with another broker in the market with whom they have a relationship; just not the Former Employees. The public also has an interest in the enforcement of contracts and fair competition.

* * *

For all of the above-referenced reasons, Aon respectfully requests that the Court enter the

accompanying proposed TRO.

Dated: May 31, 2023.                           *Respectfully submitted,*

                                               s/ *James M. Witz*
                                               James M. Witz
                                               jwitz@littler.com
                                               Orly Henry
                                               ohenry@littler.com
                                               LITTLER MENDELSON, P.C.
                                               321 N. Clark Street, Suite 1100
                                               Chicago, Illinois  60654
                                               (312) 372-5520

Jessica F. Pizzutelli
jpizzutelli@littler.com
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, New York  14450
(585) 203-3400

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on May 31, 2023, he filed the foregoing using the Court's CM/ECF system, which will provide notice of the same to the below and all counsel of record.

> Debra Fischer
> Debra.fischer@morganlewis.com
> Seth M. Gerber
> seth.gerber@morganlewis.com
> Morgan Lewis & Bockius LLP
> 2049 Century Park East, Suite 700
> Los Angeles, California 90067

> Tinos Diamantatos
> Tinos.diamantato@morganlewis.com
> Sari Alamuddin
> Sari.alamuddin@morganlewis.com
> Eric Mackie
> Eric.mackie@morganlewis.com
> Morgan, Lewis & Bockius LLP
> 110 N. Wacker Drive, Suite 2800
> Chicago, Illinois 60606

> */s/ James Witz*