**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AON PLC, AON CORPORATION, and AON FAC, INC., Plaintiff, v. ALLIANT INSURANCE SERVICES, INC., LOUIS AMBRIANO, NICHOLAS AMBRIANO, JUAN APONTE, OWEN BUSCAGLIA, ANDREW MASSE, RACHEL MCALLISTER, CHRISTOPHER MEDLICOTT, MICHAEL O'BRIEN, and ROBERT OSBORNE, Defendants. | ) | No. 23-cv-03044 Judge John J. Tharp, Jr. |

**ORDER**

For the reasons set forth in the Statement below, the plaintiffs' motion for temporary restraining order [9] is denied.

**STATEMENT**

Plaintiffs Aon PLC, Aon Corporation, and AON FAC, Inc. (collectively "Aon") have filed suit and moved for a temporary restraining order against nine former employees ("Individual Defendants") and Alliant Insurance Services, Inc. In April 2023, Alliant allegedly poached twenty-six employees from Aon's facultative reinsurance division and launched its own reinsurance brokerage group composed almost entirely of those former Aon employees.[1] Aon claims that the

[1] According to Investopedia: "Facultative reinsurance is coverage purchased by a primary insurer to cover a single risk—or a block of risks—held in the primary insurer's book of business. . . . Facultative reinsurance allows the reinsurance company to review individual risks and determine whether to accept or reject them." David Hayes, Facultative Reinsurance, Investopedia (July 27, 2021), https://www.investopedia.com/terms/f/facultative-reinsurance.asp. The primary insurer who cedes the risk is known as a "ceding company" or "cedent." Facultative reinsurance differs from the other common type of reinsurance scheme, treaty reinsurance, in that "[f]acultative reinsurance is considered to be more of a one-time transactional deal, while treaty reinsurance is typically part of a long-term arrangement of coverage between two parties." *Id.*

Individual Defendants misappropriated trade secrets in anticipation of their departure for Alliant in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3), and breached certain restrictive covenants and confidentiality provisions to which they had agreed while working at Aon. Aon also seeks to hold Alliant liable for inducing the Individual Defendants to breach their agreements with Aon and tortiously interfering with Aon's prospective economic advantage.[2]

Aon has moved for a temporary restraining order that would require the defendants to return any trade secret materials, submit their devices to forensic investigation and remediation, and not use any Aon information in the future. It also seeks an order enjoining the Individual Defendants from soliciting, accepting business from, or servicing cedents with which they had a business relationship while employed at Aon.

Awarding preliminary injunctive relief before the merits of a case have been decided "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As the party seeking the TRO, Aon bears the burden of showing that it is warranted. A plaintiff seeking a TRO must show that it has some likelihood of succeeding on the merits, it is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in its favor, and the requested relief is in the public interest. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020); *Mays v. Dart*, 974 F.3d 810, 818-822 (7th Cir. 2020).[3]

"In assessing whether Aon has met its burden, the Court views the available evidence in the record from a 'neutral and objective viewpoint without accepting [Aon's] allegations as true nor drawing all reasonable inferences in [its] favor.'" *Aon plc v. Alpine Rewards, LLC*, No. 22-CV-4762, 2023 WL 3713987 at *3 (N.D. Ill. Apr. 12, 2023) (quoting *Doe v. Univ. of Chicago*, 2022 WL 16744310, at *2 (N.D. Ill. 2022)). The Court concludes that Aon has not met its burden. Its motion for TRO is denied.

## I. Likelihood of Success on the Merits

Aon must establish that it is likely to succeed on the merits of its claims. Aon's claims for which it seeks preliminary relief include trade secret misappropriation and use (or inevitable disclosure) under the DTSA, breach of restrictive covenants, and tortious interference. If it cannot succeed on its breach of contract claims, it cannot succeed on its tortious interference claim either. As for how strong its showing must be, the Seventh Circuit has clarified that, following *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) and *Nken v. Holder*, 556 U.S. 418 (2009), "an applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the applicant need not show that it definitely will win the case."

---

Reinsurance brokers like Aon, and now Alliant, are responsible for connecting cedents and reinsurance companies.

[2] Aon also lodges breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and civil conspiracy claims against some but not all defendants, but it does not move for a temporary restraining order on those grounds.

[3] The standard for obtaining a temporary restraining order mirrors that for preliminary injunctive relief. *See YourNetDating, Inc. v. Mitchell*, 88 F. Supp. 2d 870, 871 (N.D. Ill. 2000).

*Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). While proof by a preponderance of the evidence is not required, a mere "possibility of success is not enough. Neither is a 'better than negligible chance.'" *Id.* at 762.

**1. Misappropriation of Trade Secrets under the DTSA**

Aon alleges that several of the Individual Defendants misappropriated its trade secrets. To succeed on the merits of this claim, "Aon must demonstrate that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Aon Risk Services Companies, Inc. v. Alliant Ins. Services, Inc.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019). It must also show that the party against whom it seeks the injunction is the party responsible for misappropriating the trade secret.

Aon has sufficiently demonstrated for the purposes of a TRO that at least some of the documents and the information at issue qualify as trade secrets. Under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), information is a trade secret if (1) the owner has taken reasonable measures to keep the information secret, and (2) the information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Aon identifies specific documents that the Individual Defendants supposedly accessed or emailed to themselves, and it characterizes that information as "employee-specific compensation information, financial information, competencies, and knowledge concerning employee-client relationships; budgets and forecasts (including broken down by individual employee, including numerous of the employees targeted by Alliant); client reinsurance submissions; renewal lists; client lists; renewal information; confidential pricing information; and renewal and brokerage spreadsheets." Pl. Memo. at 6, ECF No. 10. It seems likely that at least some of the information in these materials qualify as trade secrets.

Aon has not, however, made a sufficient showing that any of the defendants misappropriated trade secrets through improper acquisition, disclosure, or use, or that they threaten to do so, at least based on the limited evidence available at this juncture. "Misappropriation" occurs when a person acquires a trade secret by improper means or discloses or uses a trade secret without consent. 18 U.S.C. § 1839(5). "Improper" means include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6). "[F]actual enhancement of 'improper' is necessary where [a former employer] alleges defendants had access to trade secrets because of their position in the company and accessed the information while still employed at [the company]." *Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*, 17 C 923, 2018 WL 1156246 (N.D. Ill. Mar. 5, 2018).

Aon presents a host of allegations that the Individual Defendants misappropriated trade secret materials shortly before they resigned from Aon, but almost all of these allegations are speculative and based on a premise that the Individual Defendants had no legitimate reason to access that information in the days leading up to their resignations. The Individual Defendants, however, have offered sworn declarations denying each of Aon's accusations of misappropriation and explaining that they accessed the information in question because they continued to do their jobs for Aon up until the time of their departures and to ensure that their files accurately reflected the status of each of their accounts. These declarations are discussed in more detail below, but the

Court finds them to be facially credible and unrebutted explanations for the conduct Aon characterizes as misappropriation. At this very preliminary stage, they suffice to persuade the Court that Aon's misappropriation allegations are not likely to succeed.

Aon has offered evidence that two Individual Defendants, Aponte and Masse, emailed trade-secret information to their personal accounts shortly before they departed for Alliant. But Aon has not sufficiently demonstrated that these actions were improper, or that they have not been sufficiently remediated. Starting with Masse, he submitted a declaration explaining that the conduct in question was consistent with his longstanding practice of printing documents from his home printer via his personal email. 5/20/23 Masse Decl. ¶ 7, ECF No. 23-1. He attests that an independent computer forensics consultant accessed his personal email account and deleted all Aon-related emails (while still preserving them in a manner that is inaccessible to Masse). 4/24/23 Masse Decl., ECF No. 23-2. Similarly, Aponte, although failing to explain why he had emailed Aon work materials to his personal email accounts, attests that a forensic consultant wiped those materials from his personal account. Aponte Decl. ¶ 2, ECF No. 23-25. He attests that he no longer has any Aon confidential, proprietary, or trade secret information in his possession. *Id.* As discussed in greater detail below, Aon contends that Alliant's independent forensic remediations are sham procedures, but there is no concrete evidence in the record to support that contention.

Aon has further alleged that defendants N. Ambriano, Medlicott, O'Brien, Masse, and McAllister accessed numerous files and folders containing confidential information in the days preceding their departure without any legitimate reason to do so. Moreover, Aponte supposedly made an "unusual request" for renewal documents under a false pretense. But a review of the declarations submitted by the Individual Defendants leads to an overall impression—again, at this stage based only on the limited evidence before the Court—that Aon's concerns about digitally accessed files and folders, communications with other Aon employees, and in-person conduct at Aon offices are speculative extrapolations from conduct that can be—and has been—innocently explained. *See, e.g.*, L. Ambriano Decl. ¶ 5, ECF No. 23-26 ("Aon alleges … that I came into the Aon office on April 20th to take Aon information. Aon is making up allegations that are not true…. The only things I left the office with were my own, personal items – not work materials."); Medlicott Decl. ¶ 4, ECF No. 23-13. The declarations provide innocuous explanations for the vast majority of instances of digital folder and file access where Aon suggests there was foul play; most of the time the conduct at issue was simply the Individual Defendants executing their job duties while still employed at Aon. *See, e.g.*, N. Ambriano Decl. ¶¶ 12-17, ECF No. 23-29 ("Aon claims that I accessed approximately 39 folders and files in the three days prior to my resignation. I worked hard just about up to the last possible minute for Aon before resigning …. I would most definitely have accessed the folders in question in the course of normal business."); Buscaglia Decl. ¶ 5, ECF No. 23-30 ("I was dutifully completing the work I had done for Aon, nothing more."). On reply, Aon does not provide any further evidence to rebut any of the explanations regarding information access provided in the Individual Defendants' declarations, except to reemphasize that certain defendants, such as N. Ambriano, had access to sensitive Aon information.

The Court's findings regarding the likelihood of actual or threatened misappropriation are buttressed by the fact that all of the Individual Defendants apparently returned their Aon-issued devices to Aon in a timely fashion. Aon was able to glean some information, which it used to support its complaint and motion for TRO, by forensically investigating those devices, as well as

logs of how the users of those devices interacted with Aon's email servers, networks, and digital data. *See* White Decl., ECF No. 10-1. There is simply not enough concrete evidence in the record to merit injunctive relief requiring forensic examination of the defendants' personal or Alliant-issued devices, particularly in light of applicable traditional ESI preservation obligations to which the defendants are certainly subject and which the Court will stringently enforce.

The proactive and remedial measures that Alliant undertook during the onboarding process also hold weight with the Court. Alliant has submitted copies of its "Prospective Employee Departure Protocols," which the Individual Defendants signed. Exs. A-I to Dizdari Decl., ECF Nos. 23-3—23-12. These protocols explicitly warn the employees not to take or disclose trade secrets or confidential information from their former employers.[4] Alliant has also explained that it "employs internal IT measures designed to prevent new employees from downloading, uploading, saving or transferring information from their former employers to Alliant computers and systems, such as blocking access to USB ports and personal email transmissions." Dizdari Decl. ¶ 5, ECF No. 23-3; Andrada Decl. ¶¶ 3-5, ECF No. 23-28 (noting that the Individual Defendants were also prevented from using cloud storage websites and third-party file sharing websites on their newly issued Alliant devices). And, as alluded to earlier, Alliant reacted to information that certain employees, Aponte and Masse, had emailed information to their personal accounts by hiring a third-party consultant to remove those emails, delete the additional small quantity of information sent earlier, and create a mirror image of the devices for document preservation purposes. *See* Little Decl. ¶ 4-6, ECF No. 23-23. The forensic consultant also confirmed that those emails had not been forwarded to anyone else. *Id.* ¶ 7. Lastly, the forensic consultant also collected, searched, preserved, and remediated the accounts of defendant Buscaglia as well as "personal email accounts and personal devices of other new hires who are not named as defendants in this action." *Id.* at ¶ 4.

Aon replies that "Alliant's 'remediation' efforts are nothing more than an effort to disguise their wrongdoing." Aon Reply at 6, ECF No. 27. It argues that it should not have to rely on the defendants' assurances about whether they currently possess any Aon information. But the fact of the matter is that Aon has not been able to present any evidence to suggest that the Individual Defendants currently possess any trade secret or confidential information, *i.e.,* that they or Alliant are lying. Aon's rhetoric alone does not suffice to undercut the impact of Alliant's evidence regarding its onboarding procedures.

Aon also invokes the "inevitable disclosure" doctrine in arguing that the defendants are likely to use trade secret information they learned while working at Aon in their new positions at Alliant. The logic of the "inevitable disclosure" doctrine is that, even when an employee does not

---

[4] And beyond general exhortations, the protocols specifically detail what type of conduct to avoid (*e.g.*, emailing proprietary information to one's personal account, printing it, transferring it via external drives, transferring it via cloud storage.) and what the employees should actually do upon resignation (*i.e.*, "Upon resignation from any current employer, leave your office and client files 'as is' and leave any employer-owned mobile phone(s), computer(s), or other electronic devices (including USB devices and external drives) on your desk at the time of your departure."). *Id*. They also direct employees not to contact their former coworkers if they are subject to employee non-solicitation agreements.

take trade secret data with him, an employee performing the same job in the same industry for a new employer is unlikely to be able to avoid consideration of trade secret information of his former employer that is nevertheless known to him while competing with that former employer in his new position.[5] While "inevitable disclosure" can be a viable theory under state law, it appears to be foreclosed for claims under the DTSA. The civil remedies provision of DTSA precludes the imposition of injunctive relief for actual or threatened misappropriation based "merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(i)(I).[6] The inevitable disclosure doctrine therefore allows plaintiffs to satisfy the third element of a claim of misappropriation—use by the new employer—but not the second, which is that the trade secret data at issue actually be misappropriated. Here, as discussed above, there is insufficient evidence that any trade secret information was improperly accessed, in the defendants' possession, or about to be used by the defendants, To get by on "threatened misappropriation," a plaintiff must have evidence beyond that the defendant "knows" a trade secret. Plaintiffs have presented no such evidence.

### 2. Breach of Restrictive Covenants

The plaintiffs also seek to enforce several restrictive covenants included in restricted stock unit agreements ("RSUs") the Individual Defendants entered into as a condition of receiving Aon stock as part of their compensation packages. Based on these covenants, Aon seeks to preliminarily enjoin the Individual Defendants from soliciting renewal or new business from the clients they worked with at Aon, from providing any services to such clients, and responding to unsolicited approaches from such clients. They also seek to bar the Individual Defendants from soliciting other Aon employees to join them at Alliant.

"Enforceability of a restrictive covenant in an employment contract is dependent on whether, given the particular facts of the case, the restraints imposed thereby are reasonably necessary for the protection of the employer's business from unfair or improper competition." *Arpac Corp. v. Murray*, 589 N.E.2d 640, 649 (Ill. App. 1st Dist. 1992). "A restrictive covenant ... is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d

[5] "Courts examine three factors in an inevitable disclosure analysis: (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent the use or disclosure of the former employer's trade secrets. In addition, plaintiffs must allege more than the mere fact that a person assumed a similar position at a competitor to state a claim for inevitable disclosure, which requires a showing of intent or a high probability that the employee will use trade secrets. Courts are cautious in their application of the doctrine due to its significant potential to curb employee movement among competitors." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1070 (N.D. Ill. 2020) (cleaned up).

[6] More fully: "a court may grant an injunction … to prevent any actual or threatened misappropriation … provided the order does not … prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows[.]" *Id*.

393, 396 (Ill. 2011). This is a highly fact-bound and case-specific inquiry. "The three-prong test of reasonableness remains unstructured. Notably, precedents are of less than usual value because the question of reasonableness must be decided on an *ad hoc* basis. There is no inflexible formula." *Id.* at 401 (cleaned up).

"[W]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case." *Id.* at 403.

As an initial matter, defendants argue that there is a mismatch between the Individual Defendants' actual former employer, AON FAC, and the Aon entity that was a party to the RSUs (which contained the restrictive covenants), Aon PLC, the ultimate parent company of the Aon entities. The agreements, however, state, "The parties acknowledge and agree that each Aon entity, including the Employer, is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement." *E.g.*, Ex. 1, Restricted Stock Unit Agreement Under Amended and Restated Aon PLC 2011 Incentive Plan at Section 9(g), ECF No. 1-1. Defendants' objection on this basis appears unfounded.

***a) Non-solicitation provisions as to "Covered Clients" and Aon employees***

Each of the Individual Defendants signed RSUs containing the following covenants:

> The [Former Employee] hereby covenants and agrees that, except with the prior written consent of Aon, the [Former Employee] (on the [Former Employee's] own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the [Former Employee's] Termination Date (the "Restricted Period")… directly or through the direction or control of others: (i) call upon or solicit, any business of the same type or kind as the business performed by Aon from or with respect to a Covered Client; or (ii) accept, engage in, service or perform any business of the same type or kind as the business performed by Aon from or with respect to a Covered Client; or (iii) knowingly engage in any conduct that is intended to cause, or could reasonably be expected to cause a Covered Client to stop or reduce doing business with Aon, or that would involve diverting business opportunities away from Aon.
>
> "Covered Client" means (i) any client of Aon with respect to whom the [Former Employee] provided services, either alone or with others, or had a business relationship, or on whose account the [Former Employee] worked or became familiar, or supervised directly or through the direction or control of others the servicing

> activities related to such clients, during the 24 months prior to the [Former Employee's] Termination Date (or such shorter time as [Former Employee] was employed) ("Look Back Period") and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within 12 months prior to such Termination Date….
>
> [Former Employee] acknowledges that with respect to Aon's reinsurance business, the foregoing reference to clients shall include all risk protection buyers, cedents and retrocedents (a/k/a reinsureds), and, in respect of facultative reinsurance Business, the original policyholders (a/k/a underlying insureds) and wholesale and retail brokers. "Solicit" is understood to include any direct or indirect interaction between the [Former Employee] and another person or entity that takes place in an effort to develop or further a business relationship, irrespective of which party first initiates contact, and expressly includes notifying a client that the [Former Employee] has left Aon's employ to go to a competitor….
>
> The [Former Employee] hereby also agrees, for the duration of the Restricted Period, not to, directly or through the direction or control of others: (i) solicit or cause any person or other entity to solicit or induce, any Covered Employee to work for the [Former Employee] or for any third party or entity, or to leave the employ of Aon; (ii) induce, attempt to induce, or cause any person or other entity to induce any Covered Employee to leave the employ of Aon, or on behalf of a competing business, (iii) assist with hiring or attempting to hire any Covered Employee.
>
> "Covered Employee" means any employee of Aon with whom the [Former Employee] had material contact, whom [Former Employee] supervised, or about whom [Former Employee] had access to Confidential Information during the twenty-four (24) months prior to the [Former Employee's] termination of employment….

Compl. ¶¶ 52-53, ECF No. 1 (citing Exs. 1-9, § 9(b)-(c) to the complaint, ECF No. 1-1).

"Under Illinois law, [client/customer] non-solicitation covenants are 'usually justified on the ground that the employer has a legitimate business interest in restraining the employee from appropriating the employer's (1) confidential trade information, or (2) customer relationships.' " *Alpine Rewards,* 2023 WL 3713987 at *6 (quoting *Aon plc v. Infinite Equity, Inc.*, 2021 WL 4034068, at *15 (N.D. Ill. 2021)). Although these are factors to be considered and not hard-and-fast rules, the guiding principle is that "a company has a legitimate interest in protecting its information and its customer relationships, which grow and gain value over time." *Id.*

Non-solicitation covenants are generally only enforceable as to actual former client relationships. Courts typically do not extend them to cover prospective clients or clients with which

the former employee did not work. *AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463 (Ill. App. 1st Dist. 2015). "Under Illinois law, an employer has a greater interest when the employee actually worked with the client. The closer the connection between the former employee and the client, the greater the interest of the employer in protecting that relationship." *Alpine Rewards, LLC*, 2023 WL 3713987, at *6 (citing *Dent Wizard Int'l Corp. v. Andrzejewski*, 2021 WL 1611106, at *7 (Ill. App. Ct. 2021); *Eichmann v. Nat'l Hosp. and Health Care Services, Inc.*, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999)).

And while not dispositive, an important factor that Illinois courts consider in evaluating the former employer's interest in customer non-solicitation is the nature of its customer relationships—specifically whether they can be characterized as "near-permanent." *Reliable Fire*, 2011 IL 111871 ¶ 11; *Appelbaum v. Appelbaum*, 355 Ill. App. 3d 926, 935-36 (2005). "Whether a client is near-permanent turns in large degree on the nature of the business involved, and certain businesses are just more amenable to success under that theory. Among those are businesses who sell their customers a unique product or service, and those under contract with customers." *W. Capra Consulting Group, Inc. v. Snyder*, 1:19 C 4188, 2019 WL 3935045 at *9 (N.D. Ill. Aug. 20, 2019) (cleaned up). "A near-permanent relationship with customers is generally absent from businesses engaged in sales. When the employer's business is sales of a non-unique product, its customers also do business with its competitors, are generally known to competitors, or are ascertainable by reference to telephone or specialized directories, the near-permanency test will not be satisfied." *Applebaum*, 355 Ill. App. 3d at 935.

Based on the present record, the Court is not persuaded that cedents are "near-permanent" clients of facultative reinsurance brokers. The declarations submitted by the defendants provide substantial support for their argument that it is by nature a relatively transient business. The product—brokering services—is not a unique product or service, which is why "in a given year, under current market conditions, a reinsurance brokerage firm will keep roughly 65-70% of its facultative reinsurance accounts," N. Ambriano Decl. ¶ 6, ECF No. 23-29, and "[t]he common customer pool of cedents purchases reinsurance policies through different producers associated with different brokerage firms," O'Brien Decl. ¶ 11, ECF No. 23-27. A business that fails to retain a third of its accounts ***year over year*** does not seem particularly "sticky." To be sure, trust may develop between cedents and intermediaries such as Aon, and several cedents may have been with Aon for more than a decade, *see* Laing Supp. Decl. ¶ 17; however, that trust and longevity does not make the brokerage services somehow unique or exclusive, nor does it in itself justify totally restricting Alliant from otherwise fairly competing for at least some facultative reinsurance business with those clients who comprise a significant portion of the market.

In that vein, Alliant has submitted evidence that "[w]ithin the facultative reinsurance industry, about 80 percent or more of the demand for [facultative reinsurance] policies comes from around 15 or so insurer-cedents." O'Brien Decl. ¶ 11. And this "core group" of cedents all does business with Aon, meaning that, if the ban on solicitation of new business with Aon clients were enforced, the Individual Defendants would be effectively shut out of the industry. *See* N. Ambriano Decl. ¶ 8. Aon does not contest that the "core group" of cedents that provide approximately 80% of the business would be largely off limits to Alliant were the covenants to be enforced. Rather, it counters that "in 2022, Aon captured less than 20% of the total facultative reinsurance premium in North America. That still leaves billions of dollars in premium available to Defendants." Aon Reply at 19 (citing Laing Supp. Decl. ¶ 6-7, 11). But that Aon had captured "only" 20% of the

market at any given time does not mean that the other 80% of the market would be available to the defendants if Aon has its way; the relevant number is how much of that remainder would be off limits were the Court to enforce a total non-solicitation restriction on Aon clients over the course of any defendant's restricted period. Based on Aon's reasoning, if it had a single dollar of a cedent's business during the restricted period, the Individual Defendants would be foreclosed from soliciting any of the millions of dollars of business that cedent might be doing with other brokers.[7] And that holds for every cedent with which Aon had a relationship during the restricted period.

Accordingly, while Aon has shown that the Individual Defendants likely solicited cedents with which they worked with while at Aon for new facultative business, Aon has not shown that it is likely that covenants purporting to restrict their ability to do so are reasonable in the context of the facultative reinsurance market. Again, further fact development relating to Aon's and Alliant's businesses, the cedents, and the industry more broadly may warrant a different conclusion, but at this point, the restriction posed by barring the Individual Defendants from soliciting new business from the core group of cedents does not appear reasonable. The Court finds, based on the totality of the circumstances available at this stage, that Aon does not have a legitimate business interest that justifies a total prohibition on solicitation of former cedents by the defendants.

That said, the Court concludes that Aon does have a legitimate business interest in preventing the Individual Defendants from soliciting cedents they worked with at Aon for transfers of the renewals to Alliant. This is partly because Alliant would be primed to know about and compete for impending renewal business by virtue of its new hires' prior work at Aon. Still, Aon has not cited any evidence or provided any declarations from anyone attesting that Alliant actually breached the non-solicitation covenant by attempting to steer renewals of policies Aon previously brokered to Alliant. Each of the Individual Defendants has denied under oath that they initiated any such discussions. Therefore, while the non-solicitation clause would likely be enforceable as to renewals of reinsurance policies previously brokered by Aon, Aon has not demonstrated that it has a likelihood of proving breach, *i.e.*, the Individual Defendants called cedents seeking to switch their policies to Alliant for impending renewals.[8]

As for employee solicitation, maintaining a stable workforce can be a legitimate business interest. *Arpac Corp. v. Murray*, 226 Ill. App.3d 65, 76 (1st Dist. 1992). Aon maintains that a

---

[7] This issue highlights another shortcoming of Aon's motion, namely the lack of evidence establishing which customer relationships are relevant as to each defendant—in other words, what clients are each of the Individual Defendants barred from soliciting? Aon treats the defendants as a group and does not parse out the specific customers that each defendant would be barred from soliciting based on the defendant's work while at Aon. The complaint asserts a civil conspiracy theory against some of the defendants but does not seek a TRO on that ground.

[8] Aon has submitted that it has received notifications that the defendants have become brokers of record ("BOR") for renewal business they worked on at Aon. Laing Supp. Decl. ¶¶ 19-20. But the notion that the Individual Defendants must have solicited them for that renewal business is not rooted in any evidence, and the Court finds it too speculative, especially in light of the defendants' declarations to the contrary, to justify a conclusion that it is likely such solicitation occurred.

number of customer service employees who were among the Aon employees hired by Alliant must have been recruited by the Individual Defendants because Alliant would not have known who they were otherwise; that's a thin reed and it is unsupported by any evidence from any Aon current or former employee attesting that they were solicited to move to Alliant by any of the Individual Defendants. For their part, the Individual Defendants retort that there is nothing unusual or surprising about fact that less senior personnel may follow their bosses out the door and each denies under oath in their declarations that they did not recruit any employees of Aon to work at Alliant. Again, the Court finds these declarations to be substantially more persuasive at this juncture than Aon's speculative inferences and therefore concludes that Aon has not established a likelihood of success on its claim that the Individual Defendants have breached the agreements not to solicit employees.

***b) Non-servicing and non-acceptance provisions***

Aon also seeks to enforce the non-servicing and non-acceptance portions of the restrictive covenants. Those provisions purport to bar the Individual Defendants from performing any services relating to an existing policy brokered by Aon and from brokering new policies for cedents they worked with at Aon—even when the cedents have brought the business to the defendants without any enticement or solicitation. It is difficult enough to justify the anti-solicitation covenant discussed above with respect to new business; it is harder still to conclude that a restrictive covenant that limits not only the realm in which the employee who signed the agreement may operate but also denies customers—the cedents—the freedom to choose the broker with which they seek to do business. It is not surprising to find, then, as Judge Seeger has recently observed, that:

> Illinois courts have expressed hesitation about enforcing non-acceptance and non-servicing covenants. Under Illinois law, "it is more difficult for an employer to justify prohibiting its former employees from accepting orders from the employer's clients than merely prohibiting its employee from soliciting such clients." Soliciting business is one thing; accepting business is another.

*Alpine Rewards, LLC*, 2023 WL 3713987, at *7 (quoting *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993)). See also *Aon Risk Servs. Co. v. Alliant*, 415 F. Supp. 3d 843, 852–53 (N.D. Ill. 2019) (declining to grant a TRO as to non-servicing and non-acceptance covenants).

Aon maintains nevertheless that non-servicing and non-acceptance covenants are routinely enforced in Illinois. Most of the cases Aon cites for that proposition, however, either involve different contexts from the situation at hand, such as restrictive covenants after the sale of a business, *e.g.*, *Howard Johnson & Co. v. Feinstein*, 609 N.E.2d 930, 935 (Ill. App. Ct. 1993), involve little to no analysis of the covenants beyond the non-solicitation restrictions, *e.g.*, *Arthur J. Gallagher & Co. v. Roi*, 2015 IL App. (1st) 140786-U (2015); *Aon Risk Services v. Cusack*, 946 N.Y.S.2d 65 (N.Y. Sup. Ct. 2011), involve rather reckless misappropriation of trade secrets/confidential information, *e.g.*, *Hanchett Paper Co. v. Melchiorre*, 792 N.E.2d 395, 399, 400, 403 (Ill. App. Ct. 2003), or apply where the former employer's relationships with the clients

were exceptionally strong and longstanding, *e.g.*, *Dam, Snell & Taveirne, Ltd. v. Verchota*, 754 N.E.2d 464 (Ill. App. Ct. 2001).

The Illinois Supreme Court has not addressed this issue; decisions of the Illinois Appellate Courts therefore govern, "unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently." *Alpine Rewards*, 2023 WL 3713987, at *7 (quoting *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015)). Most recently, in *Quality Trans. Servs., Inc. v. Mark Thompson Trucking, Inc.*, 183 N.E.3d 260, 265 (Ill. App. Ct. 2021), the Illinois Appellate Court affirmed the trial court's refusal to enforce a restrictive covenant to bar a former employee from responding to unsolicited requests for bids; the former employer, the court confirmed, "cannot prohibit [the former employee] from developing prospective business opportunity that came their way through no fault of theirs." To hold otherwise, the court held, "would be contrary to public policy." *Id.* This Court therefore concludes that Aon's non-servicing and non-acceptance restrictions are unlikely to be enforceable. S*ee also Hay Grp., Inc. v. Bassick*, 2005 WL 2420415, at *6 (N.D. Ill. 2005) (declining to enforce a covenant prohibiting a former employee from doing any business at all (even at the client's behest) with the employer's clients, as that prohibition would restrict the rights of the client without its consent.").

Citing 820 Ill. Comp. Stat. Ann. 90/10, Aon also claims that the Illinois Legislature has spoken on the issue. The statute states, in relevant part:

> (a) No employer shall enter into a covenant not to compete with any employee unless the employee's actual or expected annualized rate of earnings exceeds $75,000 per year. This amount shall increase to $80,000 per year beginning on January 1, 2027, $85,000 per year beginning on January 1, 2032, and $90,000 per year beginning on January 1, 2037. A covenant not to compete entered into in violation of this subsection is void and unenforceable.
>
> (b) No employer shall enter into a covenant not to solicit with any employee unless the employee's actual or expected annualized rate of earnings exceeds $45,000 per year. This amount shall increase to $47,500 per year beginning on January 1, 2027, $50,000 per year beginning on January 1, 2032, and $52,500 per year beginning on January 1, 2037. A covenant not to solicit entered into in violation of this subsection is void and unenforceable.

*Id.* Aon reads the statute as permitting covenants not to compete, so long as the employee's salary matches or exceeds the identified threshold. Having permitted blanket covenants not to compete, Aon argues, Illinois has clearly signaled that lesser restrictions do not offend its public policy.

But that Section simply delineates a condition under which covenants are *per se* ***unenforceable***; it does not state or suggest that restrictive covenants not to compete or solicit for employees whose salaries exceed those amounts are *per se* ***enforceable***. To the contrary, the Illinois Legislature has enshrined the common-law principles used by Illinois courts to assess the validity of restrictive employment covenants in the very next Section of the Illinois Compiled Statutes. 820 Ill. Comp. Stat. Ann. 90/15, effective Jan. 1, 2022, states:

> A covenant not to compete or a covenant not to solicit is illegal and void unless (1) the employee receives adequate consideration, (2) the covenant is ancillary to a valid employment relationship, (3) the covenant is no greater than is required for the protection of a legitimate business interest of the employer, (4) the covenant does not impose undue hardship on the employee, and (5) the covenant is not injurious to the public.

This statute, enacted at the same time 820 ILCS 90/10 was enacted, would be entirely unnecessary if § 90/10 statute carried the water Aon assigns to it. To the extent that the Illinois Legislature, through the Illinois Freedom to Work Act, has "spoken on the issue" here, it is to say that Illinois public policy continues to require that restrictive covenants in employment agreements be reasonable in their relation to the interests of the employer, the employee, and the public. Non-servicing and non-acceptance restrictions that purport to bar employees from responding to unsolicited inquiries from customers pose unwarranted hardships on both the former employee and customers and are therefore contrary to Illinois public policy.

The defendants have not addressed the enforceability of the restrictive covenants under New York or New Jersey law (which Aon contends governs their claims against certain Individual Defendants), the Court's preliminary canvasing of the case law suggests that those states employ the same overarching principles as Illinois and similarly uphold non-solicitation clauses; however, the extent to which they enforce non-servicing clauses is similarly unclear. *See, e.g.*, *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 189-90 (S.D.N.Y. 2011) (enjoining defendant from servicing former clients but only analyzing enforceability of non-soliciting clause under New York law in post-sale-of-business case); *Menasha Packaging Co., LLC v. Pratt Industries, Inc.*, CV 17-0075, 2017 WL 639634 (D.N.J. Feb. 15, 2017) (similarly enjoining servicing of a single former client but only analyzing whether restriction against soliciting that former client was enforceable); *Marsh USA Inc. v. Doerfler*, 9 N.Y.S.3d 594 (N.Y. Sup. 2015) (holding that plaintiff failed to establish that non-servicing restriction was "no greater than is required for the protection of the legitimate interest of the employer" and refusing to partially enforce restriction because it was impossible to separate the goodwill generated by the former employer and the former employee). None of the cases the plaintiffs cite compels a conclusion that New York or New Jersey law is materially different than Illinois law.

Lastly, for the reasons set forth in the trade secrets analysis, Aon has not established a likelihood of success on the merits of its breach of contract claims with respect to the confidentiality provisions because it has not demonstrated to a sufficient degree that the Individual Defendants retained any confidential information in their possession and are likely to deploy it at Alliant.

## II. Irreparable Harm and Adequacy of Remedy at Law

The Court also concludes that Aon's motion fails to establish that it will suffer irreparable harm if the motion is denied. "A finding of irreparable harm absent an injunction 'is a threshold requirement for granting a preliminary injunction.' Harm is irreparable if legal remedies are inadequate to cure it. Inadequate 'does not mean wholly ineffectual; rather, the remedy must be

seriously deficient as compared to the harm suffered.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Intern v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)).

Aon's principal argument is that the loss of customers constitutes irreparable harm and, in some cases that may be true. But "harm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable." *Id.* at 546. In *DM Trans, LLC v. Scott*, 38 F.4th 608 (7th Cir. 2022), the Seventh Circuit recently found that the district court—which was confronted with a case, like this one, involving "poached" employees who possibly breached their restrictive covenants and misappropriated trade secrets—acted within its discretion when it concluded that monetary damages were an adequate remedy at law. *Id.* at 618-20. The court of appeals concluded that because the defendant and the district court had "posited a straightforward method for quantifying the financial harm to [the plaintiff] that is traceable to the individual defendants' allegedly wrongful solicitation of the eleven at-issue customers. [Plaintiff] has not meaningfully contested the quantifiability of those losses." *Id.* at 619.

Similarly in this case, facultative reinsurance business lost by Aon to Alliant should be identifiable and quantifiable because it also involves allegedly wrongful solicitation of discrete, known (or knowable) customers. Policies transferred from Aon to Alliant can be identified, as can the new business generated by the Individual Defendants for Alliant. Further, as Alliant argues, damages experts frequently value businesses using accepted methodologies, such as discounted cash flows and applying market multiples, to compare the value of a book of business before and after a significant acquisition, or loss, of a substantial volume of business. Aon contends that the revenues Alliant gained are not a good proxy for Aon's losses because it took years of investment by Aon to develop some of its relationships and those costs may never be recouped, but that argument ignores the fact that the value of those investments, whether realized or not, is manifested in ***sales***. And, as noted above, the value of the sales lost due to the efforts of the defendants in this case can be measured. That Aon invested to obtain the business in question while Alliant didn't may mean that the business was more profitable for Alliant (which has avoided making similar investments to this point) but that says nothing about the availability of a methodology to value the profitability to Aon of that business had it not gone out the door. Aon has simply not provided any basis to conclude that its lost revenues from business diverted by the Individual Defendants to Alliant are incalculable.

Aon also maintains that Aon will lose goodwill as the result of the defection of a large number of its facultative reinsurance business producers. Given the size and prominence of Aon's reinsurance business (proffered during the hearing to be in excess of $2 billion annually), this argument merits skepticism, particularly where, as here, it is supported by a single reported statement from an unidentified person that "[REDACTED] would prefer to use [REDACTED COMPETITOR] for [a] renewal over aon the incumbent as no one seems to work there currently." Ex. E to Laing Supp. Decl., ECF No. 27-2. That is an extremely thin reed on which to base an argument that Aon will be irreparably harmed by a loss of goodwill after the defection of the Individual Defendants. Moreover, as alleged by Aon, the reputational harm evinced here appears to have flowed from the wide-scale April 2023 defection, which was not in itself violative of any of Aon's rights, rather than from any of the illicit conduct that Aon seeks to halt through an injunction.

Accordingly, the Court finds that Aon has not established that it will be irreparably harmed in the absence of the injunctive relief sought.

* * * * *

Because Aon has not demonstrated a likelihood of success on the merits of its claims or that it will suffer irreparable harm if the defendants' conduct is not enjoined, its motion for a TRO is denied. This ruling is without prejudice to the reassertion in a preliminary injunction motion of any arguments advanced in the TRO motion (or any additional arguments that may be developed) after the parties have had an opportunity to conduct discovery.

Dated: June 9, 2023

John J. Tharp, Jr.
United States District Judge